## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT NEBRASKA

| | |
|---|---|
| UNION PACIFIC RAILROAD COMPANY<br>1400 Douglas Street<br>Omaha, NE  68179 | : <br> : <br> : <br> : |
| Plaintiff, | :   Civil Action No. _____ <br> : |
| v. | : <br> : |
| BROTHERHOOD OF MAINTENANCE OF WAY<br>EMPLOYES DIVISION OF THE<br>INTERNATIONAL BROTHERHOOD OF<br>TEAMSTERS<br>41475 Gardenbrook Road<br>Novi, MI 48375 | : <br> : <br> : <br> : <br> : <br> : |
| Defendant | : <br> : |

## VERIFIED COMPLAINT FOR
## DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff, Union Pacific Railroad Company ("Union Pacific") brings this action to enforce the mandatory dispute resolution procedures of the Railway Labor Act, 45 U.S.C. §§ 151 *et seq.* ("RLA").  Defendant, Brotherhood of Maintenance of Way Employes Division/IBT ("BMWED" or the "Union") represents Union Pacific's maintenance of way employees.  Union Pacific and BMWED are presently engaged in the process of negotiating a new collective bargaining agreement.  Under the RLA, during the collective bargaining process the parties are prohibited from engaging in strikes, lockouts or other forms of "self-help" until they have been "released" by the National Mediation Board ("NMB").

In violation of its obligation to maintain the status quo, BMWED has threatened to call a strike by its members if Union Pacific does not accede to the Union's bargaining demands, including additional paid time off for employees affected by the COVID-19 pandemic. The Union's threat to strike violates its obligation to maintain the status quo during the bargaining

process and to exert every reasonable effort to make and maintain agreements and to avoid interruptions to commerce or to Union Pacific's operations.  45 U.S.C. § 152, First.  BMWED's threat to engage in the premature exercise of self-help against Union Pacific violates the RLA and should be enjoined.

The Federal Railroad Safety Act ("FRSA"), 49 U.S.C. § 20109(b)(1)(c) does not permit BMWED to strike over its bargaining demands.  Union Pacific's employees do not face any hazardous safety conditions that present an imminent risk of death or serious bodily injury, and the Union has alternatives to resolve the dispute without resorting to a strike.  BMWED has been corresponding with Union Pacific and other railroads concerning its demands for over ten months.  During this time, BMWED has had the option to seek an emergency order from the Federal Railroad Administration ("FRA") under 49 U.S.C. § 20104 if the Union believed that its members faced imminent danger because of COVID-related issues.  BMWED's failure to seek relief from the FRA, and its ability to resolve the dispute through means other than a strike, precludes a finding that any work stoppage it may call is protected under the FRSA.

## PARTIES

1.      Union Pacific is a Class I railroad that provides freight transportation services in 23 States in the western half of the United States.  Union Pacific's headquarters and principal place of business is 1400 Douglas Street, Omaha, Nebraska 68179.  Union Pacific is a "carrier" within the meaning of the RLA, 45 U.S.C. § 151, First.

2.      Defendant BMWED is an unincorporated labor organization in which employees participate and that exists for the purpose of, among other things, dealing with carriers pursuant to the RLA concerning rates of pay, rules and working conditions, including negotiation and administration of CBAs.  BMWED is a "representative" within the meaning of Section 1, Sixth

of the RLA, 45 U.S.C. § 151, Sixth.  BMWED represents Union Pacific employees in the craft or class of "Maintenance of Way Employees."

## JURISDICTION AND VENUE

3.      Jurisdiction exists pursuant to the RLA, 45 U.S.C. §§ 151-188 and 28 U.S.C. §§ 1331, 1337.

4.      Union Pacific and BMWED are both actively doing business within this Judicial District.

5.      Venue over this action properly lies in this Judicial District under 28 U.S.C. 1391(b)(1) and (2) because a substantial portion of the events giving rise to the claim took place in this Judicial District.

## THE BARGAINING PROCESS UNDER THE RLA

6.      Union Pacific and BMWED are parties to multiple collective bargaining agreements that, together with terms implied therein, govern the rates of pay, rules and working conditions of BMWED-represented employees of Union Pacific.

7.      Under the RLA, collective bargaining agreements do not "expire."  Rather, they become "amendable" after the expiration of a period of time, known as the "moratorium," during which the parties agree not to seek changes to their agreements.  The process of negotiating collective bargaining agreements is known as a "major dispute" under the RLA.

8.      The RLA's major dispute procedures, including the obligation to observe the status quo during the bargaining process, were described by the Supreme Court in *Brotherhood of R. R. Trainmen v. Jacksonville Terminal Co.*, 394 U.S. 369, 378 (1969) as follows:

> The Act provides a detailed framework to facilitate the voluntary settlement of major disputes.  A party desiring to effect a change of rates of pay, rules, or working conditions must give advance written notice.  § 6.  The parties must confer, § 2 Second, and if conference fails to resolve the dispute, either or both may invoke the services of the National Mediation Board, which may also proffer its services *sua sponte* if it finds a labor emergency to exist. § 5 First.  If mediation fails, the Board must endeavor to induce the

LEGAL\50194041\2

> parties to submit the controversy to binding arbitration, which can take place, however, only if both consent.  §§ 5 First, 7.  If arbitration is rejected and the dispute threatens 'substantially to interrupt interstate commerce to a degree such as to deprive any section of the country of essential transportation service, the Mediation Board shall notify the President', who may create an emergency board to investigate and report on the dispute.  § 10.  ***While the dispute is working its way through these stages, neither party may unilaterally alter the status quo.***  [i.e., the union may not strike] §§ 2 Seventh, 5 First, 6, 10.  (emphasis added).

9.      In the freight railroad industry, it is common for the large railroads to negotiate collective bargaining agreements on a national basis with multiple unions.  This is known as "national handling."  Union Pacific is a member of a multi-carrier collective bargaining group that is represented in the current round of national handling by the National Carriers' Conference Committee ("NCCC") of the National Railway Labor Conference ("NRLC").

10.     On or about November 1, 2019, NCCC, acting on behalf of several carriers including Union Pacific, served a formal notice under Section 6 of the RLA on BMWED beginning the bargaining and mediation process that will ultimately lead to a new agreement.  The formal notice to commence negotiations is known as a "Section 6 Notice."

11.     On or about November 4, 2019, BMWED served its own Section 6 Notice on the carriers represented by NCCC.  BMWED's Section 6 Notice includes demands for increase pay for BMWED-represented employees and demands for additional paid time off.

12.     Since the Section 6 Notices were served, NCCC and BMWED have been engaged in direct negotiations for the purpose of reaching a new agreement.  The parties remain in bargaining and have not reached agreement.  To date, neither NCCC nor BMWED has requested the mediation services of the NMB.

13.     During the period after the service of a Section 6 Notice under Section 6 of the RLA, 145 U.S.C. § 156, and prior to a release from bargaining by the NMB, the parties have a duty to maintain the status quo and to refrain from engaging in self-help, including any strikes or work stoppages under Sections 2 First and 6 of the RLA, 45 U.S.C. §§ 152 First and 156.

LEGAL\50194041\2

14.     Section 2 First of the RLA also imposes an affirmative duty on the parties to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes, whether arising out of the application of such agreements or otherwise, in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof.

### THE RESPONSE TO THE COVID-19 PANDEMIC

15.     On March 11, 2020, shortly after the emergence of the COVID-19 pandemic in the United States, the chief officers of multiple rail unions wrote to Brendan Branon, the Chairman of the NRLC, seeking a coordinated response from the NRLC's member railroads to the pandemic, including a request that the railroads follow guidelines of the Centers for Disease Control and Prevention ("CDC").  A copy of that letter is attached as Exhibit A.  In addition, the unions requested that all attendance policies be suspended, there be no discipline for employees who were required to quarantine, and that employees subject to quarantine receive paid leave. The unions also requested that railroads implement policies consistent with CDC guidelines for hand washing and sanitization of work spaces.

16.     On March 13, 2020, Mr. Branon responded to the unions' letter and informed the unions that the NRLC had been "actively monitoring the health threat posed by the spread of the COVID-19 virus," and that "Our member carriers have been working closely with their medical experts to implement and maintain prevention and response measures that are consistent with CDC recommendations and guidance and that appropriately safeguard employees and operations." A copy of that letter is attached as Exhibit B. Mr. Branon also advised the unions to raise specific questions with the individual carriers.

17.     On March 19, 2020, BMWED's President, Freddie Simpson, wrote to Union Pacific's Chairman and CEO, Lance Fritz, requesting that Union Pacific provide "copies of its preventative and response plans and any related policies regarding attendance for BMWED-represented maintenance of way employees.  A copy of that letter is attached as Exhibit C.

5

18.     By letter dated March 30, 2020, Union Pacific's Vice President, Mechanical and Engineering, Eric Gehringer, responded to Mr. Simpson.  A copy of that letter is attached as Exhibit D.  Mr. Gehringer explained that Union Pacific was "endeavoring to follow the Centers for Disease Control and Prevention (CDC) Guidelines," and provided a link to Union Pacific's practices and policies that provided "instructions such as travel guides, social distancing policy, cleaning protocols" and other materials.  Mr. Gehringer also explained that "as the situation is fluid, we are constantly updating this site."  In addition, Mr. Gehringer reminded Mr. Simpson that Union Pacific had "established a daily call with its senior staff and all General Chairmen to share the most up to date information and to hear concerns and issues" raised by the unions.

19.     Among other measures aimed at preventing the spread of COVID-19, Union Pacific has adopted policies governing employees who believe they have been exposed to COVID-19 and those who test positive for the virus.  In late March, Union Pacific adopted a policy providing up to 14 days of paid time off for employees who were directed to self-quarantine due to a workplace exposure to COVID-19.  Union Pacific also adopted policies requiring social distancing and the use of facial coverings in public settings.

20.     On March 20, 2020, two rail labor unions – the Brotherhood of Locomotive Engineers and Trainmen ("BLET") and the International Association of Sheet Metal, Air, Rail and Transportation Workers – Transportation Division ("SMART-TD") filed a petition with the FRA under 49 U.S.C. § 20104 seeking an emergency order "to address safety conditions arising from the novel coronavirus (COVID-19) emergency" and to "standardize and define the best protocols across the industry for the mitigation of the spread of the virus and the protection of employees."  A copy of that petition is attached as Exhibit E.  In that petition BLET and SMART-TD requested that the FRA issue an emergency order imposing requirements for locomotive sanitation, common room sanitation and the provision of hand sanitizer, temperature scanning of employees, lodging and meals for employees at so-called "away from home terminals," cleaning of vehicles used for transportation of train crews, responses to employees who develop COVID-19 symptoms and the recall of employees from furlough.

6

21.    In response to the petition from BLET and SMART-TD, on April 10, 2020 the

FRA issued a Safety Advisory that encouraged railroads to follow all applicable guidance from

the CDC and to develop and implement procedures that incorporate best practices in railroad

operations.  The FRA denied BLET and SMART-TD's petition for an emergency order at that

time.  A copy of the FRA's letter is attached as Exhibit F.  The FRA explained that "Although

FRA believes that many safety precautions included in the Petitions could constitute best

practices that should be applied in the railroad industry, FRA does not believe that an emergency

order is justified."  Specifically, the FRA explained:

> 49 U.S.C. § 20104 authorizes FRA to issue an emergency order
> when an "unsafe condition or practice, or a combination of unsafe
> conditions and practices, causes an emergency situation involving
> a hazard of death, personal injury, or significant harm to the
> environment."  Although COVID-19 presents challenges to ensure
> that railroad employees and passengers are protected from the
> spread of the virus, those challenges are not unique to the railroad
> industry, and thus not the type of rail safety issue where FRA
> would typically exercise its emergency order authority.

The FRA further explained that it had taken a number of measures to mitigate the impact of

COVID-19 on railroad employees and operations, including activating its emergency relief

docket to provide waivers from certain regulatory requirements "to ensure railroad operations, to

the extent possible, are carried out consistent with the CDC's recommendations for social

distancing and limiting the touching of common surfaces."

22.    Following its exchange of correspondence with BMWED in late March, Union

Pacific continued to provide regular updates on COVID-19 developments and the Company's

continued efforts to mitigate the spread of COVID-19 to the BMWED officers representing

Union Pacific employees.  BMWED did not raise any concerns about Union Pacific's response

to the COVID-19 pandemic until July.

LEGAL\50194041\2

23.     On July 2, 2020, BMWED's President sent another letter to Union Pacific's Chairman and CEO enclosing a "white paper" outlining a number of steps the Union believed were necessary to protect employees.  A copy of that letter is attached as Exhibit G.

24.     Union Pacific responded to Mr. Simpson's letter in a letter dated July 14, 2020 from Union Pacific's Vice President, Labor Relations, Rodney Doerr.  A copy of that letter is attached as Exhibit H.  Mr. Doerr explained that Union Pacific has "a Pandemic Team made up of our Chief Medical Officer, Occupational Health Nurses, Industrial Hygienists and many others assembled that constantly assess the latest information from government, both State and Federal, along with the CDC and WHO.  Union Pacific's programs comply with CDC guidelines."

25.     By letter dated July 21, 2020, BMWED's President responded to Mr. Doerr.  A copy of that letter is attached as Exhibit I.  In that letter, BMWED demanded that Union Pacific implement specific protocols in three areas: (1) testing of BMWED-represented employees once per month with paid leave for any employee who tests positive; (2) temperature screening with a requirement that employees with a temperature greater than 100.4° be sent home and receive paid leave; and (3) contact tracing with a requirement that employees who had contact with a co-worker who tested positive for COVID-19 be quarantined with pay.

26.     On September 24, 2020, BMWED sent another letter alleging that Union Pacific had not adopted adequate protocols for protecting employees from the spread of COVID-19 and demanded that Union Pacific implement protocols outlined in BMWED's white paper for personal protective equipment, hand hygiene, disinfection and maintenance, leave policies, physical distancing, shared workspaces and training and education.  A copy of that letter is attached as Exhibit J.

27.     Union Pacific responded to BMWED by letter dated October 6, 2020, a copy of which is attached as Exhibit K.  In that letter, Mr. Doerr assured the Union that Union Pacific "accepts your feedback and will make a number of your suggested changes."  However, Mr. Doerr explained, "Based on both internal and external medical experts, Union Pacific will not

8

advance several BMWED outlined recommendations as they would have the detrimental effect of creating an atmosphere of false security."

## THE CURRENT DISPUTE

28.     On December 18, 2020, BMWED threatened to strike Union Pacific over its previous demands.  On that date, Union Pacific received a letter from BMWED General Chairman, Tony Cardwell.  A copy of that letter is attached as Exhibit L.  In that letter, BMWED demanded that Union Pacific adopt six (6) different measures, including:

1.     "Continuation of Pay" to provide paid time off to employees "who are not working for any Covid-19 related reason," such as "being treated for the infection, quarantining because of being exposed to some who has Covid-19, obtaining a test, traveling to and from the test and waiting for the test results, and any other Covid-19 related reason for absence."  BMWED also took the position that "Continuation of pay as if they were working means in addition to lost straight time wages any overtime they would have been entitled to work and continuation of other benefits including, but not limited to, health and retirement credits."

2.     "Access to Testing," including providing on the job tests for COVID-19 "on company time."  BMWED demanded that employees "be paid while waiting for the results," and also pay employees for time spent traveling to and from any offsite testing and waiting for test results.

3.     "Temperature Testing," which essentially reiterated BMWED's earlier demand that Union Pacific screen all employees prior to the start of their shift, and send home with pay any employee whose temperature exceeds 100.4°.

4.     "Contact Tracing," including a demand that all employees who had any contact with a workplace exposure be quarantined with pay for 14 days and test negative before returning to work.

5.     "PPE and Sanitation Supplies," including a demand that employee be "furnished new face masks and hand cleaner each workday" and daily sanitization of all vehicles, machines and locker rooms, and a demand that employees "will continue to be paid in the event that PPE or proper sanitation is not provided."

6.     "Social Distancing," requiring "social distancing in locker rooms, vehicles and machines at all times"

29.     BMWED concluded its letter stating, "If UP does not rectify the situation within ten days from receipt of this letter, BMWED will declare a health and safety emergency because

of the imminent threat to its members of serious injury or death, and will call for a cessation of work if UP does not take the necessary corrective actions."

30.     On Saturday, December 19, 2020, Rodney Doerr, Union Pacific's Vice President, Labor Relations, spoke to BMWED's Director of Strategic Coordination and Research Peter Kennedy, BMWED General Chairman Tony Cardwell, and BMWED Vice President, Louis Below.  During that call, Mr. Doerr inquired whether the Union would be willing to discuss possible resolution of the concerns raised in the Union's letter.  BMWED's representatives refused to discuss any resolution and stated that the Union's position was set forth in its letter.

### IMMEDIATE AND IRREPARABLE HARM

31.     A work stoppage by BMWED would cause a shutdown of Union Pacific's rail system and would cause immediate and irreparable harm to Union Pacific, its customers and the public.

32.     Union Pacific is the largest carrier of finished automobiles west of the Mississippi River and operates or has access to 38 distribution centers. Union Pacific's extensive franchise directly serves five vehicle assembly plants and connects to West Coast ports, Mexico gateways, and the Gulf of Mexico to accommodate both import and export shipments. Approximately 70 percent of all new vehicles use rail for delivery, with Union Pacific handling more than 60 percent of the western U.S. rail automotive market share.  Because U.S. automobile manufacturing facilities operate on a "just-in-time" basis, and have little room for storage of finished vehicles, a disruption of Union Pacific's inbound or outbound rail transportation would cause immediate disruption to U.S. automobile manufacturing plants.

33.      The same is true for other manufacturers.  Union Pacific serves many manufacturers that rely on the timely deliveries of parts or supplies, and for outbound transportation of finished goods.  These facilities largely operate on a just-in-time inventory basis and have limited capacity to store finished goods.  Accordingly, any disruption to Union Pacific's operations would cause immediate disruption to the many manufacturers that rely on

LEGAL\50194041\2

Union Pacific.  Union Pacific is also a major shipper of grain, transporting grain and grain products from the Midwest to domestic markets and for export to Mexico through ports in the Gulf Coast and Pacific Northwest.  Union Pacific currently is in the middle of its peak grain shipment season and a disruption to Union Pacific's operations would impact the availability of grain and grain products.

34.     Another key industry served by Union Pacific is coal.  Union Pacific handles hundreds of daily shipments of coal from the Powder River Basin to utility companies such as Ameren, American Electric Power and Wisconsin Electric that are responsible for providing electricity, including heating and air conditioning, for millions of homes and businesses.  Coal is not shipped by truck in sufficient quantity to keep coal-fired utility plants in operation, and many such plants maintain only a few days of coal supply.  Union Pacific is directly responsible for servicing mines in the following major U.S. coal basins: the Southern Powder River basin, the Uinta basin in Colorado and Utah, the Illinois basin, and the Hanna basin in Southern Wyoming. This year, Union Pacific will ship approximately 85 million tons of coal. Any disruption of the "coal pipeline" would cause immediate and irreparable harm to Union Pacific, to the customers who rely on Union Pacific, and to the public, which would result in additional ill-effects long after the service disruption ended.  A prolonged work stoppage would affect the ability of the utilities served by Union Pacific to generate sufficient electricity to serve millions of their customers.

35.     Union Pacific also transports commodities that are essential to the U.S. economy and for public health and safety.  These commodities include: medical grade plastic, water purification chemicals, chlorine, steel and other metals, ethanol, perishable and refrigerated food, gas and oil.  Many of these commodities cannot be shipped by truck because of safety concerns or because the volume of the commodities are too great for truck transportation.  A work stoppage that disrupts Union Pacific's rail operations would have an immediate impact on the many industries that rely on Union Pacific to deliver these essential commodities and on the public that these industries serve.

11

36.     Union Pacific's rail network connects 23 states in the western two-thirds of the country.  Union Pacific serves many of the largest and fastest-growing U.S. population centers, operates from all major West Coast and Gulf Coast ports to eastern gateways, connects with Canada's rail systems, and is the only railroad serving all six major Mexico gateways.  Union Pacific connects with other major U.S. freight railroads in Chicago, Kansas City, St. Louis and many other U.S. gateways.  Any service problem at any one of these interchange points will immediately affect traffic not only across Union Pacific's 23-state system, but also across the country.  A job action on the Union Pacific will necessarily adversely affect the nation's other major railroad. The effects of a job action against Union Pacific also would extend internationally.  In 2019, approximately 40% of Union Pacific freight originated or terminated outside of the U.S., and a disruption to operations would impact the global supply chain, of which Union Pacific is a critical link

37.     A work stoppage would also cause severe financial harm to Union Pacific. For the twelve-month period ending September 30, 2020, Union Pacific generated approximately $54 million per day of operating revenue from more than 21,000 freight shipments per day. Transportation services cannot be stockpiled.  Any disruption to Union Pacific's daily shipment of freight would cost Union Pacific tens of millions of dollars per day in lost revenue. Customers who are able to find alternative means of shipment may never return.

### COUNT I – UNLAWFUL EXERCISE OF SELF-HELP

38.     Union Pacific incorporates by reference as if fully set forth herein each and every allegation of the preceding Paragraphs.

39.     This Cause of Action arises under Sections 2 First and 6 of the RLA, 45 U.S.C. §§152 First, 156.

40.      Union Pacific and BMWED are currently engaged in bargaining for a new collective bargaining agreement.  The parties have not yet sought the mediation services of the NMB and have not been released from bargaining by the NMB.

LEGAL\50194041\2

41.     While the parties are engaged in the bargaining process, the RLA requires the parties to maintain the status quo and prohibits BMWED from engaging in self-help.

42.     BMWED's demands for additional paid time off is an economic demand that must be made through the mandatory collective bargaining process of the RLA.  The Union is not seeking to trade or exchange existing paid time off provisions such as vacations or holidays for a provision allowing employees to be paid for COVID-related absences.  Rather, the Union is demanding additional paid time off.  BMWED does not have a right to engage in self-help to force Union Pacific to accede to its demands.

43.     Union Pacific has at all times been willing to comply with the mandatory collective bargaining procedures of the RLA and has exercised and is continuing to exercise all reasonable efforts to resolve this dispute with BMWED.

44.     Union Pacific has not adequate remedy at law.

45.     As to each item of relief sought herein, greater injury will be inflicted on the public and on Union Pacific if such relief is denied than will be inflicted on BMWED by the granting thereof.

**COUNT II – BREACH OF SECTION 2 FIRST**

46.     Union Pacific incorporates by reference as if fully set forth herein each and every allegation of the preceding Paragraphs.

47.     This Cause of Action arises under Section 2 First of the RLA, 45 U.S.C. §152 First.

48.     Section 2 First imposes an affirmative duty on the parties:
> to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes, whether arising out of the application of such agreements or otherwise, in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof.

45 U.S.C. §152 First.

49.     BMWED has breached its duty under Section 2 First to maintain its existing collective bargaining agreement with Union Pacific by threatening to exercise self-help against Union Pacific prior to a release from mediation by the NMB.  A strike by the Union against Union Pacific would cause substantial disruption to Union Pacific and to the national freight transportation system.

50.     Union Pacific has been willing at all times to comply with its duties under Section 2 First and has exercised and is continuing to exercise reasonable efforts to resolve this dispute with BMWED.

51.     Union Pacific has exhausted all available remedies under the RLA to prevent the unlawful activity and has no adequate remedy at law.

52.     As to each item of relief sought herein, greater injury will be inflicted on the public and on Union Pacific if such relief is denied than will be inflicted upon BMWED by the granting thereof.

## COUNT III - FRSA

53.     Union Pacific incorporates by reference as if fully set forth herein each and every allegation of the preceding Paragraphs.

54.     This cause of action arises under Section 20109(b)(1)(C) and (2) of the FRSA, 49 U.S.C. §  20109(b)(1)(C) and (2).

55.     There exists a current, live and ripe controversy that warrants declaratory relief from this Court.

56.     The FRSA provides that an employee may refuse to perform work when confronted with a hazardous safety condition that creates "an imminent risk of death or serious injury."  To constitute a protected refusal to work, the statue prescribes specific requirements that must be met.  Specifically, the FRSA provides that a refuse to work is protected if:

> (A)     the refusal is made in good faith and no reasonable alternative to the refusal is available to the employee;

14

(B)     a reasonable individual in the circumstances then confronting the employee would conclude that –

(i)     the hazardous condition presents an imminent danger of death or serious injury; and

(ii)     the urgency of the situation does not allow sufficient time to eliminate the danger without such refusal; and

(C)     the employee, where possible, has notified the railroad carrier of the existence of the hazardous condition and the intention not to perform further work … unless the condition is corrected immediately

49 U.S.C. § 20109(b)(2).

57.     BMWED cannot establish that its threatened work stoppage meets the requirements of the FRSA.

58.     Employees represented by BMWED do not face an "imminent danger of death or serious injury."  Union Pacific has taken and continues to take necessary action to protect employees against the spread of COVID-19 in the workplace, and follows CDC guidelines for protecting its employees.

59.     BMWED cannot establish that the urgency of the situation does not allow sufficient time to eliminate the danger without a refusal.  BMWED and Union Pacific have been engaged in discussions and correspondence regarding the impact of COVID-19 in the workplace since March 2020.  Several of the demands in BMWED's letter dated December 17, 2020 have been presented before, including demands for temperature screening and additional contact tracing.  Union Pacific has offered and continues to offer to meet with BMWED to discuss its concerns and additional actions that may be implemented to address those concerns.  There is no urgency that would justify a refusal to work.

60.     BMWED has reasonable alternatives to a work stoppage available to it to address its concerns.  The FRSA includes a specific provision allowing the FRA to issue an emergency order to address allegedly hazardous conditions.  Section 20104 of the FRSA provides that if the Secretary of Transportation "decides that an unsafe condition or practice, or a combination of

15

unsafe conditions and practices, causes an emergency situation involving a hazard of death, personal injury, or significant harm to the environment, the Secretary immediately may order restrictions and prohibitions … that may be necessary to abate the situation." 49 U.S.C. § 20104(a)(1). The statute further provides that if the Secretary fails to issue such an order, a railroad employee or the employee's representative may bring suit in federal district court to compel the Secretary to do so. BMWED has failed to avail itself of the potential remedy for its alleged safety concerns provided by the process set forth in Section 20104 despite having ample opportunity over the course of months to do so.

## PRAYER FOR RELIEF

WHEREFORE, Union Pacific respectfully requests that the Court grant the following relief:

1.      Issue a Judgment declaring that BMWED's threatened use of self-help against Union Pacific violates Sections 2 First and 6 of the RLA, 45 U.S.C. §§ 152 First and 156;

2.      Issue a Judgment declaring that BMWED's participation in and encouragement of a strike against Union Pacific violates the RLA by seeking to circumvent the mandatory and exclusive authority of the NMB;

3.      Issue a Judgment declaring that by exercising self-help before the exhaustion of the RLA's major dispute procedures, BMWED has breached its obligation to maintain the status quo;

4.      Issue a Judgment declaring that BMWED's threatened work stoppage is not a protected refusal to work under Section 20109(b)(1)(C) and (2) of the FRSA;

5.      Issue an Injunction restraining and enjoining Defendant, individually and as officers or members and representatives of all members of the defendant labor organization, its agents, successors, deputies, servants, and employees, and all persons acting by, with, through or

LEGAL\50194041\2

under Defendant, or by and through Defendant's orders, and all others acting in concert or participation with Defendant:

a) from calling, instigating, authorizing, seeking authorization for, encouraging, participating in, approving or continuing any strike, work stoppage, "sick-out," or slowdown against Union Pacific or any other rail carrier affiliated with Union Pacific, and all acts in furtherance or in support thereof;

b) from taking any action that has the purpose or effect of disrupting Union Pacific's operations, including but not limited to engaging in a strike;

c) from failing to report for work unless otherwise excused under existing collective bargaining agreements and applicable work rules;

d) from interfering with ingress to and egress from said premises by Union Pacific employees and other persons having business with Union Pacific, including the delivery, unloading, dispatch and movement of rolling stock and equipment and the contents thereof;

e) from seeking to resolve the major dispute with Union Pacific by any means (including picketing, patrolling or economic pressure of any kind) other than by pursuing the major dispute resolution procedures contained in the RLA;

f) from exercising self-help until exhaustion of the RLA's major dispute procedures; and

g) directing the said defendant and said other persons to take all steps within their power to prevent said strike, work stoppage, "sick-out," or slowdown, and all acts in furtherance or in support thereof from occurring or from continuing;

6. Order BMWED to pay the costs of these proceedings, including reasonable attorneys' fees; and

7.      Grant Union Pacific such other and further relief as the Court may deem proper

and just in the circumstances.

Respectfully submitted,

 /s/ Jacquelyn V. Clark
   JACQUELYN V. CLARK
   Union Pacific Railroad
   1400 Douglas Street STOP 1580
   Omaha, NE 68179
   (402) 544-3078 (phone)
   jvclark@up.com

   ROBERT S. HAWKINS (*pro hac vice pending*)
   ANDREW J. ROLFES (*pro hac vice pending*)
   COZEN O'CONNOR
   1650 Market Street, Suite 2800
   Philadelphia, PA   19103
   (215) 665-2015 (phone)
   (215) 717-9535 (fax)
   rhawkins@cozen.com
   arolfes@cozen.com

   Counsel for Plaintiff
   Union Pacific Railroad Company

Date:   December 20, 2020

18

**VERIFICATION**

I, Rodney Doerr, am employed by Union Pacific Railroad Company ("Union Pacific") as Vice President, Labor Relations, and I am authorized to execute this Verification on behalf of Union Pacific.  I hereby verify that I have read the foregoing Verified Complaint for Declaratory and Injunctive Relief, and that the averments contained therein are true and correct to the best of my knowledge, information and belief.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 20th day of December, 2020.

_____
RODNEY DOERR