## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNION PACIFIC RAILROAD CO. | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No:  8:20-cv-00516 |
| | : | |
| BROTHERHOOD OF MAINTENANCE OF | : | |
| WAY EMPLOYES DIVISION/IBT | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

The issue presented by Plaintiff's Emergency Motion for a Temporary Restraining Order and Preliminary Injunction is whether the Court should enforce the mandatory dispute resolution procedures of the Railway Labor Act 45 U.S.C. §§ 151 *et seq.* ("RLA") by enjoining Defendant Brotherhood of Maintenance of Way Employes Division/IBT ("BMWED" or "Union") from commencing an illegal strike against Union Pacific Railroad Company ("Union Pacific") a Class I rail carrier, where, as here, (1) BMWED's threatened use of self-help represents a blatant violation of the RLA; (2) the Federal Railroad Safety Act, 49 U.S.C. § 20109, (the "FRSA") does not exempt BMWED from the requirements of the RLA; (3) the Norris-LaGuardia Act, 29 U.S.C. §§101-115, does not bar the issuance of injunctive relief; and (4) BMWED's threatened work stoppage would result in severe and irreparable harm not only to Union Pacific but also to the public, including many shippers that depend on Union Pacific for timely and uninterrupted rail service.

I.        INTRODUCTION AND SUMMARY

On December 18, 2020, BMWED threatened to call a strike against Union Pacific on December 27, 2020 unless Union Pacific accedes to BMWED's demands that include additional paid time off (including overtime) for employees affected by the COVID-19 pandemic and other issues related to Union Pacific's protocols for addressing the pandemic.[1]  All of the demands made by BMWED affect employees' rates of pay, rules and working conditions, and are therefore subject to the RLA's mandatory collective bargaining process.  BMWED's threat to strike in support of its demands violates the Union's obligations under Section 6 of the RLA, 45 U.S.C. § 156, to maintain the status quo during the parties' ongoing collective bargaining process and under Section 2 First of the RLA, 45 U.S.C. § 2 First, to exert every reasonable effort to make and maintain agreements and to avoid interruptions to commerce or to Union Pacific's operations.  BMWED's threats to engage in the premature exercise of self-help against Union Pacific violate the RLA and should be enjoined.

To justify its strike threat, the Union purports to rely on the FRSA.  However, the FRSA simply protects employees from retaliation following a refusal to work if the employee is faced with a hazardous safety condition that presents an imminent risk of death or serious bodily injury and the employee has no alternative but to refuse to work.  The anti-retaliation provision of the FRSA does not provide a labor union an alternative method to alter employees' wages and terms

---

[1] BMWED's advance notice of its intent to initiate a work stoppage presumably was given pursuant to a permanent injunction issued by the U.S. District Court for the Northern District of Texas, affirmed by the Court of Appeals for the Fifth Circuit, requiring BMWED to give certain Class I rail carriers, including Union Pacific, at least ten (10) days advance notice of intent to strike.  *Burlington Northern & Santa Fe Ry. Co. v. BMWED*, 143 F. Supp. 2d 672, aff'd, 286 F.2d 803 (5th Cir. 2002), cert. denied, 537 U.S. 1172 (2003).  BMWED is the only national rail union subject to such a permanent injunction, which was issued following BMWED's lengthy history of calling strikes later deemed unlawful under the RLA.

of employment.  On the contrary, the FRSA provides a mechanism by which employees or their representatives may seek an emergency order from the Federal Railroad Administration ("FRA"), the agency charged with ensuring workplace safety in the railroad industry, to address any unsafe conditions or practices that create a hazard of death or personal injury.  49 U.S.C. § 20104.  BMWED has had ample time to bring its concerns to the FRA and seek an emergency order to remedy them.  The Union has not done so.  Its failure to do so precludes a finding that any work stoppage is protected under the FRSA.

BMWED also is unable to demonstrate an "imminent" danger of death or serious injury where the "urgency of the situation" does not allow for any alternative but a refusal to work. BMWED has been pursuing many of its demands for months.  The section of the FRSA on which BMWED would rely is an anti-discrimination statute, designed to adjudicate and remedy discrete claims of employment discrimination.  The proper channel for seeking system-wide policy changes is collective bargaining or a request for an emergency order by the FRA pursuant to 49 U.S.C. § 20104 – not self-help in derogation of the fundamental purposes of the RLA.

Union Pacific satisfies each of the factors necessary for injunctive relief.  BMWED's threatened work stoppage plainly violates its obligations under Sections 6 and 2 First of the RLA.  Failure to enjoin BMWED's threatened work stoppage would result in massive economic damage to Union Pacific's customers and the states in which they operate, as well as Union Pacific itself.  Contrasted with the grave harm inflicted if BMWED is permitted to strike, enjoining the threatened strike will preserve the status quo so that the parties may attempt to peaceably resolve their dispute, either through direct negotiations or in proceedings before the FRA.

3

Finally, the Norris-LaGuardia Act does not bar the grant of relief in this case, as courts have long recognized the need to harmonize federal labor statutes and have issued strike injunctions where, as here, an injunction is necessary to effectuate the core purpose of the RLA to avoid interruptions to interstate commerce.

II.        STATEMENT OF FACTS

        A.        The Parties.

Union Pacific is a Class I railroad that provides freight transportation services in 23 States in the western half of the United States.  (Doc. #1, Complaint at 2, ¶ 1).[2] Union Pacific's headquarters and principal place of business is 1400 Douglas Street, Omaha, Nebraska 68179. Union Pacific is a "carrier" within the meaning of the RLA, 45 U.S.C. § 151, First.  (*Id.*).

Defendant BMWED is an unincorporated labor organization in which employees participate and that exists for the purpose of, among other things, dealing with carriers pursuant to the RLA concerning rates of pay, rules and working conditions, including negotiation and administration of CBAs.  (Doc. #1, Complaint at 2-3, ¶ 2).  BMWED is a "representative" within the meaning of Section 1, Sixth of the RLA, 45 U.S.C. § 151, Sixth.  (*Id.*). BMWED represents Union Pacific employees in the craft or class of "Maintenance of Way Employees." (*Id.*).

        B.        Union Pacific And BMWED Are Currently Engaged In Negotiations For A New
                Collective Bargaining Agreement.

In the freight railroad industry, it is common for the large railroads to negotiate collective bargaining agreements on a national basis with multiple unions.  (Doc. #1, Complaint at 4, ¶ 9). This is known as "national handling."  (*Id.*). Union Pacific is a member of a multi-carrier collective bargaining group that is represented in the current round of national handling by the

---

[2] Citations herein to the Verified Complaint and Exhibits to the Verified Complaint reference the document number and the sequential page ID number.

National Carriers' Conference Committee ("NCCC") of the National Railway Labor Conference ("NRLC"). (*Id.*).

On or about November 1, 2019, NCCC, acting on behalf of several carriers including Union Pacific, served a formal notice under Section 6 of the RLA on BMWED beginning the bargaining and mediation process that will ultimately lead to a new agreement. (Doc. #1, Complaint at 4, ¶ 10). The formal notice to commence negotiations is known as a "Section 6 Notice." (*Id.*).

On or about November 4, 2019, BMWED served its own Section 6 Notice on the carriers represented by NCCC. (Doc. #1, Complaint at 4, ¶ 11). BMWED's Section 6 Notice includes demands for increase pay for BMWED-represented employees and demands for additional paid time off. (*Id.*).

Since the Section 6 Notices were served, NCCC and BMWED have been engaged in direct negotiations for the purpose of reaching a new agreement. (Doc. #1, Complaint at 4, ¶ 12). The parties remain in bargaining and have not reached agreement. (*Id.*). To date, neither NCCC nor BMWED has requested the mediation services of the National Mediation Board. (*Id.*).

C.     Union Pacific's Response to the COVID-19 Pandemic

On March 11, 2020, shortly after the emergence of the COVID-19 pandemic in the United States, the chief officers of multiple rail unions wrote to Brendan Branon, the Chairman of the National Rail Labor Conference ("NLRC"), which represents a multi-carrier collective bargaining group including Union Pacific in the current round of national handling, seeking a coordinated response from the NRLC's member railroads to the pandemic, including a request that the railroads follow guidelines of the Centers for Disease Control and Prevention ("CDC").

(Doc. #1-1, March 11, 2020 letter at 21-22). In addition, the unions requested that all attendance policies be suspended, there be no discipline for employees who were required to quarantine, and that employees subject to quarantine receive paid leave. (*Id.*). The unions also requested that railroads implement policies consistent with CDC guidelines for hand washing and sanitization of work spaces. (*Id.*). On March 13, 2020, Mr. Branon responded to the unions' letter and informed the unions that the NRLC had been "actively monitoring the health threat posed by the spread of the COVID-19 virus," and that "Our member carriers have been working closely with their medical experts to implement and maintain prevention and response measures that are consistent with CDC recommendations and guidance and that appropriately safeguard employees and operations." (Doc. #1-2, March 13, 2020 letter at 25).  Mr. Branon also advised the unions to raise specific questions with the individual carriers. (*Id.*).

On March 19, 2020, BMWED's President, Freddie Simpson, wrote to Union Pacific's Chairman and CEO, Lance Fritz, requesting that Union Pacific provide "copies of its preventative and response plans and any related policies regarding attendance for BMWED-represented maintenance of way employees. (Doc. #1-3, March 19, 2020 letter at 28).  By letter dated March 30, 2020, Union Pacific's Vice President, Mechanical and Engineering, Eric Gehringer, responded to Mr. Simpson. (Doc. #1-4, March 30, 2020 letter at 35).  Mr. Gehringer explained that Union Pacific was "endeavoring to follow the Centers for Disease Control and Prevention (CDC) Guidelines," and provided a link to Union Pacific's practices and policies that provided "instructions such as travel guides, social distancing policy, cleaning protocols" and other materials. (*Id.*). Mr. Gehringer also explained that "as the situation is fluid, we are constantly updating this site."  In addition, Mr. Gehringer reminded Mr. Simpson that Union Pacific had "established a daily call with its senior staff and all General Chairmen to share the

6

most up to date information and to hear concerns and issues" raised by the unions.  (*Id.*).  Among other measures aimed at preventing the spread of COVID-19, Union Pacific has adopted policies governing employees who believe they have been exposed to COVID-19 and those who test positive for the virus.  (Doc. #1, Complaint at 6, ¶ 19).  In late March, Union Pacific adopted a policy providing up to 14 days of paid time off for employees who were directed to self-quarantine due to a workplace exposure to COVID-19.  (*Id.*).  Union Pacific also adopted policies requiring social distancing and the use of facial coverings in public settings.  (*Id.*).

On March 20, 2020, two rail labor unions – the Brotherhood of Locomotive Engineers and Trainmen ("BLET") and the International Association of Sheet Metal, Air, Rail and Transportation Workers – Transportation Division ("SMART-TD") filed a petition with the FRA under 49 U.S.C. § 20104 seeking an emergency order "to address safety conditions arising from the novel coronavirus (COVID-19) emergency" and to "standardize and define the best protocols across the industry for the mitigation of the spread of the virus and the protection of employees." (Doc. #1-5, Petition at 37-38).  In that petition BLET and SMART-TD requested that the FRA issue an emergency order imposing requirements for locomotive sanitation, common room sanitation and the provision of hand sanitizer, temperature scanning of employees, lodging and meals for employees at so-called "away from home terminals," cleaning of vehicles used for transportation of train crews, responses to employees who develop COVID-19 symptoms and the recall of employees from furlough. (*Id.* at 38-43).  In response to the petition from BLET and SMART-TD, on April 10, 2020 the FRA issued a Safety Advisory that encouraged railroads to follow all applicable guidance from the CDC and to develop and implement procedures that incorporate best practices in railroad operations.  (Doc. #1, Complaint at 7, ¶ 21).  The FRA denied BLET and SMART-TD's petition for an emergency order at that time.  (Doc. #1-6, April

10, 2020 letter).  The FRA explained that "Although FRA believes that many safety precautions

included in the Petitions could constitute best practices that should be applied in the railroad

industry, FRA does not believe that an emergency order is justified."  (*Id.* at 46).  Specifically,

the FRA explained:

> 49 U.S.C. § 20104 authorizes FRA to issue an emergency order
> when an "unsafe condition or practice, or a combination of unsafe
> conditions and practices, causes an emergency situation involving
> a hazard of death, personal injury, or significant harm to the
> environment."  Although COVID-19 presents challenges to ensure
> that railroad employees and passengers are protected from the
> spread of the virus, those challenges are not unique to the railroad
> industry, and thus not the type of rail safety issue where FRA
> would typically exercise its emergency order authority.

The FRA further explained that it had taken a number of measures to mitigate the impact of

COVID-19 on railroad employees and operations, including activating its emergency relief

docket to provide waivers from certain regulatory requirements "to ensure railroad operations, to

the extent possible, are carried out consistent with the CDC's recommendations for social

distancing and limiting the touching of common surfaces."  (*Id.*).

Following its exchange of correspondence with BMWED in late March, Union Pacific

continued to provide regular updates on COVID-19 developments and the Company's continued

efforts to mitigate the spread of COVID-19 to the BMWED officers representing Union Pacific

employees.  (Doc. #1, Complaint at 7, ¶ 22).  BMWED did not raise any concerns about Union

Pacific's response to the COVID-19 pandemic until July.  (*Id.*).  On July 2, 2020, BMWED's

President sent another letter to Union Pacific's Chairman and CEO enclosing a "white paper"

outlining a number of steps the Union believed were necessary to protect employees.  (Doc. #1-

7, July 2, 2020 letter at 49).  Union Pacific responded to Mr. Simpson's letter in a letter dated

July 14, 2020 from Union Pacific's Vice President, Labor Relations, Rodney Doerr.  (Doc. #1-8,

July 14, 2020 letter at 64). Mr. Doerr explained that Union Pacific has "a Pandemic Team made up of our Chief Medical Officer, Occupational Health Nurses, Industrial Hygienists and many others assembled that constantly assess the latest information from government, both State and Federal, along with the CDC and WHO. Union Pacific's programs comply with CDC guidelines." (*Id.*). By letter dated July 21, 2020, BMWED's President responded to Mr. Doerr. (Doc. #1-9 at 67-68). In that letter, BMWED demanded that Union Pacific implement specific protocols in three areas: (1) testing of BMWED-represented employees once per month with paid leave for any employee who tests positive; (2) temperature screening with a requirement that employees with a temperature greater than 100.4° be sent home and receive paid leave; and (3) contact tracing with a requirement that employees who had contact with a co-worker who tested positive for COVID-19 be quarantined with pay. (*Id.*).

On September 24, 2020, BMWED sent another letter alleging that Union Pacific had not adopted adequate protocols for protecting employees from the spread of COVID-19 and demanded that Union Pacific implement protocols outlined in BMWED's white paper for personal protective equipment, hand hygiene, disinfection and maintenance, leave policies, physical distancing, shared workspaces and training and education. (Doc. #1-10, September 24, 2020 letter). Union Pacific responded to BMWED by letter dated October 6, 2020. (Doc. #1-11, October 6, 2020 letter at 75). In that letter, Mr. Doerr assured the Union that Union Pacific "accepts your feedback and will make a number of your suggested changes." (*Id.*). However, Mr. Doerr explained, "Based on both internal and external medical experts, Union Pacific will not advance several BMWED outlined recommendations as they would have the detrimental effect of creating an atmosphere of false security." (*Id.*).

     D.     The Parties' Current Dispute

On December 18, 2020, BMWED threatened to strike Union Pacific over its previous

demands.  (Doc. #1-12, December 17, 2020 letter).  On that date, Union Pacific received a letter

from BMWED General Chairman, Tony Cardwell.  In that letter, BMWED demanded that Union

Pacific adopt six (6) different measures, including:

1.   "Continuation of Pay" to provide paid time off to employees "who are not
     working for any Covid-19 related reason," such as "being treated for the
     infection, quarantining because of being exposed to some who has Covid-
     19, obtaining a test, traveling to and from the test and waiting for the test
     results, and any other Covid-19 related reason for absence."  BMWED
     also took the position that "Continuation of pay as if they were working
     means in addition to lost straight time wages any overtime they would
     have been entitled to work and continuation of other benefits including,
     but not limited to, health and retirement credits."

2.   "Access to Testing," including providing on the job tests for COVID-19
     "on company time."  BMWED demanded that employees "be paid while
     waiting for the results," and also pay employees for time spent traveling to
     and from any offsite testing and waiting for test results.

3.   "Temperature Testing," which essentially reiterated BMWED's earlier
     demand that Union Pacific screen all employees prior to the start of their
     shift, and send home with pay any employee whose temperature exceeds
     100.4°.

4.   "Contact Tracing," including a demand that all employees who had any
     contact with a workplace exposure be quarantined with pay for 14 days
     and test negative before returning to work.

5.   "PPE and Sanitation Supplies," including a demand that employee be
     "furnished new face masks and hand cleaner each workday" and daily
     sanitization of all vehicles, machines and locker rooms, and a demand that
     employees "will continue to be paid in the event that PPE or proper
     sanitation is not provided."

6.   "Social Distancing," requiring "social distancing in locker rooms, vehicles
     and machines at all times"

(Doc. #1-12, December 17, 2020 letter at 78-79).  BMWED concluded its letter stating, "If

Union Pacific does not rectify the situation within ten days from receipt of this letter, BMWED

will declare a health and safety emergency because of the imminent threat to its members of

10

serious injury or death, and will call for a cessation of work if Union Pacific does not take the necessary corrective actions." (*Id.* at 79).

On Saturday, December 19, 2020, Rod Doerr, Union Pacific's Vice President, Labor Relations, spoke to BMWED's Director of Strategic Coordination and Research Peter Kennedy, BMWED General Chairman Tony Cardwell, and BMWED Vice President, Louis Below. (Doc. #1, Complaint at 10, ¶ 30). During that call, Mr. Doerr inquired whether the Union would be willing to discuss possible resolution of the concerns raised in the Union's letter. BMWED's representatives refused to discuss any resolution and stated that the Union's position was set forth in its letter. (*Id.*).

E.      BMWED's Threatened Work Stoppage Would Result in Immediate and Irreparable Harm.

A work stoppage by BMWED would cause a shutdown of Union Pacific's rail system and would cause immediate and irreparable harm to Union Pacific, its customers and the public. Union Pacific provides freight rail transportation over 32,200 miles (51,800 km) in 23 U.S. states west of Chicago and New Orleans. (Ex. 1, Powers Decl. at ¶ 3).[3] The Union Pacific system is the second largest freight rail system in the United States, and is one of the world's largest transportation companies. (*Id.*). Union Pacific employs approximately 30,000 people. (*Id.*). Broadly speaking, Union Pacific deals in the shipment of goods ranging from coal, chemicals, and biofuels; to fresh and frozen food; forest products, and automobiles and agricultural products such as grain. (*Id.*). Union Pacific plays a critical role in ensuring continuity of functions critical to public health and safety, as well as economic and national security. (*Id.*). Union Pacific delivers the materials that power hospitals, stock grocery shelves, purify water, make medicine

and feed livestock.  (Ex. 1, Powers Decl. at ¶ 4).  Union Pacific provides essential transportation service to its roughly 10,000 customers.  (*Id.*).  The following are just a few limited illustrations of how Union Pacific and a few of its customers would be impacted by a work stoppage.

Union Pacific is the largest carrier of finished automobiles west of the Mississippi River and operates or has access to 38 distribution centers.  (Ex. 1, Powers Decl. at ¶ 5).  Union Pacific's extensive franchise directly serves five vehicle assembly plants and connects to West Coast ports, Mexico gateways, and the Gulf of Mexico to accommodate both import and export shipments.  (*Id.*).  Approximately 70 percent of all new vehicles use rail for delivery, with Union Pacific handling more than 60 percent of the western U.S. rail automotive market share.  (*Id.*).  Delays and backlogs of shipments on these railroads would effectively shut down the lines that depend on Union Pacific to move freight that originates on their lines.  (*Id.*).  In turn, because U.S. automobile manufacturing facilities operate on a "just-in-time" basis, and have little room for storage of finished vehicles, a disruption of Union Pacific's inbound or outbound rail transportation would cause immediate disruption to U.S. automobile manufacturing plants.  (*Id.*).  The same is true for other manufacturing facilities in the United States.  (Ex. 1, Powers Decl. at ¶ 6).  Union Pacific serves many manufacturers that rely on the timely deliveries of parts or supplies, and for outbound transportation of finished goods.  (*Id.*). These facilities largely operate on a just-in-time inventory basis and have limited capacity to store finished goods; accordingly, a disruption to Union Pacific's service would cause immediate disruption to the many manufacturer that rely on Union Pacific. (*Id.*).

---

[3] The Declaration of Carrie J. Powers is Exhibit 1 in the Index of Evidence in support of Union Pacific's Motion for Temporary Restraining Order and Preliminary Injunction.

Union Pacific also is a major shipper of grain, transporting grain and grain products from the Midwest to domestic markets and for export to Mexico and through ports in the Gulf Coast and Pacific Northwest.  (Ex. 1, Powers Decl. at ¶ 7).  Another key industry served by Union Pacific is coal. (Ex. 1, Powers Decl. at ¶ 8).  A significant part of Union Pacific's revenue arises from the hundreds of daily shipments of coal from the Powder River Basin to utility companies such as Ameren, American Electric Power and Wisconsin Electric that are responsible for providing electricity, including heating and air conditioning, for millions of homes and businesses.  (*Id.*).  Coal is not shipped by truck in sufficient quantity to keep coal-fired utility plants in operation.  (*Id.*).  Union Pacific is directly responsible for servicing mines in the following major U.S. coal basins: the Southern Powder River basin, the Uinta basin in Colorado and Utah, the Illinois basin, and the Hanna basin in Southern Wyoming.  (*Id.*).  This year, Union Pacific will ship approximately 85 million tons of coal.  (*Id.*).  Any disruption of the "coal pipeline" would cause immediate and irreparable harm to Union Pacific, to the customers who rely on Union Pacific, and to the public, which would result in additional ill-effects long after the disruption ended.  (*Id.*).  Any prolonged work stoppage could affect the utilities' ability to generate sufficient electricity to serve millions of their customers. (*Id.*).

Union Pacific transports commodities that are essential to the U.S. economy and for public health and safety.  (Ex. 1, Powers Decl. at ¶ 9).  These commodities include: medical grade plastic, water purification chemicals, chlorine, steel and other metals, ethanol, perishable and refrigerated food, gas and oil.  (*Id.*).  Many of these commodities cannot be shipped by truck because of safety concerns or because the volume of the commodities are too great for truck transportation.  (*Id.*).  Union Pacific serves multiple military installations west of the Mississippi.

(Ex. 1, Powers Decl. at ¶ 10). As to some of these facilities, Union Pacific is the sole source of rail transportation. (*Id.*).

Union Pacific's rail network connects 23 states in the western two-thirds of the country. (Ex. 1, Powers Decl. at ¶ 11).  Union Pacific serves many of the largest and fastest-growing U.S. population centers, operates from all major West Coast and Gulf Coast ports to eastern gateways, connects with Canada's rail systems, and is the only railroad serving all six major Mexico gateways.  (*Id.*).  Union Pacific connects with other major U.S. freight railroads in Chicago, Kansas City, St. Louis and many other U.S. gateways.  (*Id.*).  Any service problem at any one of these interchange points will immediately affect traffic not only across Union Pacific's 23-state system, but also across the country.  (*Id.*).  A job action on the Union Pacific will necessarily adversely affect the nation's other major railroads.  (*Id.*).  The effects of a job action against Union Pacific also would extend internationally.  (Ex. 1, Powers Decl. at ¶ 12). In 2019, approximately 40% of Union Pacific freight originated or terminated outside of the U.S., and a disruption to operations would impact the global supply chain, of which Union Pacific is a critical link. (*Id.*).

A strike against Union Pacific would immediately cause severe and irreparable financial loss. (Ex. 1, Powers Decl. at ¶ 13).  For the twelve-month period ending September 30, 2020, Union Pacific generated about $54 million per day of operating revenue from more than 21,000 freight shipments per day.  (*Id.*).  Key business segments include Premium – Automotive and Intermodal  (approximately 10,300 shipments per day), Industrial Products (approximately 5,500 shipments per day), and Bulk - Agricultural Products and Coal  (approximately 5,300 shipments per day).  (*Id.*).  Union Pacific's Operating Ratio (expenses as a percent of revenue) for the same time period was 59.6%, which nets Operating Income of approximately $22 million dollars per

day.  (*Id.*).  Transportation services cannot be stockpiled.  (*Id.*).  Any disruption to Union

Pacific's daily shipment of freight would cost Union Pacific millions of dollars in lost revenue.

(*Id.*).

III.     ARGUMENT

      A.     BMWED's Threatened Strike Should Be Enjoined Because
            It Violates BMWED's Duty to Refrain from Exercising Self-Help
            During the Pendency of a Major Dispute

The very purpose of the RLA is "[t]o avoid any interruption to commerce or to the

operation of any carrier engaged therein."  45 U.S.C. § 151(a).  Congress judged railway strikes

to be so disruptive of national commerce that it carefully designed the RLA to "provide a

machinery to prevent strikes" and the resulting interruptions to interstate commerce.  *Detroit &*

*T. Shore Line R.R. v. United Transp. Union*, 396 U.S. 142, 148 (1969); *Texas & N.O. R.R. Co. v.*

*Brotherhood of Ry. & S.S. Clerks*, 281 U.S. 548, 565 (1930).  *See also Sheet Metal Workers'*

*Int'l Ass'n v. Burlington N. R.R. Co.*, 893 F.2d 199, 202 (8th Cir. 1990) (observing that a purpose

of the RLA "is to prevent the disruption to the Nation's rail service").

Where, as here, the parties' dispute implicates the negotiation of a new collective

bargaining agreement, the dispute is classified as a "major dispute" under the RLA.  "Major

disputes are  . . . 'disputes over the formation of collective agreements or efforts to secure them'

and 'arise where there is no such agreement or where it is sought to change the terms of one, and

therefore the issue is not whether an existing agreement controls the controversy.'"  *Sheet Metal*

*Workers' Int'l Ass'n*, 893 F.2d at 202 (quoting *Elgin, Joliet & E. Ry. Co. v. Burley*, 325 U.S. 711,

723 (1945)).  "'They look to the acquisition of rights for the future, not to assertion of rights

claimed to have vested in the past.'"  *Id.  See also United Transp. Union v. Kansas City S. Ry.*

*Co.*, 172 F.3d 582, 586 (8th Cir. 1999).

BMWED's current dispute with Union Pacific is classic RLA major dispute.  In its strike threat, BMWED does not assert that its existing agreements with Union Pacific entitle it to the monetary relief, additional paid time off for its members, or changes to Union Pacific's COVID-19 protocols that it now seeks; instead BMWED aims to establish entirely new rights, principally economic concessessions that overlap with the rights BMWED currently is seeking to obtain at the bargaining table in national handling.  BMWED is threatening self-help against Union Pacific to achieve its bargaining goals, directly contrary to the plain mandates of the RLA.

"[I]n major disputes, 'the parties are obligated to maintain the status quo' while they pursue a 'lengthy process of bargaining and mediation."  The RLA mandates a lengthy process of negotiation and mediation before either party may resort to self-help."  *United Transp. Union v. Kansas City S. Ry. Co.*, 172 F.3d at 585 (quoting *Consolidated Rail Corp. v. Railway Labor Execs.' Ass'n,* 491 U.S. 299, 302 (1989) ("*Conrail v. RLEA*")).  When rail carriers and their employees are involved in major disputes, they must submit to the bargaining, mediation and emergency board procedures specified in and required by Sections 2 First, 5, 6 and 10 of the RLA before resorting to strikes or other forms of economic self-help.  *Conrail v. RLEA*, 491 U.S. at 302-03.  The RLA's procedures, including the status quo obligation, were concisely described in an opinion by Justice Harlan in *Bhd. of R.R. Trainmen v. Jackson Terminal Co.*, 394 U.S. 369, 378 (1969):

> The Act provides a detailed framework to facilitate the voluntary settlement of major disputes.  A party desiring to effect a change of rates of pay, rules, or working conditions must give advance written notice.  § 6.  The parties must confer, § 2 Second, and if conference fails to resolve the dispute, either or both may invoke the services of the National Mediation Board, which may also proffer its services sua sponte if it finds a labor emergency to exist.  § 5 First.  If mediation fails, the Board must endeavor to induce the parties to submit the controversy to binding arbitration, which can

> take place, however, only if both consent.  §§ 5 First, 7.  If
> arbitration is rejected and the dispute threatens 'substantially to
> interrupt interstate commerce to a degree such as to deprive any
> section of the country of essential transportation service, the
> Mediation Board shall notify the President', who may create an
> emergency board to investigate and report on the dispute.  § 10.
> <u>While the dispute is working its way through these stages, neither
> party may unilaterally alter the status quo.</u>  [e.g., the union may not
> strike and the carrier may not lockout] §§ 2 Seventh, 5 First, 6, 10.
> (emphasis added).

*See also Elgin, J. & E. Ry. Co.*, 325 U.S. at 725; *Sheet Metal Workers' Int'l Ass'n*, 893 F.2d at

202; *International Ass'n of Machinists v. Aloha Airlines, Inc.*, 776 F.2d 812, 815-16 (9th Cir.

1985), cert. denied, 479 U.S. 931 (1986).  Congress designed the dispute resolution process of

the RLA to be "***almost interminable***." *Detroit & T. S. L. R. Co.*, 396 U.S. at 149.  *See also*

*Burlington Northern R. Co. v. B.M.W.E.*, 481 U.S. 429, 444 (1987) (describing major dispute

resolution process as "***virtually endless***"); *Brotherhood of Ry. & S.S. Clerks v. Florida E. C. R.*

*Co.*, 384 U.S. 238, 246 (1966) (describing procedures as "***purposely long and drawn out***")

(emphasis added in each case).

"During this entire process, neither party may unilaterally alter the status quo."  *Sheet*

*Metal Workers' Int'l Ass'n*, 893 F.2d at 202.  If a union strikes during the status quo period, the

strike is enjoinable, even without regard to the customary showing of irreparable injury.  As the

Supreme Court explained:

> In the event of a major dispute, the RLA requires the parties to
> undergo a lengthy process of bargaining and mediation. §§ 5 and 6.
> Until they have exhausted those procedures, the parties are
> obligated to maintain the status quo, and the employer may not
> implement the contested change in rates of pay, rules, or working
> conditions. The district courts have subject-matter jurisdiction to
> enjoin a violation of the status quo pending completion of the
> required procedures, without the customary showing of irreparable
> injury.

*Conrail v. RLEA*, 491 U.S. at 302-03 (footnote and citations omitted).  *See also United Transp. Union v. Kansas City S. Ry. Co.*, 172 F.3d at 585.

In short, it is indisputable that Union Pacific and BMWED are in the RLA status quo period.  The parties have exchanged Section 6 notices, beginning the process that will lead to a new agreement.  Under the RLA, BMWED has an obligation to observe the status quo — and to refrain from economic action — until exhausting the RLA's major dispute resolution processes, including direct bargaining and mediation under the auspices of the NMB.  As there is no dispute that the parties remain in the early stages of the RLA's major dispute resolution processes, BMWED's resort to self-help is premature and unlawful under the RLA.  *Chicago & North Western Ry. Co. v. United Transp. Union*, 402 U.S. 570 (1971).

> B.   BMWED's Threatened Strike Blatantly Violates Its Obligation to Exert Every Reasonable Effort to Make and Maintain Agreements, which Obligation is Not Excused by the Federal Railroad Safety Act.

Section 2 First of the RLA, 45 U.S.C. § 152 First, imposes a duty on carriers and employees:

> to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes, whether arising out of the application of such agreements or otherwise, in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof.

"The RLA requires both the union and the railroad to negotiate whenever a dispute arises." *Sheet Metal Workers' Int'l Ass'n*, 893 F.2d at 202.  This duty involves more than a duty to bargain in good faith, and is "[t]he heart of the Railway Labor Act." *Brotherhood of R. R. Trainmen*, 394 U.S. at 377.  The Supreme Court has ruled that § 2 First "was designed to be a legal obligation, enforceable by whatever appropriate means might be developed on a case-by-case basis." *Chicago & N.W. Ry. Co.*, 402 U.S. at 577.  Strike injunctions may issue to enforce

18

the duty under § 2 First when that remedy is "the only practical, effective means of enforcing the duty." *Id.* at 583.

In this case, BMWED plainly has not "exert[ed] every reasonable effort to make and maintain agreements."  Union Pacific received BMWED's 10-day notice of its intent to withhold service without warning.  When Union Pacific's Vice President, Labor Relations spoke with his counterpart at BMWED the following day, BMWED rebuffed any attempt at bargaining and repeatedly responded that its position was expressed in its 10-day notice.  By resorting to self-help and economic pressure in an effort to change the existing agreements, BMWED has violated its obligation to make and maintain agreements under the RLA.  *Detroit & T. Shore Line R.R.*, 396 U.S. at 148; *Burlington Northern R. Co.*, 481 U.S. at 429; *Trans Intern. Airlines Inc. v. Intern. Bhd. of Teamsters*, 650 F.2d 949, 960 (9th Cir. 1980), *cert. denied*, 449 U.S. 1110 (1981).[4]

---

[4] Under the RLA, a district court may enjoin any unlawful job action, including a job action short of a full-fledged strike, to enforce the statutory duties imposed upon the parties. Work stoppages, threats to strike and other forms of economic self help are prohibited, and injunctive relief is available where all that has taken place is a strike threat or a statement that the union intends to strike.  *See B.M.W.E. v. Atchison, Topeka & Santa Fe Ry. Co.*, 840 F. Supp. 1221, 1235-36 (N.D. Ill. 1993) (granting injunctive relief where BMWED merely indicated its intent to strike; court notes that carriers cannot be forced to "wait until the trigger is pulled before seeking the protection to which they are entitled" under the RLA); *Alton v. B.M.W.E.*, 883 F. Supp. 755 (D.D.C. 1995) (enjoining BMWED from striking based on single threat "[b]ecause the RLA's long and drawn out procedures have only just begun, the Court finds that any attempt by the BMWED to alter the status quo by exercising self help would be quite premature") (emphasis added); *Manning v. American Airlines, Inc.*, 329 F.2d 32, 35 (2d Cir. 1964) ("The purpose of § 6 was to prevent rocking of the boat by either side until the procedures of the Railway Labor Act were exhausted"), *cert. denied*, 379 U.S. 817 (1964); *American Airlines, Inc. v. T.W.U.*, 57 L.R.R.M. 2484, 2487 (S.D.N.Y. April 17, 1964) ("The resort to economic force during the pendency of the procedures of the Railway Labor Act [by either party to the dispute] is inconsistent with the requirements of that Act").

In its 10-day notice, BMWED contends that its strike threat is warranted due to a "safety emergency" and that employees may withhold service where workplace conditions present an "imminent danger of death or serious injury."  BMWED ostensibly contends that it is excused from its legally-enforceable Section 2 First obligation to make and maintain agreements by operation of the Federal Railroad Safety Act, which provides:

(b)     Hazardous Safety or Security Conditions –

(1)     A railroad carrier engaged in interstate or foreign commerce, or an officer or employee of such a railroad carrier, shall not discharge, demote, suspend, reprimand, or in any other way discriminate against an employee for –
        …

(B)     refusing to work when confronted by a hazardous safety or security condition related to the performance of the employee's duties, if the conditions described in paragraph (2) exist…
        …

(2)     A refusal is protected under paragraph (1)(B) and (C) if –

(A)     the refusal is made in good faith and no reasonable alternative to the refusal is available to the employee;

(B)     a reasonable individual in the circumstances then confronting the employee would conclude that –

(i)     the hazardous condition presents an imminent danger of death or serious injury; and

(ii)    the urgency of the situation does not allow sufficient time to eliminate the danger without such refusal; and

(C)     the employee, where possible, has notified the railroad carrier of the existence of the hazardous condition and the intention not to perform further work, or not to authorize the use of the hazardous equipment, track, or structures, unless the conditions is corrected immediately or the equipment, track, or structures are repaired properly or replaced.

20

49 U.S.C. § 20109(b)(1) and (2).  The FRSA's protection against retaliation for railroad employees who refuse to work in narrowly drawn circumstances does not, as BMWED apparently believes, authorize BMWED to conduct a systemwide strike in blatant violation of its Section 2 First obligations.  Congress phrased the test for a protected refusal to work under FRSA in the conjunctive, requiring an employee to meet **all** of the prerequisites enumerated in 49 U.S.C. § 20109(b)(2).

        (1)     **BMWED Has Reasonable Alternatives to a Strike that Would Cripple the Nation's Rail System.**

Under the plain terms of the statute, a refusal to work is not protected under FRSA if there is any reasonable alternative to the refusal available to the employee.  BMWED has available multiple alternatives to address its concerns short of a withdrawal of service.  In addition to bargaining with Union Pacific for the changes it seeks, as required by Section 2 First of the RLA, BMWED could address its concerns to the Federal Railroad Administration, the federal agency responsible for ensuring railroad safety.  The FRA opened an "emergency relief docket" pursuant to its authority under 49 U.S.C. § 20103(g) and since that time, the FRA has approved multiple requests, both by rail carriers and union representing rail employees, found necessary to address the COVID-19 pandemic.  The FRA's emergency relief docket is available online at https://beta.regulations.gov/docket/FRA-2020-0002.[5]

Nine months ago, labor unions representing Union Pacific's train and engine service employees filed a separate petition with the FRA requesting an Emergency Order asserting some of the same demands now raised by BMWED, such as sanitation and employee temperature checks.  Under 49 U.S.C. § 20104(a), the FRA may issue an emergency order if it determines

that "an unsafe condition or practice, or a combination of unsafe conditions and practices, causes an emergency situation involving a hazard of death, personal injury, or significant harm to the environment."  Petitioning the FRA to order the economic concessions and protocol modifications it now seeks is one "reasonable alternative" available to BMWED.

If the BMWED remained unsatisfied with the FRA's resolution of an emergency petition pursuant to 49 U.S.C. § 20104(a), it could bring a civil action to compel the issuance of an emergency order by the FRA.  Specifically, 49 U.S.C. § 20104(c) provides:

> An employee of a railroad carrier engaged in interstate or foreign commerce who may be exposed to imminent physical injury during that employment because of the Secretary's failure, without any reasonable basis, to issue an order under subsection (a) of this section, or the employee's authorized representative, may bring a civil action against the Secretary in a district court of the United States to compel the Secretary to issue an order. The action must be brought in the judicial district in which the emergency situation is alleged to exist, in which that employing carrier has its principal executive office, or for the District of Columbia.

Through 49 U.S.C. § 20104, Congress therefore created an orderly mechanism for addressing employee fears of imminent physical injury.  Employees or their representatives may seek an emergency order from the FRA, the federal agency with deep knowledge of the rail industry and the ultimate responsibility for ensuring railroad safety.  If the FRA does not enter an emergency order, BMWED could ask a federal court to compel the FRA to do so.  The affected employees and the FRA would present evidence concerning the necessity of an emergency order and a court would be empowered to order appropriate relief.  Because the orderly process of § 20104 is a "reasonable alternative" to the unilateral withdrawal of service by BMWED-represented

---

[5] This Court may take judicial notice of information published on official government websites. *See Missourians for Fiscal Accountability v. Klahr*, 830 F.3d 789, 793 (8th Cir. 2016).

employees, FRSA cannot excuse BMWED from its obligations under Section 2 First to make and maintain agreements.

> (2)     The Risks Identified by BMWED Do Not Present an Imminent Danger of Death or Serious Injury Within the Meaning of FRSA

Without diminishing the seriousness of the current public health crisis, the demands raised by BMWED simply do not present an imminent danger of death or serious injury within the meaning of FRSA.  BMWED's foremost demand for additional paid time off will in no way alleviate an imminent danger of death or serious injury.  BMWED is not seeking to trade or exchange current forms of paid time off (such as vacations, holidays and the like) for time off due to COVID-related absences.  The Union is seeking *additional* paid time off.  This is an economic demand that must be addressed in collective bargaining.

With respect to BMWED's other demands, from testing to personal protective equipment to social distancing, Union Pacific already meets and in many cases exceeds the CDC guidelines for reducing the risk of exposure to COVID-19.  BMWED simply cannot prove – as it must to meet the test for a protected refusal to work under FRSA – that COVID-19 presents a systemic "imminent danger of death or serious injury" to Union Pacific's maintenance of way forces as a whole.  The risk necessary to justify a protected refusal to work under FRSA must be "imminent."  The speculative, attenuated risks cited by BMWED do not meet this heightened standard.

The "imminence" of the threat identified by BMWED is also belied by the parties' course of dealing since the early days of the COVID-19 pandemic.  As recounted in Section II(A) above, BMWED first contacted Union Pacific in March 2020, at which time Union Pacific was conducting daily calls between senior Union Pacific staff and the leadership of its employees'

unions to share the most up to date information and hear concerns and issues raised by the unions. The parties have been in regular communication since March and BMWED's 10-day strike threat of December 18, 2020 raises largely the same issues that it presented to Union Pacific in July and September 2020. In the meantime, Union Pacific has adjusted its COVID-19 protocols and policies, and has openly communicated with BMWED, over the course of months. Under the applicable objective standard, BMWED cannot show that any hazardous condition present an "**imminent** danger" and that the "**urgency** of the situation" does not allow sufficient time to eliminate the danger without a refusal to work. BMWED therefore cannot rely on § 20109(b)(1)(B) to justify its threatened work stoppage in violation of Section 2 First of the RLA.

> (3) FRSA Is Designed to Protect Employees from Discrete Acts of Retaliation, Not to Determine Issues of System-wide Policy

The FRSA's protection for employees who refuse to work when confronted with a hazardous safety or security condition does not align with the purpose for which BMWED relies on it. Section 20109 is an anti-discrimination statute. *See Dakota, Minn. & E. R.R. Corp. v. U.S. Dept. of Labor*, 948 F.3d 940, 945 (8th Cir. 2020) ("The FRSA prohibits a rail carrier from *discriminating* against an employee for engaging in protected activity") (italics in original). The statute is not concerned with labor relations in the railroad industry, but rather provides a private cause of action for "[a]n employee who alleges discharge, discipline, or other discrimination in violation of subsection (a), (b), or (c)" of FRSA. 49 U.S.C. § 20109(d)(1); *Foster v. BNSF Ry. Co.,* 866 F.3d 962, 966 (8th Cir. 2017) ("The text of the statute therefore makes clear that to receive relief under the FRSA, litigants must first file a complaint with OSHA alleging unlawful discrimination"). Remedies include reinstatement, back pay, compensatory damages, and capped punitive damages. 49 U.S.C. § 20109(e). FRSA on its face is inapplicable to BMWED's

24

present threat to withhold service unless Union Pacific promptly accedes to its bargaining demands.  As explained in Section III(B)(1) above, the proper vehicle for resolving questions of system-wide policy allegedly creating a risk of imminent death or serious bodily injury is to request an emergency order from the FRA pursuant to 49 U.S.C. § 20104(a), with an action in district court to compel issuance of such an order by the FRA pursuant to 49 U.S.C. § 20104(c) if necessary.

Federal labor law mandates that, where there exists a peaceable means to resolve labor disputes, a party may not circumvent the peaceful dispute resolution procedure by resorting to self help; otherwise the availability of a peaceful remedy would be a hollow formality.  *See, e.g., Boston and Maine Corp. v. Lenfest*, 799 F.2d 795, 803 (1st Cir. 1986) (enjoining strike under the FRSA); *Bhd. of R.R. Trainmen v. Chicago R. & I.R.R. Co.*, 353 U.S. 30, 39-42 (1957) (affirming injunction against strike over "minor dispute" subject to mandatory arbitration under the RLA); *CSX Transp., Inc. v. Transp. Union*, 86 F.3d 346 (4th Cir. 1996) (affirming injunction against strike in protest of arbitration award issued pursuant to mandatory arbitration of disputes concerning labor impact of transaction subject to federal regulation); *Burlington Northern Railroad Co. v. United Transportation Union*, 848 F.2d 856, 862-63 (8th Cir.), *cert. denied*, 488 U.S. 969, (1988); *Boys Markets, Inc. v. Retail Clerks Union*, 398 U.S. 235, 251 (1970) (enjoining strike over dispute subject to arbitration under collective bargaining agreement negotiated pursuant to the National Labor Relations Act).  The same reasoning applies here.  BMWED has readily available peaceful means to resolve its demands for additional paid time off for its members and to seek FRA intervention if it believes that there exists a systemic safety hazard in Union Pacific's operations.  There is no basis for BMWED to jettison these peaceful procedures

25

and engage in economic self-help, thereby disrupting not only Union Pacific but the national economy.

    C.      The Norris-LaGuardia Act Permits The Grant Of Injunctive Relief In This Case.

The Norris-LaGuardia Act, 29 U.S.C. §§101-115 ("NLGA"), does not bar the grant of an injunction in this case.  The courts have held Norris-LaGuardia and the RLA must be accommodated to each other since each was adopted as part of a pattern of labor legislation. Consistent with that rationale, the courts have approved the use of injunctions to enforce the RLA's mandatory dispute resolution procedures.  *Burlington N. R.R. Co. v. BMWED*, 481 U.S. at 444-46 (injunction can issue to enforce mandates of the RLA); *Chicago & N.W. Ry. Co. v. United Transp. Union*, 402 U.S. at 582 (recognizing need to "properly accommodate the conflicting policies of our labor laws" and approving injunction to enforce major dispute bargaining duty where a strike injunction is the only practical, effective means of enforcing the requirements of Section 2 First); *Brotherhood of R.R. Trainmen and Chicago River and Indiana R.R. Co.*, 353 U.S. 30 (1957) (approving injunction to enforce minor dispute resolution procedure).  *See also Railway Labor Executives' Ass'n v. Wheeling & L. E. Ry. Co.*, 914 F.2d 53 (4th Cir. 1990) (approving injunction to enforce representation dispute resolution procedure).

Norris-LaGuardia permits injunctive relief because it is the only practical and effective means of enforcing a party's RLA obligations.  *International Ass'n of Machinists v. Street*, 367 U.S. 740 (1961).  "The injunction . . . does no more than compel compliance by [the defendants] with the orderly dispute settlement procedures established by the Railway Labor Act and [is] well within the district court's jurisdiction."  *Illinois Central R. Co. v. BLE*, 443 F.2d 136, 144 (7th Cir. 1971).  *Accord Brotherhood of R.R. Trainmen v. Akron & B.B. R. Co.*, 385 F.2d 581

26

(D.C. Cir. 1967), *cert. denied*, 390 U.S. 923 (1968); *see also Virginia Ry. Co. v. System Federation No. 40*, 300 U.S. 515 (1937).

In this case, the RLA mandates that BMWED refrain from exercising self-help during the status quo period (45 U.S.C. § 156), as discussed in Section II(A) above, and exert every reasonable effort to make and maintain agreements (45 U.S.C. § 152 First), as discussed in Section II(B) above. Strikes, threats to strike or other job actions which violate a union's duties to make and maintain agreements violate the RLA, and are enjoinable. *See Chicago & N.W. Ry.*, 402 U.S. at 577, 581-84; *BMWE v. Atchison, Topeka & Santa Fe*, 840 F. Supp. at 1236; *Long Island R.R. v. IAM*, 709 F. Supp. 376 (S.D.N.Y. 1989); *Long Island R.R. Co. v. System Fed. No. 156*, 289 F. Supp. 119 (E.D.N.Y. 1968). Since injunctive relief is required in these circumstances to enforce the obligations of the RLA and to prevent a disruption to interstate commerce, Norris-LaGuardia is not a bar to injunctive relief.

> D.   Union Pacific Has Satisfied The Requirements For Injunctive Relief Enjoining BMWED From Striking Over the Present Dispute.

When deciding whether to issue a temporary restraining order, the Court will turn to the four factors identified in *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir.1981) (en banc): (1) the probability that the movant will succeed on the merits; (2) the threat of irreparable harm to the movant; (3) the state of the balance between this harm and the injury that granting the injunction will inflict on the nonmovant and other parties; and (4) the public interest. *Roudachevski v. All–American Care Centers, Inc.*, 648 F.3d 701, 705 (8th Cir.2011); *Kuper Indust. LLC v. Reid*, 89 F. Supp. 3d 1005, 1009 (D. Neb. 2015). Union Pacific has already shown a likelihood of success on the merits of its claim that BMWED's job action and use of other economic force violates the mandatory dispute resolution procedures of the RLA. Union

27

Pacific and innocent third parties will suffer irreparable injury if the injunctive relief is not granted. As demonstrated in Union Pacific's Complaint, a withdrawal of service or other job action by BMWED threatens to cause a curtailment of service, resulting in a loss of revenue and goodwill to Union Pacific, as well as critical transportation services to the shippers who rely on Union Pacific. Union Pacific also will be irreparably injured because BMWED's self-help undermines the exclusive, mandatory processes which Congress has prescribed for the peaceful resolution of labor disputes in the rail industry. On the other hand, BMWED will not suffer any injury from the grant of an injunction.

Finally, the public interest requires the grant of injunctive relief. *Virginian Ry. Co.*, 300 U.S. 515 (courts should go further to issue injunctions in RLA disputes than they would in purely private disputes, because of the public's interest in continuous transportation service). The primary purpose of the RLA is to protect the public from interruptions to interstate commerce resulting from labor strife. *Id.* To that end, the RLA mandates peaceful resolution of labor disputes in the rail industry. This purpose will be frustrated, and the RLA dispute resolution procedures by which the public interest is protected will be rendered nugatory, if injunctive relief is not granted.

IV.    <u>CONCLUSION</u>

For the foregoing reasons, plaintiff, Union Pacific respectfully requests that the Court grant its motion for injunctive relief.

Respectfully submitted,

 /s/ Jacquelyn V. Clark
JACQUELYN V. CLARK
Union Pacific Railroad
1400 Douglas Street STOP 1580
Omaha, NE 68179
(402) 544-3078 (phone)
jvclark@up.com

ROBERT S. HAWKINS (*pro hac vice pending*)
ANDREW J. ROLFES (*pro hac vice pending*)
COZEN O'CONNOR
1650 Market Street, Suite 2800
Philadelphia, PA   19103
(215) 665-2177 (phone)
(215) 717-9535 (fax)
rhawkins@cozen.com
arolfes@cozen.com

Counsel for Plaintiff
Union Pacific Railroad Company

Date:  December 21, 2020

CERTIFICATE OF COMPLIANCE

Pursuant to NECiv.R. 7.1(d)(3), I hereby certify that this brief complies with the word count limitation provided under the rule and further certify that the word count function was applied to include all text, including the caption, headings, footnotes and quotations.  This document was prepared using Microsoft Word 2016 and contains 8,977 words.

Dated this 21st day of December, 2020.


*/s/ Jacquelyn V. Clark*
JACQUELYN V. CLARK