IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNION PACIFIC RAILROAD COMPANY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 8:20-cv-00516 |
| | ) |
| BROTHERHOOD OF MAINTENANCE OF WAY | ) |
| EMPLOYES DIVISION/IBT | ) |
| | ) |
| Defendant. | ) |
| | ) |

## MEMORANDUM IN OPPOSITION TO APPLICATION FOR A TEMPORARY RESTRAINING ORDER

Richard S. Edelman
Aaron S. Edelman
Mooney, Green, Saindon, Murphy &
Welch, P.C.
1920 L Street NW, Suite 400
Washington, DC 20036
(202) 783-0010
(202) 841-8796 (cell)
Redelman@MooneyGreen.com


Robert E. O'Connor, Jr.
P.O. Box 451116
Omaha, NE 68145
(402) 330-5906
reolaw@aol.com


Attorneys for Brotherhood of Maintenance of Way Employes Division/IBT

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ........................................................................................ ii

I.  INTRODUCTION ................................................................ 1
II.  FACTS ................................................................................ 3
III.  APPLICABLE LAW ............................................................ 9
    A. Rail Worker Refusal to Work In Unsafe Conditions Under the Federal Railroad Safety Act ........................................................................ 9
    B. Norris Laguardia Act Constraints On Judicial Intervention In Labor Disputes .. 12
        1. The NLGA Governs All Requests For Injunctions In Labor Disputes .. 12
        2. The NLGA Applies To All Labor Disputes, And Expansively Defines "Labor Dispute" ............................................................... 13
        3. Application of the NLGA When an Injunction is Permissible ............... 16
IV.  ARGUMENT ....................................................................... 20
    A. The Withdrawal From Service By UP's Maintenance Of Way Workers In Response To UP's Insufficient Covid-19 Protocols Is Covered By, And Protected By, The FRSA .......................................................... 20
        1. Exposure to Covid-19 Is A Hazardous Condition That Threatens Death Or Serious Injury ................................................... 20
        2. UP's Response To The Pandemic Provides Inadequate Protection To Its Maintenance of Way Employees Such That A Reasonable Employee Would In Good Faith Fear That Their Working Conditions Threaten Imminent Danger of Death Or Serious Injury ........................................ 21
        3. UP Has Been Notified Of The Hazardous Working Conditions That Threaten Its Maintenance Of Way Workers ........................................... 26
        4. BMWED's Declaration Of A Health And Safety Emergency And Its Members' Collective Withdrawal From Service in Response to That Emergency Are Protected By The FRSA ................................................ 26
    B. UP Can Not Establish A Basis For Issuance Of A Restraining Order Against A Withdrawal From Service By BMWED's Members In Response To UP's Covid-19 Protocols .......................................................................... 27
        1. The Withdrawal From Service Is Not Unlawful; It Is In Response To Working Conditions That Threaten Death Or Serious Injury To UP's Maintenance Of Way Employees ........................................... 29
        2. Even If The Workers' Action Was Not Protected By The FRSA UP Is Ineligible For An Injunction Because It Has Failed To Adequately Protect Its Maintenance Of Way Employees ..................................................... 31
        3. The Balance of Harms Militates Against Issuance of the Injunction ..... 33
        4. The Public Interest Does Not Support Issuance of an Injunction............ 34
V.  CONCLUSION ..................................................................... 35

## TABLE OF AUTHORITIES

### CASES

Page

*Aircraft Service International, Inc. v. International Brotherhood of Teamsters,*
779 F. 3d 1069 (9th Cir. 2015) ....................................................................................... 13, 19, 31

*Boston & Maine Corp. v. Lenfest,*
799 F.2d 795 (1st Cir. 1986) ................................................................................................ *passim*

*Brady v. v. National Football League,*
644 F. 3d 661 (8th Cir. 2011) ............................................................................... 16, 17, 18, 29

*Brisbois v. Soo Line R.R.,*
No. 15-CV-0570, 2016 BL 428108 (D. Minn. Dec. 22, 2016) ................................................ 10

*Brotherhood of Locomotive Engineers v. Missouri-Kansas-Texas R.R. Co.,*
363 U.S. 528 (1960) ................................................................................................................... 32

*Brotherhood of Railroad Trainmen v. Chicago River and Indiana R.R. Co.,*
353 U.S. 30 (1957) ............................................................................................................... 13, 16

*Brotherhood of Railroad Trainmen v. Jacksonville Terminal,*
394 U.S. 369 (1969) ................................................................................................................... 13

*Brotherhood of Railroad Trainmen v. Toledo, Peoria & Western,*
321 U.S. 50 (1944) ............................................................................................................. *passim*

*Burlington Northern R.R. v. Brotherhood of Maintenance of Way Employes,*
481 U.S. 429 (1987) ............................................................................................................ 13, 16

*Burlington Northern v. UTU,*
862 F.2d 1266 (7th Cir. 1988) .................................................................................................. 19

*Butte Anaconda & P. Ry. v. Brotherhood of Locomotive Firemen and Enginemen,*
268 F.2d 54 (9th Cir. 1959) ...................................................................................................... 19

*Camping Construction Co. v. District Council of Iron Workers,*
915 F.2d 1333 (9th Cir. 1990) ............................................................................................ 14, 15

*Celotex Corp. v. Oil Chemical and Atomic Workers,*
516 F.2d 242 (3d Cir. 1975) ..................................................................................................... 17

*Central Vermont Ry. v. Brotherhood of Maintenance of Way Employes,*
  793 F. 2d 1298 (D.C. Cir. 1986) ................................................................................. 15

*Cieslicki v. Soo Line R.R.,*
  ARB Case No. 2019-0065, 2020 BL 243372 (June 4, 2020) .................................... 9

*Consol. Rail Corp. v. Transp. Union,*
  947 F. Supp. 168 (E.D. Pa. 1996) ...................................................................... 10, 12

*Delta Airlines v. Air Line Pilots Ass'n.,*
  238 F. 3d 1300 (11th Cir. 2001) ............................................................................... 17

*District 17, United Mine Workers of America v. Apogee Coal Co.,*
  13 F.3d 134 (4th Cir. 1993) ................................................................................ 17, 18

*Hernandez v. Metro-N. Commuter R.R.,*
  74 F. Supp. 3d 576 (S.D.N.Y. 2015) ....................................................................... 10

*Illinois Central R.R. Co. v. Brotherhood of R.R. Trainmen,*
  398 F. 2d 973 (7th Cir. 1968) ................................................................................... 32

*In re Dist. No. 1, MEBA,*
  723 F.2d 70 (D.C. Cir. 1983) ............................................................................. 16, 29

*Inland Steel Co. v. United States et al.,*
  306 U.S. 153 (1939) ................................................................................................. 32

*Int'l Ass'n of Machinists v. Street,*
  376 U.S. 740 (1961) ........................................................................................... 13, 20

*Int=l B;hood of Teamsters v. Frontier Airlines,*
  628 F. 3d 402 (7th Cir. 2010) ................................................................................... 32

*Jackson v. Union Pac. R.R.,*
  ARB No. 13-42, ALJ No. 2012-FRS-17, 2015 BL 137571 (March 20, 2015) ....................... 10

*Jacksonville Bulk Terminals v. International Longshoremen's Ass'n.,*
  457 U.S. 702 (1982) ................................................................................................. 15

*Jacksonville Maritime Ass'n v. International Longshoremen's Ass'n.,*
  571 F. 2d 319 (5th Cir.) ............................................................................................ 17

*Lauf v. Shinner,*
303 U.S. 323 (1938) ................................................................................................ 16

*Lillian v. Nat'l R.R. Passenger Corp.,*
259 F. Supp. 3d 837 (N.D. Ill. 2017) ...................................................................... 10

*Local Union 733 v. Ingalls Ship Building,*
906 F. 2d 149 (5th Cir. 1990) ................................................................................. 17

*Lockhart v. MTA Long Island R.R.,*
949 F.3d 75 (2d Cir. 2020) ..................................................................................... 10

*Lukens Steel Co. v. United Steel Workers of America,*
989 F.2d 668 (3d Cir. 1993) ................................................................................... 17

*Marine Cooks and Stewards v. Panama SS Co.,*
363 U.S. 365 (1960) ..................................................................................... 12, 14, 28

*Monongahela Ry. v. Transportation Communications Union,*
No. 89-4439, 1989 BL 175 (W.D. Pa. July 12, 1989) ..................................... *passim*

*New Negro Alliance v. Sanitary Grocery Co.,*
303 U.S. 552 (1938) ......................................................................................... 14, 28

*Norfolk S. Ry. Co. v. Solis,*
915 F. Supp. 2d 32 (D.D.C. 2013) .......................................................................... 11

*Oklahoma Retail Grocers Ass=n v. Wal-Mart Stores,*
605 F 2d 1155 (10th Cir. 1979) .............................................................................. 32

*Order of Railroad Telegraphers v. CNW,*
362 U.S. 330 (1960) ........................................................................................... 19, 31

*Piedmont Aviation v. Air Line Pilots Assoc. Int.,*
416 F. 2d 633 (4th Cir. 1969) ................................................................................. 32

*Pittsburgh & Lake Erie R.R. Co.,*
491 U.S. 490 (1989) ................................................................................................ 16

*Port of Houston v. International Organization of Masters, Mates and Pilots,*
456 F.2d 50 (5th Cir. 1972) .................................................................................... 15

*Pulte Homes v. Laborers Int'l Union,*
   648 F. 3d 295 (6th Cir. 2011) ............................................................................. 17, 18

*Railway Express Agency, Inc. v. Brotherhood of Railway Airline and Steamship Clerks,*
   437 F. 2d 388 (5th Cir. 1971) ................................................................................ 32

*Rookaird v. BNSF Ry.,*
   908 F.3d 451 (9th Cir. 2018) .................................................................................. 9

*Rossi v. Nat'l R.R. Passenger Corp.,*
   2016 BL 145042 (E.D. Pa. May 05, 2016) ............................................................ 10

*Rutland Ry. v. Brotherhood of Locomotive Engineers,*
   307 F.2d 21 (2d Cir. 1962) ................................................................... 16, 18, 19, 31

*Southern Ohio Coal Co. v. United Mineworkers,*
   551 F.2d 695 (6th Cir. 1977) ................................................................................. 20

*Triangle Constr. Corp. v. Our Virgin Islands Labor Union,*
   425 F. 3d 938 (11th Cir. 2005) .............................................................................. 17

*United Airlines v. International Association of Machinists and Aerospace Workers,*
   243 F. 3d 349 (7th Cir. 2001) ................................................................................ 16

*United States Steel Corp. v. United Mine Workers,*
   456 F. 2d 483 (3d Cir. 1972) ................................................................................. 17

*United Telegraph Workers v. Western Union,*
   771 F. 2d 699 (3d Cir. 1985) ................................................................................. 18

*United Transp. Union v. Springfield Terminal Co.,*
   675 F. Supp. 683 (D. Me. 1987) .............................................................. 10, 11, 33

*Winch v. DOL,*
   725 Fed. Appx. 768 (11th Cir. 2018) ..................................................................... 10

*Yakus v. United States,*
   321 U.S. 414 (1944) .............................................................................................. 32

## STATUTES AND REGULATIONS

29 C.F.R. § 1982.103-104 ........................................................................................ 11

v

29 U.S.C. §§101 *et seq.* ........................................................................................... *passim*

45 U.S.C. § 151 *et seq.* ...........................................................................................*passim*

49 U.S.C. §20109............................................................................................. *passim*

Fed. R. Civ. P. 65 ................................................................................................. 17

The Brotherhood of Maintenance of Way Employes Division/IBT ("BMWED" or "Union") respectfully submits that the Court should deny the application of the Union Pacific Railroad ("UP" or "Carrier") for a temporary restraining order enjoining BMWED's members to cease their withdrawal from service in response to UP's inadequate and ineffective protocols for handling the Covid-19 pandemic, and requiring them to return to work under those existing protocols.

## I. INTRODUCTION

Since the beginning of the Covid-19 pandemic, BMWED has sought to protect its members who have been deemed "essential workers" and required to report to work. Beginning in March, BMWED asked UP to provide necessary protections, testing, contact tracing and paid leave for employees required to quarantine to decrease the chances for transmission of the virus among maintenance of way gangs. UP adopted certain protocols, but, as more information about the virus became known, BMWED viewed those protocols as insufficient, and the Union began to seek additional measures. Over the Summer, BMWED pressed UP to adopt more stringent and effective measures, but UP refused. After the rate of infections surged in the Fall, and after eleven BMWED members on various carriers, including three employed by UP, died from the virus, BMWED demanded that UP take additional steps, including continuation of pay for all employees required to quarantine due to exposure to the virus or having Covid-19 symptoms in order to protect their co-workers; increased testing at accessible locations; pre-screening, testing and contact tracing; provision of adequate protective equipment and sanitizing materials; and implementation of social distancing requirements.

UP refused to change its protocols, so, on December 17, the Union declared a workplace safety emergency and advised UP that its Covid-19 protocols had created working conditions that

1

are immediately hazardous to the life and health of its maintenance of way employees. The Federal Railroad Safety Act ("FRSA"), 49 U.S.C. §20109, as amended by the Rail Safety Improvements Act ("RSIA"), protects the rights of rail workers to refuse to work in hazardous conditions when a reasonable person would conclude that those conditions present an "imminent danger of death or serious injury". BMWED submits the Carrier's response to the pandemic presents such conditions, so UP's application for a temporary restraining order should be denied.

UP contends that it is entitled to temporary restraining order because the parties' differences over UP's failure to adequately protect its maintenance of way employees is supposedly connected to Railway Labor Act ("RLA") bargaining over amendments to the parties' collective bargaining agreements. This is simply false. BMWED is trying to protect its members from exposure to a deadly disease as that disease is rampaging through the United States, and after three UP maintenance of way employees have died from that disease. BMWED is not proposing to change or add to any collective bargaining agreement; and BMWED's demands are for policies that would apply only during the pandemic. UP's RLA status quo argument is without any basis and is just a diversion. The real issue is the inadequate Covid-19 protocols adopted by UP and the danger to which BMWED's members are exposed as "essential employees" who work and travel in close proximity with other UP employees.

UP also mischaracterizes the actual scope of the FRSA. The statute is not limited to protecting individual workers from retaliation for exercising FRSA rights; precedent holds that, "where hazardous working conditions are the result of a system-wide failure to provide adequate protection so that employees are in danger of death or serious injury", the "Union may call a concerted work stoppage under § 10(b) to protect the lives and safety of the employees". *Boston & Maine Corp. v. Lenfest*, 799 F.2d 795, 799 (1st Cir. 1986).

2

## II. FACTS

BMWED is the collective bargaining representative of UP maintenance of way workers who are responsible for constructing, repairing, rehabilitating, upgrading, renewing, inspecting and maintaining the Carrier's track and right of way, as well as bridges, buildings, and other structures. BMWED is party to various collective bargaining agreements with UP. Declaration of Tony Cardwell (BMWED Ex. A) ¶2-3.

Many UP Maintenance of Way employees are assigned to work "gangs", which may range in size from several employees to over 100 employees. And many UP Maintenance of Way employees work away from home, traveling together to work sites in cars, trucks or buses; and they lodge overnights in motels or hotels. Cardwell Declaration ¶6-8. By the nature of their work, UP Maintenance of Way employees work in close proximity to each other; they often report to common facilities, sometimes with common locker rooms; and they are often transported in vehicles in which they quite near each other as they are being transported. Cardwell Declaration ¶8.

Maintenance of way workers are routinely exposed to hazardous and unhealthy conditions. They work outside in all weather conditions; and on and near uneven and unsteady railroad rights of way that present risks of tripping. The work involves dangerous equipment, heavy lifting and twisting, and repetitive strenuous motions. Maintenance of way workers are exposed to toxic chemicals and extremely loud work environments; sometimes maintenance of way workers are deployed on or near active tracks being used by trains. Serious injuries and fatalities are not uncommon among maintenance of way workers. Cardwell Declaration ¶9. But the pandemic exposed them to a new and different workplace danger.

3

Because maintenance of way gangs work in close proximity to each other, travel with each other in common vehicles to and from job sites, and report to common facilities sometimes with shared locker rooms, maintenance of way employees are necessarily in danger of exposure to Covid-19 if another member of the gang has been infected by the disease. Cardwell Declaration ¶¶9-10.

Beginning in March of 2020, the Union began to communicate with rail carriers, including UP, to urge them to provide adequate protection equipment and sanitation supplies for employees, and to provide paid leave for those who were infected. As the virus spread, and more became known about its transmission, and as railroad workers were deemed "essential workers" who must go to work, the Union made additional demands for protection of workers on the job. BMWED sought screening of employees before they go to work, sought contact tracing for those who were exposed. BMWED argued for continued compensation for workers who are required to self-quarantine because they are sick or were exposed to the virus in order to encourage employees to report such exposure or symptoms and to protect their co-workers. BMWED asserted that concerns about loss of income would discourage employees who were exposed to the virus or experiencing Covid-19-like symptoms from reporting such exposure or symptoms, because UP would require that they quarantine and they would lose earnings doing so. BMWED is concerned that the co-workers of exposed or symptomatic employees are at greater risk of contracting the disease because the exposed or symptomatic employees, particularly those who are uncertain about their exposure or symptoms, would be reluctant to self-report if they would have to forego pay. UP took some actions regarding personal protective equipment and sanitization, and UP agreed to pay limited, one-time compensation when an employee quarantined after exposure at work (but not if the employee was unable to demonstrate that exposure occurred at work). The Union believed that

4

UP's efforts were insufficient. In the meantime, hundreds of UP maintenance of way employees were infected, and four members of the Division, three wo employed by UP, died of the virus. Nationally, by the end of November, 2020, eleven BMWED members had died from the virus, and at least 700 members had been required to quarantine. Cardwell Declaration ¶11.

Between March and July of 2020, BMWED officers wrote to UP officials urging that UP provide its maintenance of way workers with necessary protective gear and sanitation supplies, encourage symptomatic employees to stay home, and provide paid leave to such employees. UP responded by describing its Covid-19 policy under which employees who are directed to quarantine should not report to work and could use earned vacation time or accrued paid leave for the time they were  evaluated; employees who are directed to self-quarantine because of exposure at work, but not elsewhere, could be provided a one-time, lump sum, "'Covid-19' Payment" for up to 14 days based on the minimum pay for their position, less any Railroad Retirement Sickness benefits or Supplemental Sickness benefits (the combined amount was typically less than what quarantined employees would have earned at work); and  employees required to self-quarantine for exposure other than at work would have to use their vacation or other accrued paid leave for that period.  BMWED objected that UP's policy was not sufficient, noting, among other things, that employees required to self-quarantine due to exposure outside work were not being compensated by UP, even though UP was prohibiting them from working; and they were being required to use vacation or other accrued leave, or earn nothing, while directed to quarantine. BMWED cited practices of other large employers and asserted that UP was failing to take necessary actions such as pre-screening workers (taking temperatures and assessing symptoms before work), contact tracing, frequent testing, and implementing a paid leave policy that encourages employees to self-quarantine rather than disincentivizing quarantining.  UP responded

that it was implementing protocols to comply with CDC guidelines. BMWED answered even with regard to those protocols, the actual experiences of BMWED members at work differed from, and were less protective of employees than, what was described by UP; BMWED asserted that UP had failed to verify that the policies it had announced were actually being implemented. Cardwell Declaration ¶¶12-18 and Exhibits A-E.

By a July 21, 2020 letter, BMWED President Fred Simpson again urged UP to adopt several specific measures: a) at least monthly testing and a paid leave policy that compensates quarantining employees at their full straight time rates; b) prescreening/temperature testing; and c) contact tracing when members have been exposed to co-workers who tested positive. President Simpson advised UP that "BMWED will take whatever steps necessary to protect our Members and their families in these uncertain times". Cardwell Declaration ¶19 and Exhibit F.

As the virus surged in the Fall of 2020, BMWED renewed its demands that UP do more to protect its maintenance of way workers, but UP did not adopt policies necessary to protect those employees. On September 24, 2020, BMWED Vice President Louis Below, wrote to again express concerns about UP's Covid-19 related policies and practices, including the Carrier's limited paid leave policy, which does not incentivize employees to stay home if they have been exposed to an infected person or were experiencing Covid-19-like symptoms, and actually discourages self-reporting if the employee cannot prove exposure at work or has already quarantined once before. Vice President Below again advised UP that even the protocols adopted by UP were not actually being implemented by management in the field. He concluded by repeating  BMWED's desire to work with UP on virus protocols and practices, but stated that the Union did not want to see another funeral because UP failed to implement policies necessary to protect its maintenance of way work-

force. UP responded that it had implemented some new policies, but declined to implement the policies sought by BMWED. Cardwell Declaration ¶¶20-22 and Exhibits G-H.

UP continued to refuse to implement the sort of policies and practices sought by BMWED through October and November of 2020 as the rate of infections increased dramatically. For example, UP rejected BMWED's requests for on-property Covid-19 testing, and prescreening of employees with pre-work temperature tests, as allegedly ineffective in controlling the spread of the disease. With respect to testing, UP asserted that it was not feasible to test at work sites or at multiple locations, but UP regularly conducts urinalysis drug testing at work sites. Machines and equipment that have been used by infected persons are not being sanitized before other employees are assigned to those machines and pieces of equipment. Also UP has not even successfully implemented the protocols it claims to have. The Carrier failed to ensure that face masks are readily available to employees (UP initially provided two masks to each employee and told them to clean the masks regularly even though many of these workers are away from home all week); and gangs in the field have insufficient access to hand sanitizers. General Chairman Cardwell has had to repeatedly chase down UP headquarters officials to make sure gangs have masks and sufficient hand sanitizers. Cardwell Declaration ¶¶22-23.

UP's policy of only compensating employees for quarantining if symptomatic or exposed to the virus only if they were exposed at work (which is extremely difficult to prove), leaves employees vulnerable to exposure to co-workers who were exposed away from work. And limiting compensation to a single fourteen-day quarantine means that workers in gangs are vulnerable to transmission from co-workers who have been infected or exposed multiple times. Cardwell Declaration ¶24. And while UP claims that employees are actually being paid under this program, BMWED cannot confirm how many are being paid, how many are being rejected and the criteria

used by UP in deciding whether to make payment. BMWED has requested information on this from UP but those requests have been denied. Cardwell Declaration ¶24.

Given UP's failure to adequately protect its maintenance of way employees from the virus, the Union wrote to the Carrier again on December 17, 2020. The Union said that UP had failed to adequately assure the safety and health of its maintenance of way employees creating an emergency situation; and demanded that UP take several specific steps, including: a) continuation of pay if an employee is required to quarantine (to remove disincentives to employees reporting exposure to the virus, or Covid-19-like symptoms); 2) increased testing at accessible locations; 3) pre-screening, testing and contact tracing; 3) provision of adequate protective equipment and sanitizing materials; and 4) implementation of social distancing requirements. BMWED advised UP that the Carrier's Covid-19 protocols had created work sites that are immediately hazardous to the life and health of its members; and that if current conditions continue, BMWED would have no choice but to advise its members that they have the right not to perform work in such circumstances. The December 17 letter further stated that if UP did not rectify the situation within ten days, the Union would declare a health and safety emergency because of the imminent threat to its members of serious injury or death, and that BMWED would call for a cessation of work if Union Pacific does not take the necessary corrective actions. Cardwell Declaration ¶25; Exhibit I.

On December 19, 2020, UP's Vice President for Labor Relations Rodney Doerr had a phone conversation with BMWED officers. Mr. Doerr described UP's policies and said they were sufficient and the best in the industry. He then said he wanted to better understand the Union's issues, and what the Union wanted. The Union officers responded that the December 17 letter was clear as to the issues and what the Union wanted, and that they disagreed with Mr. Doerr's characterization of UP's policies. The parties' discussed the Union's proposal for continuation of

pay for employees when they are required to quarantine. Mr Doerr said that he would take the information back to UP and that he appreciated the conversation. Cardwell Declaration ¶26.

UP has argued that BMWED's demands are related to RLA bargaining over amendments to the parties' agreements. But BMWED does not seek to amend or add to the parties' agreements. The demands relate to the specific circumstances of the pandemic. Cardwell Declaration ¶26.

### III. APPLICABLE LAW

**A. Rail Worker Refusal to Work In Unsafe Conditions Under the Federal Railroad Safety Act**

The FRSA prohibits rail carriers from "discharg[ing], demot[ing], suspend[ing], reprimand[ing], or in any other way discriminat[ing] against an employee"[1] for "refusing to work when confronted by a hazardous safety or security condition related to the performance of the employee's duties" if certain conditions are met. *See* 49 U.S.C. §20109(b)(1)(B).

A "protected activity" under the FRSA includes a refusal to work "made in good faith" where a "reasonable individual under the circumstances" would conclude that the hazardous condition confronting them presents an "imminent danger of death or serious injury" and that the employees, where possible, have "notified the railroad carrier of the existence of the hazardous condition and the intention not to perform further work". *See* 49 U.S.C. §20109(b)(2)(A-C). Further, an "employee's refusal need not be precipitated by an explicit directive in order for the employee's refusal to be FRSA-protected activity." *Rookaird v. BNSF Ry.*, 908 F.3d 451, 456 (9th Cir. 2018).

"The term 'hazardous condition' is broad and may encompass many types of hazardous conditions" across a wide range of situations that present imminent danger or the potential for

---

[1] "[S]ince the context of §10 does not confine the word 'employee' to the singular it applies to groups of employees as well as an individual employee." *Boston & Maine Corp. v. Lenfest*, 799 F.2d 795, 799 (1st Cir. 1986).

serious injury. *Cieslicki v. Soo Line R.R.*, ARB Case No. 2019-0065, 2020 BL 243372 (June 4, 2020).[2] "The good faith requirement is met if the employee has a subjective belief (*i.e.,* actually believes) that there is a violation of law, a safety or security hazard, or a work-related injury. Good faith is generally presumed unless the respondent provides evidence of bad faith." *See* OSHA INVESTIGATOR'S DESK AID TO THE FEDERAL RAILROAD SAFETY ACT (2019). And "Good faith is generally presumed unless the respondent provides evidence of bad faith." *Id.* "Objective reasonableness in such a case is based on the knowledge available to a reasonable person in the same factual circumstances with the same training and experience as the aggrieved employee." *Hernandez v. Metro-N. Commuter R.R.*, 74 F. Supp. 3d 576, 580 (S.D.N.Y. 2015). While the statute requires "some information be reported" where possible to notify the carrier of the hazard (*Winch v. DOL*, 725 Fed. Appx. 768, 771 (11th Cir. 2018), courts have held it to be satisfied where the notice was "imprecise" but where "one can infer that during the meetings, [the employee] was also calling attention to a hazardous safety condition." *Rossi v. Nat'l R.R. Passenger Corp.*, 2016 BL 145042, 3 (E.D. Pa. May 05, 2016).

While the issue of a concerted refusal to work under the FRSA has not arisen frequently, federal courts recognize a union's right to organize a system-wide work stoppage in the cases where it has occurred.

---

[2] "Hazardous conditions" under the FRSA have been found to include: construction sites without flagging protection (*Boston & Maine Corp. v. Lenfest*, 799 F.2d 795, 797 (1st Cir. 1986)); a railcar flagged for a bedbug infestation (*Lillian v. Nat'l R.R. Passenger Corp.*, 259 F. Supp. 3d 837, 839 (N.D. Ill. 2017)); defective engines and issues with engineer training (*Transp. Union v. Springfield Terminal Co.*, 675 F. Supp. 683, 685 (D. Me. 1987)); a rat infestation at the rail yard (*Consol. Rail Corp. v. Transp. Union*, 947 F. Supp. 168, 170 (E.D. Pa. 1996)); a violent picket line (*Monongahela Ry. v. Transportation Communications Union,* No. 89-4439, 1989 BL 175, *7 (W.D. Pa. July 12, 1989)); an inability to work after taking Vicodin after oral surgery (*Lockhart v. MTA Long Island R.R.*, 949 F.3d 75, 80 fn. 1 (2d Cir. 2020)); a foul smoky odor at the yard (*Jackson v. Union Pac. R.R.*, ARB No. 13-42, ALJ No. 2012-FRS-17, 2015 BL 137571 (March 20, 2015)); and a crew fouling an unprotected track *Brisbois v. Soo Line R.R.*, No. 15-CV-0570, 2016 BL 428108, 3 (D. Minn. Dec. 22, 2016).

In *Boston & Maine Corp. v. Lenfest*, 799 F.2d 795, 796 (1st Cir. 1986), the union called a strike because "the conductors and trainmen were faced with a system-wide, life-threatening danger due to the [carrier's] failure to provide consistent flagging protection at construction sites along the railroad tracks." The First Circuit recognized that where "hazardous working conditions are the result of a system-wide failure to provide adequate protection so that employees are in danger of death or serious injury… the Union may call a concerted work stoppage… to protect the lives and safety of the employees." *Id.* at 799. The court provided injunctive relief for the carrier, but cautioned that it was due to the "precarious financial condition" that could potentially result in the collapse of the railroad. *Id.* 802. The relief was limited to a preliminary injunction pending resolution of this dispute by the appropriate neutral arbitral review board; *and*, the carrier was required to follow its stated policy of flagging at all construction sites on or near the tracks and the union was only enjoined from calling a work stoppage as long as the carrier *actually* followed the flagging policy. *Id.* at 804.[3] In subsequent cases, not involving carriers in financial extremis, courts have been unwilling to grant injunctive relief.

In *United Transp. Union v. Springfield Terminal Co.*, 675 F. Supp. 683, 685 (D. Me. 1987), the union sought a declaratory injunction following their strike over hazardous conditions involving defective engines and issues with engineer training. In declining to issue injunctive relief, the court noted that the safety measures the union sought by court order had already imposed

---

[3] Prior to 2007, enforcement of the FRSA protection of the right to withdraw from service because of imminent danger of serious injury or death was done through the arbitration procedures of Section 3 of the Railway Labor Act (45 U.S.C. § 153). But in passage of the RSIA in 2007, Congress amended the FRSA and transferred the enforcement process to the Secretary of Labor. *Norfolk S. Ry. Co. v. Solis*, 915 F. Supp. 2d 32, 37 (D.D.C. 2013) *citing* Implementing Recommendations of the 9/11 Commission Act of 2007, Pub. L. No. 110–53, § 1521, 1221 Stat. 266, 444 (2007). The Secretary of Labor "delegated her authority to investigate complaints for retaliation under 49 U.S.C. § 20109 to the Assistant Secretary for Occupational Safety and Health… who oversees the Occupational Safety and Health Administration ("OSHA"). *Id.* citing 29 C.F.R. § 1982.104. Now FRSA complaints "may be filed with any OSHA officer or employee." 29 C.F.R. § 1982.103.

by the FRA so that an injunction was unnecessary and the court distinguished the case from *Lenfest. Id.* ("This case is in a very different posture from *Lenfest*, where the injunction was requested by the carrier, who was "in a precarious financial condition and claim[ed] it would quickly become insolvent if a total work stoppage were to continue.")

In denying another rail carrier's request for an injunction, the court noted that "public interest requires that we decline to order defendants to instruct their employees to report for work." *Monongahela Ry. v. Transportation Communications Union,* No. 89-4439, 1989 BL 175, *8 (W.D. Pa. July 12, 1989). Even though the railroad showed it had taken some steps to protect the workers who refused to cross a particularly violent picket line, the court was persuaded by the evidence that the risks of "imminent danger of serious injury or perhaps death" ***had not*** abated. *Id.* at *5. The carrier "failed to prove that defendants will not suffer substantial harm from the grant of an injunction" and the workers' "risk and the immediate danger to their safety outweighs the unfortunate financial losses and expenses which have been incurred." *Id.* at *8; *see also Consol. Rail Corp. v. Transp. Union*, 947 F. Supp. 168, 173 (E.D. Pa. 1996) (holding that injunctive relief should only be granted "where preliminary injunctive relief is necessary to prevent immediate irreparable harm.")

## B. NORRIS LAGUARDIA ACT CONSTRAINTS ON JUDICIAL INTERVENTION IN LABOR DISPUTES

### 1. The NLGA Governs All Requests For Injunctions In Labor Disputes

The Supreme Court has stated that "Congress passed the Norris-LaGuardia Act to curtail the jurisdiction of the courts, not, as it passed the Taft-Hartley Act to regulate the conduct of people engaged in labor disputes". *Marine Cooks and Stewards v. Panama SS Co.*, 363 U.S. 365, 369, 372 (1960). The Court has also described the Norris LaGuardia Act as a reaction to the "judge-made [labor] law of the late 19[th] and early 20[th] centuries [that] was based on self-mesmerized views

of economic and social theory", and stated that the NLGA reflected "clear disapproval of these free wheeling judicial exercises". *Brotherhood of Railroad Trainmen v. Jacksonville Terminal*, 394 U.S. 369, 382-383 (1969). In *Brotherhood of R.R. Trainmen v. Chicago River and Indiana R.R. Co.*, 353 U.S. 30, 40 (1957) ("*Chicago River*"), the Court said that the NLGA "aimed to correct existing abuses of the injunctive remedy in labor disputes". *See also Aircraft Service International, Inc. v. International Brotherhood of Teamsters*, 779 F. 3d 1069, 1073 (9th Cir. 2015) ("*Aircraft Service*").

In *Burlington Northern R.R. v. Brotherhood of Maintenance of Way Employes*, 481 U.S. 429, 437-39. (1987), the Court observed that: "'[t]he Norris-LaGuardia Act expresses a basic policy against the injunction of activities of labor Unions,'" and that the NLGA was a specific response to judicial activism in labor disputes which had restricted the rights of employees to take economic action, by narrowly confining the ability of the courts to issue injunctions in labor disputes. *Id.* at 437-38, *quoting Int'l Ass'n of Machinists v. Street*, 376 U.S. 740, 772 (1961).

Consistent with history and purpose of the NLGA, Section 1 of the statute expressly states that no injunction may issue in a labor dispute unless there is strict compliance with NLGA requirements; NLGA Section 4 provides that "No court of the United States shall have jurisdiction" to issue any restraining order or injunction in any case involving or growing out of a labor dispute to prohibit various acts, including, among other things, striking and picketing. 29 U.S.C. §§101,104.

## 2. The NLGA Applies To All Labor Disputes, And Expansively Defines "Labor Dispute"

Consistent with the overall purpose and history of the NLGA, it applies to all "labor disputes" and it defines that term very broadly; including disputes involving persons who are engaged in the same industry, are employees of the same employer or are members of the same

organization whether the dispute is between any combination of employers and employees; and the term "labor dispute" includes "any controversy concerning terms and conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee". 29 U.S.C. §113, emphasis added. In *Marine Cooks, supra.*, the Supreme Court stated "That Act's language is broad. The language is broad because Congress was intent upon taking the federal courts out of the labor injunction business except in the very limited circumstances left open for federal jurisdiction under the Norris-LaGuardia Act". 363 U.S. at 369, *see also Camping Construction Co. v. District Council of Iron Workers*, 915 F.2d 1333, 1343 (9th Cir. 1990)–the NLGA definition of labor dispute "is extremely broad, and the Supreme Court has so interpreted it".

In *New Negro Alliance v. Sanitary Grocery Co.*, 303 U.S. 552 (1938), the Supreme Court held that the NLGA barred an injunction against picketing by a civic group that was to induce an employer to cease racially discriminatory hiring policies. The NLGA applied even though the picketers were not employees of the picketed entity or union officials, and they were not seeking to affect wages, hours or other basic working conditions. The Court rejected the holding of the lower courts that the NLGA was inapplicable because the picketing was motivated by the group's "political" or "social goals". The Court concluded that the group and its members were "persons interested in a labor dispute" within the meaning of the NLGA, stating that "[t]he Act does not concern itself with the background or the motives of the dispute". *Id.* at 706-707, emphasis added. In *Marine Cooks*, *supra.,* the Court held that the NLGA controlled a motion for an injunction against picketing and an effort to prevent unloading of cargo to protest low wages paid by foreign flagships where there was no dispute between that ship's owners and employees. 363 U.S. at 368-

14

369. And in *Port of Houston v. International Organization of Masters, Mates and Pilots,* 456 F. 2d 50 (5th Cir. 1972) the Fifth Circuit held that picketing by non-employees to protest the loss of job opportunities for American seamen, and to request that the public not patronize ships using foreign crews which caused longshoreman not to unload ships using foreign crews was covered by the NLGA. The Court rejected the assertion that the case was not an NLGA labor dispute because the picketing was interfering with international commerce and was inconsistent with a treaty.

The Supreme Court reaffirmed the NLGA's expansive interpretation of the term "labor dispute" in *Jacksonville Bulk Terminals v. International Longshoremen's Ass'n.,* 457 U.S. 702 (1982), when longshoremen refused to work on ships carrying fertilizer to the Soviet Union in order to protest the invasion of Afghanistan. The Court held that the NLGA deprived the courts of jurisdiction to grant an injunction, concluding that the action was both a form of political protest and a matter involving a labor dispute within the NLGA's broad definition of that term. In response to the employer's claim that the union's "political motives" meant that the dispute was not an NLGA labor dispute, the Court said that '[t]his argument however, has no basis in the plain statutory language of the Norris LaGuardia Act or in our prior interpretations of that Act". 457 U.S. at 709. *See also Central Vermont Ry. v. Brotherhood of Maintenance of Way Employes,* 793 F. 2d 1298, 1301 (D.C. Cir. 1986), an RLA case in which the Court stated:

> Any doubts that might linger about the breadth of the [NLGA's] withdrawal of jurisdiction, moreover, are dispelled by *Jacksonville Bulk Terminals Inc. v. ILA,* 457 U.S. 702 (1982).The Supreme Court in holding that the Act barred injunctive relief against politically motivated work stoppages, specifically rejected the argument that a "labor dispute exists only when a union acts in its economic self interest. See id. at 713-715.

*See also Camping Construction Co., supra* 915 F. 2d at 1342-1343.

**3. Application of the NLGA When an Injunction is Permissible**

Notwithstanding NLGA Sections 1 and 4, the Supreme Court has held that the NLGA does not, "prevent a court from enjoining violations of a specific mandate of another labor statute". *Brotherhood of R.R. Trainmen v. Chicago River and Indiana R.R. Co.*, 353 U.S. 30, 40 (1957), holding that a strike could be enjoined when the dispute was subject to Railway Labor Act arbitration – "[t]here must be an accommodation of that statute and the Railway Labor Act so that the obvious purpose of each is preserved". *Id. See also, Pittsburgh & Lake Erie R.R. Co.,* 491 U.S. 490, 513 (1989); *Burlington Northern v. BMWED*, 481 U.S. at 440, 445, 449 n. 14.[4]

But, even when the Section 4 general bar on injunctions must give way, the other provisions of the NLGA still apply. *See Brotherhood of Railroad Trainmen v. Toledo, Peoria & Western,* 321 U.S. 50 (1944), and *Rutland Ry. v. Brotherhood of Locomotive Engineers*, 307 F. 2d 21, 37-40 (2d Cir. 1962) applying NLGA Section 8; *Brady v. National Football League,* 644 F. 3d 661, 681 (8th Cir. 2011); and *United Airlines v. International Association of Machinists and Aerospace Workers*, 243 F. 3d 349, 362 (7th Cir. 2001) applying NLGA Section 7. These requirements are not mere technicalities. When a District Court issues an injunction in a labor dispute without compliance with NLGA procedural provisions, the Court acts in excess of its jurisdiction. *Lauf v. Shinner,* 303 U.S. 323, 329-30 (1938); *In re Dist. No. 1, MEBA*, 723 F.2d 70, 76-77 (D.C. Cir. 1983),--

---

[4] When the FRSA required arbitration of disputes over whether a withdrawal from service was justified under that statute, courts held that the while the NLGA applied, the Section 4 ban on injunctions should be accommodated to the mandate for arbitration. *See e.g. Boston & Maine Corp. v. Lenfest, supra.* 799 F.2d at 802 (1st Cir. 1986) --"Pursuant to the teaching of the Supreme Court, we must accommodate the venerable Norris-LaGuardia Act with the purpose of the recently enacted FRSA." But the courts also held that "when an injunction against a work stoppage is sought by a railroad, the court must also consider the alleged hazardous condition facing the employees. An injunction should not issue if it forces the employees, upon pain of contempt, to return to work and face a hazardous condition that the FRSA was intended to allow them to avoid. In most cases where an injunction enters, then, some provision must be made for protecting the employees". 799 F.2d at 801-804 (1st Cir. 1986). *See also Monongahela Ry. v. Transportation Communications Union*, supra. 1989 BL 175, 4. As noted above, the RSIA amended the FRSA to eliminate arbitration of these issues and transferred enforcement questions to OSHA.

"[s]trict adherence to the Act's procedures is not a mere matter of form:  A district court has no *jurisdiction* under the Norris-LaGuardia Act to issue a labor injunction without adhering to the explicit terms of the Act" (emphasis in original); *District 17, United Mine Workers of America v. Apogee Coal Co.*, 13 F.3d 134, 135, 136 (4th Cir. 1993);  *Lukens Steel Co. v. United Steel Workers of America*, 989 F.2d 668, 678 (3d Cir. 1993); *Delta Airlines v. Air Line Pilots Ass'n.*, 238 F. 3d 1300, 1310 (11th Cir. 2001)–allowing injunctions in labor disputes but holding that the procedural requirements of the NLGA governed issuance of the injunctions; *Pulte Homes v. Laborers Int'l Union*, 648 F. 3d 295, 305 (6th Cir. 2011)–"the NLGA deprives a court of jurisdiction to issue a preliminary injunction 'except in strict conformity with the provisions' of the NLGA".[5]

NLGA Section 7 (29 U.S.C. §107) governs the rules and procedures for consideration of injunctions in labor disputes. *United Airlines v. IAM, supra.*, 243 F. 3d at 362 and n. 9; *Delta Airlines v. Air Line Pilots Ass'n.*, 238 F. 3d 1300 (11th Cir. 2001); *Brady v. NFL.* 644 F 3d at 681. *See also District 17, United Mine Workers of America v. Apogee Coal Co.*, 13 F.3d 134, 136-137 (4th Cir. 1993), and *Triangle Constr. Corp. v. Our Virgin Islands Labor Union*, 425 F. 3d 938, 944 (11th Cir. 2005). To grant an injunction, Section 7 requires that a court find that "unlawful acts" "have been committed and will be continued unless restrained", that substantial and irreparable

---

[5] Issuance of an injunction based on generally applicable standards governing requests for preliminary injunctive relief under Fed. R. Civ. P. 65, without application of the NLGA is reversible error.  *District 17, UMWA v. Apogee Local supra.*, 13 F.3d at 136-37. In *Local Union 733 v. Ingalls Ship Building*, 906 F. 2d 149,151 (5th Cir. 1990), the Fifth Circuit, after citing Rule 65 then stated (906 F. 2d at 152) that "A court's discretion to issue an injunction in the labor-management context is significantly circumscribed by federal law", citing the NLGA. And in *Jacksonville Maritime Ass'n v. International Longshoremen's Ass'n.* 571 F. 2d 319, 322-323 (5th Cir.)  the Court, after listing the Rule 65 criteria said that "[a] labor injunction raises questions of special delicacy and places further limitations on the court's discretion" (571 F. 2d at 323); the court later stated that "the procedural requirements of Section 7 of the Norris-LaGuardia Act remain applicable in a suit for an injunction" to prevent a strike and compel arbitration. *Id.* at 325 n.2, adopting and quoting the holding in *Celotex Corp. v. Oil Chemical and Atomic* Workers, 516 F. 2d 242, 246 (3d Cir. 1975), and *United States Steel Corp. v. United Mine Workers,* 456 F. 2d 483 (3d Cir. 1972). *See also* Rule 65 itself which expressly states that "These Rules do not modify any statute of the United States relating to temporary restraining orders and preliminary injunctions in actions affecting employer and employee".

injury to the plaintiff, for which there is no adequate remedy at law, will follow if the injunction is not issued. 29 U.S.C. §107. However, as discussed above, the Supreme Court has held that when a carrier violates Section 2 Seventh by abrogating or unilaterally changing a collective bargaining agreement, thereby negating the status quo provisions of the Act, a court may issue a preliminary injunction without making a separate finding of irreparable harm.

NLGA Section 7 also requires that evidence on a motion for an injunction in a labor dispute must be provided under oath, and that testimony on the motion be given in open court with opportunity for cross-examination.  29 U.S.C. §107. In *Brady v. NFL.* 644 F 3d at 681, the Eighth Circuit noted that Section 7 provides that a court has no authority to issue an injunction in a labor dispute except after a hearing with testimony of witnesses under oath and subject to cross-examination in open court and with rebuttal testimony. *See also United Telegraph Workers v. Western Union,* 771 F. 2d 699, 704 (3d Cir. 1985)*; District 17 United Mine Workers v. A&M Trucking,* 991 F. 2d 108, 110-111 (4th Cir. 1993); *Pulte Homes, supra.*, 648 F. 3d at 305. So, in a labor dispute, NLGA Section 7 sets the procedural standards for injunctions.

Section 8 of the NLGA (29 U.S.C. §108) provides that an injunction may not issue if the party seeking such relief lacks "clean hands". In *Brotherhood of Railroad Trainmen v. Toledo*, *Peoria and Western*, *supra.,* the Supreme Court held that Section 8 requires that a party "discharge his legal obligations", and also that "[h]e must go beyond them and make all reasonable effort" to settle the dispute. 321 U.S. at 57, 62, 63. *See also Rutland Ry. v. Brotherhood of Locomotive Engineers*, 307 F. 2d 21 (2d Cir. 1962)-- Section 8 "imposes two different requirements on one who seeks injunctive relief in a labor dispute. He must comply with all his legal obligations and, further, he must make every reasonable effort to settle the dispute by the methods enumerated". *Id.* at 39, *citing, Toledo Peoria & Western.*

Since *Toledo, Peoria & Western*, the Courts have consistently held that the NLGA will preclude issuance of an injunction on behalf of a party that has not complied with the RLA. *See e.g Order of Railroad Telegraphers v. CNW*, 362 U.S. 330, 339--NLGA barred anti-strike injunction when the carrier had refused to bargain over its decision to close a number of stations; *Aircraft Service, supra.* in which the Ninth Circuit reiterated that courts are prohibited from issuing injunctive relief to a party that has failed to comply with any obligation imposed by law or failed to make every reasonable effort to settle such dispute. 779 F. 3d at 1073; *Burlington Northern v. UTU*, 862 F.2d 1266, 1281-82 (7th Cir. 1988); and *Butte Anaconda & P. Ry. v. Brotherhood of Locomotive Firemen and Enginemen*, 268 F. 2d 54, 60 (9th Cir. 1959).

In *Rutland Ry. v. Brotherhood of Locomotive Engineers*, 307 F. 2d 21 (2d Cir. 1962) *cert. denied*, 372 U.S. 954 (1962), the Second Circuit held that that Section 8 "imposes two different requirements on one who seeks injunctive relief in a labor dispute. He must comply with all his legal obligations and, further, he must make every reasonable effort to settle the dispute by the methods enumerated". *Id*. at 39, *citing, Toledo Peoria & Western. See also Aircraft Service, supra.* in which the Ninth Circuit reiterated that courts are prohibited from issuing injunctive relief to a party that has failed to comply with any obligation imposed by law or failed to make every reasonable effort to settle such dispute. 779 F. 3d at 1073; and *Burlington Northern v. UTU,* 862 F.2d 1266, 1281-82 (7th Cir. 1988), holding that when a carrier violated the RLA by "fail[ing] to comply with the RLA mandatory bargaining procedures, it was precluded [by NLGA Section 8] from seeking relief from the Union's threatened strike.

NLGA Section 9 provides that no injunction may be granted in a labor dispute "except on findings of fact made and filed by the Court", and that any injunction "shall include only a prohibition of such specific act or acts as may be expressly complained of in the bill of complaint

19

or petition filed in such case and as shall be expressly included in said findings of fact made and filed by the court." (29 U.S.C. §109.) In *Southern Ohio Coal Co. v. United Mineworkers*, 551 F.2d 695 (6th Cir. 1977), the Sixth Circuit stated that NLGA §9 requires a court to issue the narrowest possible injunction necessary to effectively safeguard the plaintiff's rights. *Id.* at 709, *citing Int'l Ass'n of Machinists v. Street*, 367 U.S. at 773.

## IV. ARGUMENT

### A. The Withdrawal From Service By UP's Maintenance Of Way Workers In Response To UP's Insufficient Covid-19 Protocols Is Covered By, And Protected By, The FRSA

As described above, the FRSA protects railroad workers who "refus[e] to work when confronted by a hazardous safety or security condition related to the performance of the employee's duties"; and "protected activity" under the FRSA includes a refusal to work "made in good faith" where a "reasonable individual under the circumstances" would conclude that the hazardous condition confronting them presents an "imminent danger of death or serious injury", where the employees, have, if possible, "notified the railroad carrier of the existence of the hazardous condition and the intention not to perform further work". *See* 49 U.S.C. §20109(b)(1)(B) and (2)(A-C).

### 1. Exposure to Covid -19 Is A Hazardous Condition That Threatens Death Or Serious Injury

The serious, potentially fatal, consequences of infection by the Covid-19 virus are now well known. Hundreds of thousands of Americans have died from the virus, and innumerable others are experiencing lingering and long-term effects of infection. The Federal and most state governments have declared emergencies and issued extraordinary mandates to limit transmission of Covid-19. BMWED submits that the dangers of the virus are self-evident, and the Court can

20

certainly take judicial notice of its ease of transmission and lethality.[6] BMWED submits that it is clear that a reasonable individual would conclude that exposure to Covid-19 presents an "imminent danger of death or serious injury" within the meaning of the FRSA, and that refusal to work in the face of inadequate protections from exposure to the virus is a good faith and reasonable response to an employer's failure to adequately protect its workers from exposure to the virus.

**2. UP's Response To The Pandemic Provides Inadequate Protection To Its Maintenance of Way Employees Such That A Reasonable Employee Would In Good Faith Fear That Their Working Conditions Threaten Imminent Danger of Death Or Serious Injury**

UP's response to the virus has been inadequate and endangers its maintenance of way workers with serious injury or death. The Declaration of Tony Cardwell explains that BMWED has been pressing UP to take necessary steps to protect its maintenance of way employees from exposure to the virus since the beginning of the pandemic. Railroad workers have been deemed

---

[6] As of December 17, 2020, the Centers for Disease Control and Prevention ("CDC") report that there are 16,756,581 total cases of COVID-19 in the United States, including 1,485,010 cases in the previous seven days, and there have been 306,427 deaths attributed to COVID-19. *See* CENTERS FOR DISEASE CONTROL AND PREVENTION, UNITED STATES COVID-19 CASES AND DEATHS BY STATE (Dec. 17, 2020), https://covid.cdc.gov/covid-data-tracker/#cases_totalcases. The President of the United States issued a proclamation that there is a nationwide public health emergency due to COVID-19 and the Secretary of Health and Human Services ("HHS") issued a determination that COVID-19 is a public health emergency. *See* Proclamation 9994, 85 FR 15337 (March 13, 2020); Secretary of HHS Alex M. Azar, Determination that a Public Health Emergency Exists (Jan. 31, 2020), https://www.phe.gov/emergency/news/healthactions/phe/Pages/2019-nCoV.aspx. And, in a statement to the US Chamber of Commerce on December 2, 2020, CDC Director Dr. Robert Redfield said, "I do think unfortunately, before we see February, we could be close to 450,000 Americans [who] have died from this virus." Will Feuer, *CDC Director Warns The Next Few Months Could Be 'The Most Difficult In The Public Health History Of This Nation',* CNBC (Dec. 3, 2020, 10:38 AM), https://www.cnbc.com/2020/12/02/cdcs-redfield-says-the-most-difficult-months-in-health-history-loom.html. Every single state and the District of Columbia has issued some form of disaster declaration, state of emergency, or public health emergency related to COVID-19. *See* NATIONAL GOVERNOR'S ASSOCIATION, STATUS OF STATE COVID-19 EMERGENCY ORDERS, (Dec 3, 2020), https://www.nga.org/state-covid-19-emergency-orders/. CDC guidance to the public advises that "COVID-19 spreads very easily from person to person." *See* CENTERS FOR DISEASE CONTROL AND PREVENTION, HOW COVID-19 SPREADS (Oct. 28, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html. Further, the CDC advises, that the "best way to prevent illness is to avoid being exposed to this virus" and that steps to accomplish this include "[c]over[ing] your mouth and nose with a mask when around others" and "[s]tay[ing] home and isolat[ing] from others when sick." *Id.*

"essential workers" and they must report to work, and work with others in close quarters, in order to ensure that UP can safely and effectively move freight, including food and other supplies needed across the Country.

At the outset of the pandemic the steps necessary to protect workers were not as clear as they are today, and UP took certain steps to limit transmission among its workers. Even then BMWED viewed the steps taken as insufficient; but as the months progressed, and more became known, BMWED pressed UP for additional protections for its members. UP did not provide those protections. As the virus surged in the Fall, and after eleven BMWED members died, three of them UP employees, BMWED demanded additional protections with greater urgency. BMWED demanded UP adopt a policy of continuing pay for all employees required to quarantine, increased testing at accessible locations; pre-screening for workers when they report to work; frequent testing; contact tracing after a worker has been exposed to the virus; provision of adequate protective equipment and sanitizing materials; and implementation of social distancing requirements. But UP has refused to adopt the policies sought by BMWED.

Continuation of pay for employees who are symptomatic or who have been exposed to the virus, thereby encouraging such employees to self-report which means mandatory quarantining under UP's policy, is important to the health and safety of UP maintenance of way workers. In the absence of assurance of continued pay when an employee has been exposed or has Covid-19-like symptoms, employees are effectively penalized for self-reporting which will result in them being barred from reporting to work. Employees may have doubts about exposure, or may be uncertain about their symptoms, or may simply be conflicted about losing two weeks of pay; failure to continue employee pay when they are quarantining discourages rather than encourages employee reporting of exposure or symptoms. This puts their co-workers at risk of exposure when an

employee does not self-report and quarantine. As is explained by General Chairman Cardwell, maintenance of way employees work in gangs that range from several to over a hundred workers, where gang members are in close proximity to each other as they work; and gang members travel to and from work sites in vehicles where there is little distance between the passengers. In this work and travel environment, masking and social distancing are appropriate but not sufficient to protect employees if a co-worker is symptomatic or has been exposed to the virus. Not causing employees to choose between loss of earnings and protection of their co-workers when they are uncertain as to whether they have been infected is necessary to truly limit the spread of the infection among gang members.

UP does have a program of making certain payments to employees who are required to quarantine, if they were exposed at work. Those are single lump sum payments for up to fourteen days, limited to straight time earnings based on the minimum pay for their position, less any Railroad Retirement Sickness benefits or Supplemental Sickness benefits; the combined amounts have typically been less than what the quarantined employees would have earned at work. Cardwell Declaration ¶11-12, 20, 22-24. There are several glaring problems with UP's program. First, covered employees receive less compensation than they would by working. Second, employees are only eligible for a single 14 day period; but with employees working in large gangs over many months while traveling to different parts of the Midwest and Western United States, employees may be exposed multiple times to co-workers who were exposed to the virus or experienced Covid-19 type symptoms. Cardwell Declaration ¶24. Third, this compensation program is limited to employees who are exposed at work, and that is very difficult to prove, given the transmission and incubation patterns of Covid-19. BMWED has been unable to ascertain how many employees have been paid, how many have been denied and what criteria have been applied;

BMWED's requests for this information have been denied by UP. *Id.* And the danger to employees of working in close proximity to a co-worker who was exposed to the virus or is symptomatic does not differ whether the co-worker was exposed at work or outside work. It is a fundamental condition of maintenance of way employment that employees work close to co-workers and travel in confined spaces with co-workers; only a policy that does not financially penalize those who self-report, but instead truly encourages all employees who have been exposed or who are symptomatic to quarantine, will provide adequate protection from transmission of the virus. UP's policy falls far short in this regard.

UP's policy falls short in other areas too. Pre-screening of employees when they report to work, while not perfect, is a baseline approach to the problem. Frequent testing and contact tracing are also well accepted basic protections for workers. UP should provide access to testing for Covid-19 where it is easily accessible to all employees on the job site and test employees on company time, with employees tested for cause (showing symptoms, having been exposed) as many times as necessary and paid while waiting for the results. UP claims it cannot test employees at job sites or reporting sites, but the Carrier regularly performs urinalysis drug tests at work sites. UP has also failed to provide adequate protective equipment and sanitizing materials. Employees should be furnished new face masks and hand cleaner each workday, and not be required to work until those supplies are produced; and adequate sanitation materials should be supplied to ensure that all vehicles, machines and locker rooms can be sanitized daily, with records kept to ensure that it is done. And the Carrier has not implemented effective social distancing requirements. UP claims to have policies and protections of this sort, but even when UP claims to have appropriate policies, actual practices in the field do not match the published policies. Cardwell Declaration ¶20, 23-24.

UP argues that the threat to its maintenance of way employees is not "imminent" because the parties have exchanged correspondence on the issue since last March. But much more is known about the virus now than was known in March. And the exchange merely shows that UP was unmoved by the circumstances of its employees. The BMWED tried to reason with the Carrier over the course of months, as the virus raged and infections accelerated dramatically in the Fall, especially in states where UP employees work. After the loss of eleven members nationally and three from UP, the Union reasonably determined that with the virus on a rampage, and UP obstinate in its response, the present situation presents an imminent threat of death or serious injury.[7]

UP's argument that there cannot be an imminent threat because the Union tried for months to spur UP to improve its protocols is at odds with the UP's argument that BMWED was required to make efforts to resolve the dispute with the Carrier. BMWED made those efforts, when they failed, and the infection rate spiraled out of control, BMWED determined that the threat was imminent and its members have a right to refrain from working in such conditions if UP did not provide them with adequate protections. The impact of the inadequacy of the UP protocols is shown by the circumstances of a maintenance of way employee who was exposed to the virus by a train crew who came into a common facility sick, a crew member and the maintenance of way employee later tested positive for the virus, he has been out for several months and has permanent lung damage, and several members of his family caught the virus from him. Cardwell Declaration ¶22.

UP also contends that another avenue of recourse is available to BMWED so there cannot be a withdrawal from service; that BMWED could file a petition to the Federal Railroad Administration as two other unions did. But that was back in March; and much has changed.

---

[7] See also fn. 6 and the December 2, 2020 comment of CDC Director Dr. Robert Redfield that with deaths already over 300,000, it is likely that the number of deaths will reach 450,000 before February.

Furthermore, the FRA process described by UP does not exclude a withdrawal from service by employees when they are faced with an imminent threat. UP has cited no authority holding that workers cannot exercise their right to refrain from working in dangerous conditions if the FRA has not seen fit to act, or if they have not sought FRA action. FRA's authority is just part of the statutory scheme, it does not preclude employee self-protection. Indeed, it was because other avenues of recourse might not be timely, that the statute recognized the right of employees to refrain from service when they face imminent threat of death or serious injury. And the process described by UP, with appeals, could take months. In the meantime, and since March, three members of the USD have died of the virus. It should not take another death to bring about action; and BMWED members should not go to work fearing that they will be the next casualty.

### 3. UP Has Been Notified Of The Hazardous Working Conditions That Threaten Its Maintenance Of Way Workers

As shown by the Cardwell Declaration, BMWED has been communicating with UP since the start of the pandemic regarding necessary protections for the Union's members and the shortcomings of UP's protocols. After eleven BMWED members, including three UP employees, died of the virus, and after the rate of infections surged in the Fall, BMWED made more urgent demands for better protection of its members. Finally, on December 17, BMWED wrote to the Carrier formally declaring a safety emergency, specifying where UP's protocols have fallen short of what is necessary, and informing UP that if it did not make changes, the Union would advise its members that a hazardous condition threatening death or serious injury exists on the railroad, that Union members would have the right to withdraw from service in such circumstances, and that BMWED would call on them to do so if UP did not take corrective action within ten days.

UP has had ample notice of the threat posed to its maintenance of way employees and the consequences of continued disregard for the health and safety of BMWED's members.

Under the FRSA, and precedent under that statute, all elements of a valid withdrawal from service are present here; and the actions of BMWED, and those of its members in refusing to work until the hazardous conditions are rectified, are protected by the Act.

**4. BMWED's Declaration Of A Health And Safety Emergency And Its Members' Collective Withdrawal From Service In Response To That Emergency Are Protected By The FRSA**

UP contends that FRSA Section 20109 only protects employees from discrete acts of retaliation not from system-wide threats. UP is incorrect. As is shown above, applicable precedent holds that when faced with a systemic safety threat, employees can collectively refuse to work under the unsafe conditions, their union can declare a safety emergency to inform employees of the systemic threat, and the employees can respond by refusing to work under those conditions. *See e.g. Boston & Maine Corp. v. Lenfest*, 799 F.2d at 799-800 –"The next issue is whether §10 applies to a collective refusal to work under hazardous conditions called by an employee bargaining unit, or whether it creates a right that can be exercised only by an employee acting individually….First, we find that since the context of §10 does not confine the word "employee" to the singular it applies to groups of employees …Second,…safety legislation is to be liberally construed to effectuate the congressional purpose….We hold that where hazardous working conditions are the result of a system-wide failure to provide adequate protection so that employees are in danger of death or serious injury without knowing it, and the Union is aware of such danger, the Union may call a concerted work stoppage under § 10(b) to protect the lives and safety of the employees".[8]

---

[8] The decisions cited by UP are not to the contrary. In *Dakota, Minn. & E. R.R. v. DOL Admin. Review Bd.*, 948 F.3d 940, 943 (8th Cir. 2020), concerned the standard for intentional discrimination; and the court rejected "chain of events" causation as a contributing factor to the carrier's action against the complainant as inconsistent with Circuit precedent requiring a showing of intent, of "discriminatory animus". And *Foster v. BNSF Ry.*, 866 F.3d 962 (8th Cir. 2017) concerned the obligation to exhaust administrative remedies, if an employee chooses an administrative investigation, and then the scope of a claim that can be asserted in court, given the nature of the administrative claim.

**B. UP Can Not Establish A Basis For Issuance Of A Restraining Order Against A Withdrawal From Service By BMWED's Members In Response To UP=s Covid-19 Protocols**

Given the broad definition of "labor dispute" under the NLGA, this dispute is covered by the NLGA. As BMWED has shown, precedent under the NLGA defines "labor dispute" expansively. The instant dispute certainly is one between involving persons who are engaged in the same industry who are employees of the same employer; and is certainly a controversy concerning terms and conditions of employment—the health and safety of UP's maintenance of way employees, their employer's Covid-19 protocols, and its directive that employees who have been exposed to the virus or exhibit Covid-19-like symptoms refrain from reporting to work. Plainly the withdrawal from service involves a labor dispute under the NLGA, 29 U.S.C. §113; *Marine Cooks, supra.*, 363 U.S. at 369; *New Negro Alliance v. Sanitary Grocery Co.*, *supra.*  303 U.S. 502.  Accordingly, this Court lacks jurisdiction to issue a temporary restraining order sought by UP.

When the FRSA required arbitration for disputes over whether a withdrawal from service was justified under that statute, using the arbitration procedures of Section 3 of the Railway Labor Act, some courts held that the while the NLGA applied to the disputes, the Section 4 ban on injunctions should be accommodated to the mandate for arbitration. *See e.g. Boston & Maine Corp. v. Lenfest*, *supra.*  799  F.2d at 802 (1st Cir. 1986) --"Pursuant to the teaching of the Supreme Court, we must accommodate the venerable Norris-LaGuardia Act with the purpose of the recently enacted FRSA." But the courts also held that "when an injunction against a work stoppage is sought by a railroad, the court must also consider the alleged hazardous condition facing the employees. An injunction should not issue if it forces the employees, upon pain of contempt, to return to work and face a hazardous condition that the FRSA was intended to allow them to avoid. In most cases where an injunction enters, then, some provision must be made for protecting the

employees". 799 F.2d at 801-804 (1st Cir. 1986). *See also Monongahela Ry. v. Transportation Communications Union*, supra. 1989 BL 175, 4.

However, the RSIA amended the FRSA to eliminated RLA Section 3 arbitration from the FRSA, and eliminated arbitration altogether; instead, such matters were given over to OSHA. Accordingly, to the extent that the courts that issued injunctions in FRSA cases did so relying on precedent accommodating the NLGA to the arbitration procedure of the RLA, the FRSA no longer relies on RLA arbitration, so that precedent does not support issuance of an injunction despite the NLGA.

Furthermore, even if it theoretically could grant the order sought by UP, the Court lacks jurisdiction to do so because UP cannot satisfy the NLGA Section 7 criteria for issuance of an injunction Bit cannot show that a withdrawal from service by BMWED's members would be an unlawful act; nor can UP show that it will be irreparably harmed by a strike and that any potential harm to it would exceed the potential harm to BMWED's members if UP continues its current Covid-19 protocols. And because of UP=s own failure to adequately protect its workers from life threatening working conditions, UP is ineligible for injunctive relief under NLGA Section 8.  29 U.S.C. §§107 and 108; *Brotherhood of Railroad Trainmen v. Toledo, Peoria & Western, supra.,* 321 U.S. 50; *Brady v. National Football League, supra.,* 644 F. 3d at 681; *In re Dist. No. 1, MEBA, supra.,* 723 F.2d at 76-77.

## 1. The Withdrawal From Service Is Not Unlawful; It Is In Response To Working Conditions That Threaten Death Or Serious Injury To UP's Maintenance Of Way Employees

BMWED has demonstrated that because UP has failed to adequately protect its maintenance of way employees from transmission of a deadly virus, its employees have a right to refuse to work under such conditions, and their refusal to work is protected by the FRSA.

Accordingly, UP cannot show that BMWED and its members have committed an unlawful act; so UP cannot satisfy the most basic requirement of issuance of an injunction in a labor dispute.

UP argues that BMWED's action is not truly about worker safety, but a covert effort to gain leverage in collective bargaining in violation of the status quo provisions of the RLA. But the status quo provisions apply to proposals for changes in agreements or to add new terms. *Consolidated Rail Corp. v. RLEA*, 491 U.S. 299, 302 (1989). The status quo provisions of the RLA are described in *Detroit and Toledo Shore Line R.R. v United Transp. Union*, 396 U.S. 142, 150-153 (1969); they involve bargaining over changes to agreements. Here, BMWED just seeks to protect its members from a deadly virus when, as essential employees, they are required to work during a pandemic, and their employer is not providing them adequate protection. BMWED proposes no changes in or additions to agreements; and it is not attempting force changes in any agreement. The Union does not seek any permanent policies or procedures, just specific policies to deal with this extraordinary pandemic.[9]

That BMWED's efforts to persuade UP to adopt adequate protections for its maintenance of way workers, including for continuation of pay for all employees required to quarantine, is not an effort to change the parties' agreements or a violation of the status quo is also demonstrated by UP's own response to the pandemic. The Carrier unilaterally implemented certain policies for the protection of its workers, and to ensure its ability to continue to operate. Among those policies were requirements for quarantining and some compensation for some employees required to quarantine. If BMWED's efforts to secure improved Covid-19 protocols constitute an effort to

---

[9] To the extent that UP relies on RLA Sections 5, 6 and 10 for its status quo argument, such reliance is misplaced. The Section 6 status quo (45 U.S.C. §156) only applies to carriers; it just says (emphasis added) that "rates of pay, rules and working conditions shall not be altered by the carrier until the controversy has been finally acted upon" under the procedures of the Act. BMWED and UP are not in mediation under Section 5 of the Act (45 U.S.C. §155), and no Presidential Emergency Board has been appointed under Section 10 of the Act ((45 U.S.C. §160).

amend existing agreements and to add terms to agreements, and if BMWED's efforts constitute an unlawful change in the status quo because of the pendency of Section bargaining, then so did UP's implementation of its policies. But, the Union recognized that UP was reacting to an extraordinary situation and did not sue UP under the RLA. The same is true for the Union. This dispute is not about changes to agreements, it is about necessary protection of UP employees from a deadly disease.

Nor is the Union in violation of RLA Section 2 First which requires the parties to exert every reasonable effort to make and maintain agreements and to bargain in good faith. 45 U.S.C. §152 First; *Chicago and North Western Ry. Co. v United Transp. Union*, 402 U.S. 570, 578-579 (1971). The dispute over UP's Covid-19 protocols is not about any collective bargaining agreement, and is not a matter of RLA bargaining. BMWED has not failed to make every effort to make agreements, or to maintain agreements, because no agreement is at issue here. Nor has there been a failure on BMWED's part to bargain in good faith. Again, there is no RLA bargaining involved here. Rather, BMWED informed its members that UP's Covid-19 protocols placed them in imminent danger of death or serious injury such that they have a right under the FRSA to refrain from working until UP improves its protocols. And again, if BMWED's actions are violative of Section 2 First, so were UP's in its unilateral implementation of its Covid-19 protocols which clearly affected rates of pay, rules and working conditions (*e.g.* barring employees from coming to work, providing some compensation for some quarantined employees but not others).

As for generic notions of good faith, BMWED has tried to engage with UP over its safety protocols since March of 2020; but UP simply did what it chose to do and was not interested in

31

what the Union felt was necessary even as the disease accelerated in the Fall. BMWED issued its demand only after UP was unresponsive and infections surged.[10]

UP's assertions that this dispute is not about worker safety are baseless and a diversion and, frankly, they are insulting to the men and women who have shown up to work since March to move freight for America in the middle of a pandemic even as ten members of the Union, and four members of the USD, three of whom worked for UP, died of the virus. The Union is not trying to change agreements; it only seeks adequate protections for its members while the pandemic is ongoing.

## 2. Even If The Workers' Action Was Not Protected By The FRSA UP Is Ineligible For An Injunction Because It Has Failed To Adequately Protect Its Maintenance Of Way Employees

Even if the withdrawal from service was not protected by the FRSA UP is still ineligible for an anti-strike injunction because of its lack of "clean hands". In *Brotherhood of Railroad Trainmen v. Toledo, Peoria and Western, supra.* (in which an injunction was denied when striking employees engaged in act of violence), the Supreme Court held that Section 8 requires that a party seeking an injunction in a labor dispute, not only "discharge his legal obligations", but also that "must go beyond them and make all reasonable effort" to settle the dispute. 321 U.S. at 57, 62, 63. *See also Order of Railroad Telegraphers v. CNW, supra.* 362 U.S. at 333, 339; *Rutland Ry. v. Brotherhood of Locomotive Engineers, supra.*, 307 F. 2d 21, 39; *Aircraft Service, supra.*, 779 F. 3d at 1073. Here UP has not complied with its legal obligations under the FRSA, so its request for a restraining order is barred by NLGA Section 8.

---

[10] UP asserts that when its Labor Relations Vice President Doerr contacted BMWED officers, they refused to negotiate. That is not true. Mr. Doerr did not offer negotiations. He mostly touted UP's protocols and asked what the Union wanted; the Union replied that what it wanted was in the December 17 letter. Mr. Doerr then said he would discuss the matter with UP officials. BMWED officers assumed that he would get back to them, but he did not. Mr. Doerr did not indicate any willingness of UP to engage with BMWED on the matters at issue. Cardwell Declaration ¶26.

Furthermore, UP has not made every reasonable effort to resolve the dispute. UP has refused BMWED's repeated entreaties to do more to protect the Carrier's maintenance of way workers. Regardless of whether the steps sought by BMWED are required, they would do much more to ensure the safety and health of BMWED's members than UP's current protocols. UP's flat rejection of BMWED's requests and proposals constitutes failure to make all reasonable effort to resolve the dispute.

Additionally, apart from whether NLGA Section 8 precludes issuance of the order UP seeks, the Court is being asked to exercise its equity jurisdiction; it therefore has inherent authority to fashion an order in accordance with the equities. The Supreme Court has consistently held that, when a Federal court sits as a court of equity, it has all the traditional authority of equity courts unless such authority has been restricted by Congress. *Inland Steel Co. v. United States et al.*, 306 U.S. 153 (1939). In *Yakus v, United States*, 321 U.S. 414, 440 (1944), the Court stated  that >The award of an interlocutory injunction by courts of equity has never been regarded as strictly a matter of right, even though irreparable injury may otherwise result to the plaintiff=@.  *See also Oklahoma Retail Grocers Ass=n v. Wal-Mart Stores*, 605 F 2d 1155, 1157 (10th Cir. 1979)-A court can deny injunctive relief for lack of clean hands. The Supreme Court has also held that Atraditional equitable considerations@ apply to issuance of injunctions in RLA cases. *Brotherhood of Locomotive Engineers v. Missouri-Kansas-Texas R.R. Co.,* 363 U.S. 528, 531 (1960). *See also Illinois Central R.R. Co. v. Brotherhood of R.R. Trainmen,* 398 F. 2d 973, 979 (7th Cir. 1968); *Piedmont Aviation v. Air Line Pilots Assoc. Int.* , 416 F. 2d 633, 640 (4th Cir. 1969); *Railway Express Agency, Inc. v. Brotherhood of Railway Airline and Steamship Clerks,* 437 F. 2d 388, 394 (5th Cir. 1971). *And see Int=l B;hood of Teamsters v. Frontier Airlines*, 628 F. 3d 402, 407 (7th Cir. 2010)Bmodifying injunction issued by the district court in an RLA dispute based on Aage-old

equitable principles@. If the Court were to issue the sort of order sought by UP, equitable considerations militate in favor conditioning such an order on a requirement UP take the steps requested by BMWED to ensure that the health and safety of its members is protected.

Furthermore, courts that have previously issued injunctions in response to rail worker withdrawals from service under the FRSA because of imminent threats of death or serious injury, that did so in order to facilitate arbitration of the issue (a process that was eliminated by the RSIA), conditioned injunctions against the worker actions on requirements that the carriers take additional steps to address the workers' safety concerns. *Boston & Maine Corp. v. Lenfest*, *supra.,* 799 F.2d 795; *United Transp. Union v. Springfield Terminal Co*., *supra.,* 675 F. Supp. 683; *Monongahela Ry. v. Transportation Communications Union, supra.,* No. 89-4439, 1989 BL 175,

BMWED submits that because UP lacks clean hands in this dispute, if the Court decides to issue an order of the type sought by UP, the Court can, and should, exercise its equitable authority to deny UP the injunctive relief it has requested unless UP improves its Covid-19 protocols to adequately protect its maintenance of way employees.

**3. The Balance of Harms Militates Against Issuance of the Injunction**

UP states that it will be irreparably harmed by a loss of income in the event of a withdrawal from service, and that no harm will befall BMWED and its members if a withdrawal from service is enjoined. But there will be no withdrawal from service if UP improves its Covid-19 protocols; the impacts on UP of a withdrawal from service will occur only if UP holds fast to its insufficient policies and procedures. Furthermore, BMWED's members, as "essential employees", are the ones facing potential serious injury--permanently damaged health, or even death, from exposure to the virus. Hundreds have been infected and three UP maintenance of way employees have already died from the virus. UP's inadequate response to the pandemic poses threats of harm to its

employees that are quintessentially "irreparable". By contrast, UP will not be harmed by improving its response to the virus; indeed better protections will improve UP's ability to deploy the necessary numbers of maintenance of way workers. In this case, the balance of potential harms between allowing UP's maintenance of way workers to refrain from working under UP's current pandemic protocols versus forcing those workers to continue working under life threatening conditions, readily tips toward denial of the restraining order sought by UP.

**4. The Public Interest Does Not Support Issuance of an Injunction**

NLGA Section 7 does not provide for consideration of the public interest, the only interests considered are those of the party seeking the injunction and the party resisting the injunction. Indeed, as is shown above, the improper use of public interest findings to enjoin union actions was one of the reasons for enactment of the NLGA. Accordingly, public interest considerations are not relevant to consideration of UP=s motion.

In any event, BMWED submits that the public interest in this case militates against granting UP the injunction it seeks. As is demonstrated above (fn. 6), the pandemic has created a public health emergency. Ensuring that UP's workers do not become infected and do not infect their co-workers and their families and their communities is in the public interest. Furthermore, spread of the infection among UP's maintenance of way workers could leave UP's engineering department short-handed, impeding UP's ability to provide the rail service of shipping goods for America. By contrast, the public has no interest in UP maintaining its insufficient Covid-19 protocols. Accordingly, public interest considerations in this case support denial of the order sought by UP.

UP asserts that the public interest in continued transportation service supports issuance of a restraining order. But there will only be a disruption of transportation if UP still fails to provide

necessary protection for its employees who are essential to that continued transportation service. In any event, the public interest is not a factor in requests for injunctive relief in labor disputes.

## V. CONCLUSION

Based upon the foregoing, BMWED respectfully submits that the Court should deny the temporary restraining order requested by UP.

Respectfully submitted,

/s/ Richard S. Edelman
Richard S. Edelman
Aaron S. Edelman
Mooney, Green, Saindon, Murphy &
Welch, P.C.
1920 L Street NW, Suite 400
Washington, DC  20036
(202) 783-0010
(202) 841-8796 (cell)
Redelman@MooneyGreen.com

/s/Robert E. O'Connor, Jr.
Robert E. O'Connor, Jr.
P.O. Box 451116
Omaha, NE 68145
(402) 330-5906
reolaw@aol.com

Attorneys for Brotherhood of Maintenance of Way Employes Division/IBT

36

## CERTIFICATE OF COMPLIANCE WITH NE CIV R. 7.1(d)(3)

Pursuant to NE Civ R. 7.1(d)(3), I hereby certify that this brief complies with the word count limitation of the rule, that this document was prepared using Microsoft WORD, and that, using the word count function of Microsoft WORD, I have determined that the document, including the caption, headings and footnotes, contains 12,477 words.

December 22, 2020 /s/ *Richard S. Edelman*
Richard S. Edelman

## CERTIFICATE OF SERVICE

I hereby certify that I have this day caused a copy of the foregoing Memorandum in

Opposition to Application for A Temporary Restraining Order and the supporting declaration of

Tony Cardwell to be served through the Court's electronic case filing system and by email to the

following:

Jacquelyn V. Clark
Union Pacific Railroad
1400 Douglas Street STOP 1580
Omaha, NE 68179
jvclark@up.com

Robert Hawkins
Andrew Rolfes
Cozen O'Connor
1650 Market Street, Suite 2800
Philadelphia, PA 19103
rhawkins@cozen.com
arolfes@cozen.com

December 22, 2020                         /s/Robert E. O'Connor, Jr.
                                          Robert E. O'Connor, Jr.