IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNION PACIFIC RAILROAD COMPANY, | |
| Plaintiff, | **8:20-CV-516** |
| vs. | **TEMPORARY RESTRAINING ORDER** |
| BROTHERHOOD OF MAINTENANCE OF WAY EMPLOYES DIVISION OF THE INTERNATIONAL BROTHERHOOD OF TEAMSTERS, | |
| Defendant. | |

This matter came on for hearing on Plaintiff's Motion for Temporary Restraining Order, Filing 6, on the 23rd day of December, 2020. Plaintiff appeared by counsel of record. Defendant was provided notice of the motion and hearing and appeared by counsel. Having reviewed the pleadings, arguments, and evidence in the record, the Court concludes Plaintiff's Motion for Temporary Restraining Order is granted, and the Motion for Preliminary Injunction is set for further hearing.

## I.        BACKGROUND

Plaintiff Union Pacific Railroad Company ("Union Pacific") is a Class I railroad operating and providing freight transportation services in twenty-three states and over 32,000 miles. Filing 1 at 2; Filing 8-1 at 1. It is the second largest freight rail system in the United States, employs approximately 30,000 people, and provides transportation services to approximately 10,000 customers. Filing 8-1 at 2-3. Union Pacific provides transportation services to many manufacturers throughout the country, transporting a variety of goods, often on a time-sensitive basis. Filing 8-1 at 2-3. The railroad is the largest shipper of finished automobiles west of the Mississippi River and

1

a major shipper of grain and coal. Filing 8-1 at 2-3. Union Pacific also transports products and raw materials used for public health and safety, some of which cannot be shipped by truck. Filing 8-1 at 3. Union Pacific generated around $54 million per day in operating revenue in the last fiscal year, equating to around $22 million per day net operating income. Filing 8-1 at 4.

Defendant, the Brotherhood of Maintenance of Way Employes Division of the International Brotherhood of Teamsters ("BMWED") is a labor organization that represents Union Pacific employees in the craft or class of maintenance of way. Filing 1 at 2-3. BMWED and Union Pacific are parties to multiple collective-bargaining agreements ("CBAs") that govern rates of pay, rules, and working conditions of Union Pacific employees represented by BMWED. Filing 1 at 3.

Union Pacific is a member of a collective-bargaining organization of large railroads represented by the National Carriers' Conference Committee ("NCCC") of the National Railway Labor Conference ("NRLC"). Filing 1 at 4. NCCC negotiates with multiple unions nationwide to form collective-bargaining agreements on behalf of its member-railroads in what is known as national handling. On November 1, 2019, NCCC, acting on behalf of Union Pacific and other member-carriers, served BMWED with formal notice as required under the Railway Labor Act ("RLA"), 45 U.S.C. § 151 et seq., beginning the bargaining process designed to lead to a new collective-bargaining agreement between BMWED and the railroads. Filing 1 at 4; *see* 45 U.S.C. § 156 ("Carriers and representatives of the employees shall give at least thirty days' written notice of an intended change in agreements affecting rates of pay, rules, or working conditions . . . ."). BMWED served notice of its demands for increased pay and additional paid time off for the employees it represents on November 4, 2019, in accordance with the RLA. Filing 1 at 4; *see* 45 U.S.C. § 156. NCCC and BMWED have remained in bargaining since the notices were served, and neither party has sought mediation services from the National Mediation Board. Filing 1 at 4.

2

On March 11, 2020, officers of multiple rail-workers' unions wrote the Chairman of the NRLC, Brendan Branon, requesting a coordinated response by NRLC-member railroads, including Union Pacific, to the COVID-19 pandemic. Filing 1-1. The unions requested the railroads adhere to Center for Disease Control ("CDC") guidelines for mitigating COVID-19, that all attendance policies be suspended, that employees required to quarantine not be subject to discipline, and that quarantined employees receive paid leave for missed work. Filing 1-1 at 2-3. By letter dated March 13, 2020, Branon advised the unions that NRLC-member railroads were working with "their medical experts to implement and maintain prevention and response measures" consistent with CDC guidelines, and the unions should address their concerns with the individual rail carriers. Filing 1-2.

On March 19, 2020, BMWED President, Freddie Simpson, wrote to Union Pacific Chairman and CEO, Lance Fritz, and requested copies of COVID-19-related preventative and response plans and attendance policies concerning BMWED-represented employees. Filing 1-3. On March 30, 2020, Union Pacific Vice President of Mechanical and Engineering, Eric Gehring, responded to Simpson's letter, noting that Union Pacific was endeavoring to follow CDC guidelines and providing a link for Union Pacific's intranet site where the railroad's documents and instructions concerning its COVID-19 practices and policies were posted. Filing 1-4. Gehring also noted the fluidity of the situation, the need to check the intranet site often due to constant updates, and that Union Pacific had established a daily call with senior staff and union personnel to share information and hear the concerns of the unions. Filing 1-4. In late March, Union Pacific adopted a policy providing fourteen days paid leave for those employees who were directed to quarantine due to workplace exposure to COVID-19 and instituted policies requiring social distancing and face coverings. Filing 1 at 6.

On March 20, 2020, two other rail labor unions, the Brotherhood of Locomotive Engineers and Trainmen and the International Association of Sheet Metal, Air, Rail, and Transportation Workers – Transportation Division, filed a petition with the Federal Railroad Administration ("FRA") seeking an emergency order pursuant to the Federal Railroad Safety Act of 1970 ("FRSA"), 49 U.S.C. § 20101 et seq., "to address safety conditions arising from the novel coronavirus (COVID-19) emergency" and to standardize and identify best practices in the industry for mitigating the spread of the virus and protecting employees. Filing 1-5 at 1. The FRA issued a Safety Advisory encouraging railroads to adhere to CDC guidelines and incorporate industry best practices regarding the pandemic. Filing 1 at 7. The FRA declined to issue an emergency order, however. Filing 1-6.

On July 2, 2020, BMWED's President again wrote to Union Pacific's Chairman and CEO, submitting for the railroad's consideration a thirteen-page "white paper" document detailing COVID-19 mitigation guidelines and procedures BMWED sought to have Union Pacific implement. Filing 1-7. Union Pacific's Vice President of Labor Relations, Rodney Doerr, responded on July 14, 2020, writing to BMWED that Union Pacific has a qualified pandemic team that assesses the latest pandemic-related information made available by the government, and the railroad's programs comply with CDC guidance. Filing 1-8. BMWED responded by letter dated July 21, 2020, maintaining its opinion that "the only way to achieve the necessary, safe working conditions" was to implement the testing, temperature taking, and contact-tracing procedures provided in the white paper BMWED sent with its July 2, 2020, letter which would provide paid leave for employees who tested positive, who were found to have a temperature exceeding 100.4 degrees, and who had been exposed to other employees who tested positive for COVID-19. Filing 1-9.

On September 24, 2020, BMWED wrote Union Pacific again, contending Union Pacific's "Covid-19 protocols don't go far enough to protect their valuable employees and the public" and again urging Union Pacific to adopt a safety program in line with the suggestions provided in the July 2, 2020, white paper. Filing 1-10 at 4. Union Pacific responded on October 6, 2020, informing BMWED that while its suggestions were appreciated and some would be implemented, Union Pacific would "not advance several BMWED outlined recommendations as they would have the detrimental effect of creating an atmosphere of false security." Filing 1-11.

On December 18, 2020, Union Pacific received a letter, dated December 17, 2020, from BMWED General Chairman, Tony Cardwell. Filing 1 at 9; Filing 1-12. In the letter, Cardwell stated that if BMWED's demands were not met within ten days, "BMWED will declare a health and safety emergency because of the imminent threat to its members of serious injury or death, and will call for a cessation of work if UP does not take the necessary corrective actions." Filing 1-12 at 4. BMWED made six demands including: (1) Union Pacific was to continue paying employees absent from work for "any . . . Covid-19 related reason"; (2) Union Pacific was to provide access to COVID-19 testing on the job site and on company time; (3) Union Pacific was to provide for employees to have their temperatures checked at the start of each shift, and any employee having a temperature exceeding 100.4 degrees was to be prohibited from work until obtaining a negative COVID-19 test and paid any time missed as a result; (4) any employee exposed to a person with COVID-19 in the workplace was to be quarantined for at least fourteen days, required to obtain a negative COVID-19 test before returning to work, and would receive pay for any time missed at work; (5) Union Pacific was to provide new face masks and hand cleaner each day, ensure no employee be required to use a locker room, vehicle, or machine that has not been sanitized within eight hours, and pay employees unable to work due to a lack of PPE

5

or sanitization; and (6) Union Pacific was to require six-foot social distancing be made a priority over daily tasks and require job briefing in the rare instances when a task cannot be completed without employees coming within six feet of one another. Filing 1-12 at 3-4. On December 19, 2020, Union Pacific's Vice President of Labor Relations spoke by phone with BMWED representatives including Cardwell and attempted to discuss the issues BMWED raised in its most recent letter. Filing 1 at 10; Filing 19-1 at 11. BMWED representatives responded that their letter made their concerns clear. Filing 1 at 10; Filing 19-1 at 11.

Union Pacific filed suit against BMWED on December 20, 2020, seeking declaratory and injunctive relief and alleging that BMWED's threatened work-stoppage violates sections 2 and 6 of the RLA, 45 U.S.C. §§ 152, 156, and attempts to circumvent the statutory authority of the National Mediation Board ("NMB"). Filing 1 at 16. BMWED contends that its threatened work-stoppage is unrelated to its collective-bargaining agreements with Union Pacific and is a protected refusal to work under hazardous conditions pursuant to the FRSA. Filing 18 at 9 (citing 49 U.S.C. § 20109(b)(1)(B)). On December 21, 2020, Union Pacific moved for a temporary restraining order preventing BMWED from commencing its threatened work-stoppage. Filing 6; Filing 7 at 1. The Court scheduled a hearing on the Motion for Temporary Restraining Order (Filing 6) for December 23, 2020.

In support of its motion, Union Pacific presented the declaration of Carrie Powers, Union Pacific's Assistant Vice President of Financial Reporting and Analysis. Filing 8-1. Powers averred that a work stoppage of Union Pacific's services would impact critical U.S. industries including the automotive market, grain transportation, and the shipment of coal for providing electricity to millions of homes and business. Filing 8-1 at 1-4. Powers also avers that a strike against Union

Pacific would cause severe and irreparable financial loss in the range of millions of dollars in lost revenue and business opportunities. Filing 8-1 at 5-6.

Union Pacific also presented the declarations of Brant Hanquist, Nate McLaughlin, Dr. Laura Gillis, and Russell Rohlfs. Filing 22. Hanquist is the General Director of Labor Relations for Union Pacific and described the CBA bargaining process with BMWED as well as the COVID-19 Quarantine Leave Pay Policy. Filing 22-1 at 2. Nate McLaughlin, the General Director of Payroll Operations, described how employees are paid when forced to quarantine due to COVID-19. Filing 22-5 at 2-3. According to Rohlfs, Assistant Vice President of Engineering for Union Pacific's Northern Region, Union Pacific provides hand sanitizer and disinfecting wipes to all employees, cleans equipment regularly, has taken steps to allow employees to maintain social distance whenever possible, and mandated all employees to wear facial coverings. Filing 22-6 at 2-4.

Dr. Gillis, Chief Medical Officer for Union Pacific, leads the COVID-19 Pandemic Response Team at Union Pacific. Filing 22-7 at 2. She elaborated on the team's response and the various actions it has undertaken to protect employees, including implementing safety protocols and setting up a COVID-19 website. Filing 22-7 at 2-3. The website contains information about Union Pacific's mask policy and availability of free cloth face coverings, Filing 22-8; Filing 22-9; outlines Union Pacific's social distancing policy and cleaning protocols, Filing 22-10; Filing 22-11; describes Union Pacific's COVID-19 notification process, Filing 22-14; and provides additional resources and updated information, Filing 22-12; Filing 22-13.

BMWED presented the declaration of Tony Cardwell which elaborated on the inadequacies BMWED sees in Union Pacific's approach to COVID-19 and the risks it believes such shortcomings pose to workers. Filing 19-1. BMWED and Union Pacific both submitted

correspondence between Union Pacific and BMWED concerning and leading up to the present dispute. *See, e.g.*, Filing 19-2. BMWED also submitted a letter, dated April 2, 2020, from three BMWED General Chairmen, including Cardwell, to Union Pacific's Vice President of Labor Relations detailing what the union perceived as conflicts between some of Union Pacific's COVID-19 policies and its collective-bargaining agreement with BMWED. Filing 19-2 at 11-12.

The Court has reviewed the parties' submissions and arguments and makes the following findings.

## II.   DISCUSSION

Union Pacific seeks a temporary restraining order preventing BMWED from "directing, calling, causing, approving, authorizing, instigating, conducting, threatening, continuing, encouraging, inducing or engaging in any strike, self-help, sickout, concerted refusal to bid on advertised assignments, absenting themselves from work, slowdown, work stoppage, refusal to work, job action, picketing, or refusal to cross a picket line at or outside of the premises of or against Union Pacific, and any and all acts of any kind whatsoever, in furtherance or support thereof"; "interfering in any manner with any person employed by Union Pacific while that person is performing his or her work and duties for the carrier"; "seeking to resolve their major dispute with Union Pacific by any means (including picketing, patrolling or economic pressure of any kind against Union Pacific or any of its corporate affiliates or any person doing business with them, or any of them) other than by pursuing the collective bargaining and mediation procedures contained in the Railway Labor Act"; and "otherwise interfering with the normal business operations of Union Pacific." Union Pacific further requests the Court order BMWED to notify all officers and employees of the temporary restraining order, order them to take all steps within their power to halt any strike, require them to take all steps necessary to ensure compliance with the order, and

notify the Court of the steps it has taken to comply. The Court addresses whether it has the statutory authority to issue the requested injunctive relief and whether such relief is proper.

### A. The Norris-LaGuardia Act

Labor disputes are subject to the Norris-LaGuardia Act ("NLGA"), 29 U.S.C. § 101 et seq. In the NLGA, Congress stripped federal courts of "jurisdiction to issue any . . . temporary or permanent injunction in a case involving or growing out of a labor dispute, except in . . . strict conformity" with various procedural requirements. 29 U.S.C. § 101. The NLGA also categorically eliminates jurisdiction to enjoin certain types of conduct in "any labor dispute," including work stoppages and slowdowns. 29 U.S.C. § 104. However, where another statute specifically applies to a labor dispute, its narrower provisions can create exceptions to the NLGA which allow a court to issue injunctive relief. *See, e.g., United Air Lines, Inc. v. Int'l Ass'n of Machinist & Aerospace Workers, AFL-CIO*, 243 F.3d 349, 362 (7th Cir. 2001) ("[W]here a challenged action violates specific provisions of [a labor statute], 'the specific provisions . . . take precedence over the more general provisions of the [NLGA]'" (third alteration in original) (quoting *Pittsburgh & Lake Erie R.R. Co. v. Ry. Labor Executives' Ass'n*, 491 U.S. 490, 513, 109 S. Ct. 2584, 105 L. Ed. 2d 415 (1989))).

When a statutory exception permits a court to issue injunctive relief in a labor dispute, the procedural requirements of the NLGA still apply. *See United Air Lines, Inc.*, 243 F.3d at 363 ("[W]hen a carrier seeks to enjoin a strike against a union under the status quo provisions of the RLA, the procedural provisions of the NLGA remain in effect."); *accord Delta Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l*, 238 F.3d 1300, 1310 (11th Cir. 2001) ("[T]he general procedural provisions of the NLGA still apply to this action [involving a labor dispute], even though the anti-injunction portion of the NLGA does not . . . ."). These procedural requirements include:

(a) That unlawful acts have been threatened and will be committed unless restrained or have been committed and will be continued unless restrained, but no injunction or temporary restraining order shall be issued on account of any threat or unlawful act excepting against the person or persons, association, or organization making the threat or committing the unlawful act or actually authorizing or ratifying the same after actual knowledge thereof;

(b) That substantial and irreparable injury to complainant's property will follow;

(c) That as to each item of relief granted greater injury will be inflicted upon complainant by the denial of relief than will be inflicted upon defendants by the granting of relief;

(d) That complainant has no adequate remedy at law; and

(e) That the public officers charged with the duty to protect complainant's property are unable or unwilling to furnish adequate protection.

29 U.S.C. § 107. The NLGA further states that the court may not issue injunctive relief to a party "who has failed to comply with any obligation imposed by law which is involved in the labor dispute in question, or who has failed to make every reasonable effort to settle such dispute either by negotiation or with the aid of any available governmental machinery of mediation or voluntary arbitration." 29 U.S.C. § 108.

The parties here disagree over whether a specific statutory exception exists which would permit the Court to issue injunctive relief in light of the NLGA. Union Pacific argues the RLA allows the Court to issue a temporary restraining order while BMWED urges that the FRSA prohibits the requested relief.

### B.  The Railway Labor Act

Union Pacific argues that the Railway Labor Act (RLA), 45 U.S.C. § 151 et seq., applies to the present dispute and provides an exception to the NLGA's prohibition on injunctive relief in labor disputes. *See* Filing 7 at 15-16. The Court agrees the RLA governs the present dispute.

10

The RLA was enacted, among other reasons, "[t]o avoid any interruption to commerce or to the operation of any carrier engaged therein," and "to provide for the prompt and orderly settlement of all disputes concerning rates of pay, rules, or working conditions." 45 U.S.C. § 151a. "The purposes of the Act include avoiding interruption to commerce, ensuring worker freedom of association and the right to unionize, providing for the 'prompt and orderly' settlement of employment related disputes, and securing the 'complete independence' of railroads and their employees in matters of self-organization and in carrying out the Act's other purposes." *Burlington N. R. Co. v. United Transp. Union*, 848 F.2d 856, 860 (8th Cir. 1988) (citing 45 U.S.C. § 151a). In the RLA, Congress established separate procedures to resolve two different types of labor disputes in the transportation industry, commonly referred to as major and minor disputes. *Consol. Rail Corp. v. Ry. Labor Execs.' Ass'n*, 491 U.S. 299, 302, 109 S. Ct. 2477, 105 L. Ed. 2d 250 (1989). A major dispute concerns the formation or amendment of a collective-bargaining agreement. *Id.*; *see also Sheet Metal Workers' Int'l Ass'n v. Burlington N. R. Co.*, 893 F.2d 199, 202 (8th Cir. 1990) ("Major disputes are . . . 'disputes over the formation of collective agreements or efforts to secure them' and 'arise where there is no such agreement or where it is sought to change the terms of one, and therefore the issue is not whether an existing agreement controls the controversy.'" (quoting *Elgin, J. & E. Ry. v. Burley*, 325 U.S. 711, 723, 65 S. Ct. 1282, 1290, 89 L. Ed. 1886 (1945))). The RLA's process for resolving a major dispute is detailed and extensive, including the giving of notice, 45 U.S.C. § 156, mediation by the NMB, 45 U.S.C. § 155, and investigations and reports regarding disputes, 45 U.S.C. § 160. "Until they have exhausted those procedures, the parties are obligated to maintain the status quo . . . ." *Consol. Rail Corp.*, 491 U.S. at 302, 109 S. Ct. at 2480, 105 L. Ed. 2d 250. Only once that process is complete may the company or the union alter the status quo by engaging in a work slowdown or stoppage. *Bhd. of R.R.*

*Trainmen v. Jacksonville Terminal Co.*, 394 U.S. 369, 378, 89 S. Ct. 1109, 22 L. Ed. 2d 344 (1969) ("While the dispute is working its way through these stages [of the RLA], neither party may unilaterally alter the status quo."). Delaying the time at which labor or management may use economic self-help encourages compromise and prevents interruptions to commerce or carriers' operations. *Id.* If either side unilaterally alters the status quo during the bargaining and mediation process, a court may issue an injunction to put a stop to that party's illegal self-help and to restore the status quo, and it may do so even without the traditional showing of irreparable injury to the other party. *See Consol. Rail Corp.*, 491 U.S. at 303, 109 S. Ct. at 2480, 105 L. Ed. 2d 250 ("The district courts have subject-matter jurisdiction to enjoin a violation of the status quo pending completion of the required procedures, without the customary showing of irreparable injury.").

By contrast, a minor dispute involves a question about how to interpret an existing collective-bargaining agreement, like the meaning of a term or whether the agreement permits a certain action. *Id.*; *accord Elgin, J. & E. Ry. Co.*, 325 U.S. at 723, 65 S. Ct. at 1290, 89 L. Ed. 1886. As long as the contested "action is arguably justified by the terms of the parties' collective-bargaining agreement," a court treats the dispute as minor. *Consol. Rail Corp.*, 491 U.S. at 307, 109 S. Ct. at 2483, 105 L. Ed. 2d 250; *Air Line Pilots Ass'n, Int'l v. E. Air Lines, Inc. (Eastern)*, 869 F.2d 1518, 1521 (D.C. Cir. 1989). The resolution process for a minor dispute is less involved, and there is no "general statutory obligation . . . to maintain the status quo" while that process is ongoing. *Consol. Rail Corp.*, 491 U.S. at 307, 109 S. Ct. at 2483, 105 L. Ed. 2d 250. So although "[c]ourts may enjoin strikes arising out of minor disputes" in limited circumstances, they generally may not enjoin other violations of the status quo. *Id.*

Here, the parties' dispute arises out of the negotiation of a new collective-bargaining agreement. The Court concludes this is therefore a major dispute under the RLA. This is supported

by the evidence submitted at the temporary restraining order hearing that since November 1, 2019, the parties have been engaged in bargaining to negotiate a new CBA. Filing 1 at 4. Additionally, BMWED's strike letter does not assert that any existing agreement with Union Pacific entitles it to the monetary relief, additional paid time off, or changes to COVID-19 protocols that it now seeks. *See* Filing 1-12. Rather, BMWED is aiming to establish entirely new rights that overlap with the rights it is currently seeking to negotiate in the new CBA relating to pay and leave time. *See* Filing 1-12 at 3-4. Thus, this "dispute[] [is] over the formation of [a] collective agreement[]," *Sheet Metal Workers*, 893 F.2d at 202, rather than whether an existing agreement controls the controversy and is therefore a major dispute.

Section 2 First of the RLA, 45 U.S.C. § 152 First, imposes a duty on carriers and employees "to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes, whether arising out of the application of such agreements or otherwise, in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof." 45 U.S.C. § 152. The Supreme Court has ruled that § 2 First "was designed to be a legal obligation, enforceable by whatever appropriate means might be developed on a case-by-case basis." *Chicago & N. W. Ry. Co. v. United Transp. Union*, 402 U.S. 570, 577, 91 S. Ct. 1731, 1735, 29 L. Ed. 2d 187 (1971). Strike injunctions may issue to enforce the duty under § 2 First when that remedy is "the only practical, effective means of enforcing the duty." *Id.* at 583, 91 S. Ct. at 1738, 29 L. Ed. 2d 187.

Accordingly, because this is a major dispute, neither side can alter the status quo absent following the extended procedures provided for in the RLA. *Consol. Rail Corp*, 491 U.S. at 302, 109 S. Ct. at 2480, 105 L. Ed. 2d 250. There is no dispute that the parties are in the early stages of negotiating a new CBA per the RLA. Filing 1 at 4. BMWED has violated its legal obligation to

13

follow the RLA process and honor its duty under 45 U.S.C.§ 152. Thus, BMWED's resort to self-help unlawfully alters the status quo and is prohibited by the RLA.

The Court finds the requested injunctive relief is also appropriate under the NLGA. BMWED has threatened a strike unless restrained, which is unlawful under the RLA. *See* 29 U.S.C. § 107(a). Union Pacific has shown it will suffer substantial and irreparable injury if a work stoppage occurs in the form of severe harm to its business and reputation. The harm to Union Pacific if the temporary restraining order is not granted would be greater than the harm to BMWED if it is granted. *See* 29 U.S.C. § 107(b) & (c). In particular, Union Pacific's Assistant Vice President of Financial Reporting and Analysis, Carrie J. Powers, avers that a work stoppage of Union Pacific's services would impact critical U.S. industries including the automotive market, grain transportation, and the shipment of coal for providing electricity to millions of homes and business. Filing 8-1 at 1-4. Powers also avers that a strike against Union Pacific would cause severe and irreparable financial loss in the range of millions of dollars in lost revenue and business opportunities. Filing 8-1 at 5-6. In contrast, BMWED has no lawful interest in resorting to self-help under these circumstances. Lastly, the Court finds there is no adequate remedy at law given BMWED's threatened violation of the RLA and that there are no public officers charged with protecting Union Pacific's interest who can provide adequate protection. *See* 29 U.S.C. § 107(d) & (e). Accordingly, the issuance of a temporary restraining order is in accordance with both the RLA and the NLGA.

## C.  The Federal Railroad Safety Act

BMWED, on the other hand, argues that the RLA does not apply and that the present dispute is governed exclusively by the FRSA, 49 U.S.C. § 20109. The FRSA provides a railroad carrier "may not discharge, demote, suspend, reprimand, or in any other way discriminate against

14

an employee for . . . refusing to work when confronted by a hazardous safety or security condition related to the performance of the employee's duties" if certain prerequisite conditions exist. 49 U.S.C. § 20109(b)(1)(B). Those conditions include that the refusal is made in good faith; that a reasonable individual under the circumstances would conclude "the hazardous condition presents an imminent danger of death or serious injury" and "the urgency of the situation does not allow sufficient time to eliminate the danger without such refusal"; and the employee has notified the railroad carrier of the hazard. 49 U.S.C. § 20109(b)(2). BMWED argues this statute protects its proposed strike because COVID-19 presents a hazardous condition which Union Pacific has failed to adequately address. Filing 18 at 27-33.

First, the Court does not agree that this statute protects labor strikes as BMWED proposes. The statutory language is clear that the FRSA is an anti-retaliation statute applicable when employees are unable to work due to hazards on the job. *See* 49 U.S.C. § 20109(b)(1)(B) (stating the statute prohibits "discriminat[ing] against an employee"). Its protections do not mention labor unions or mass labor strikes. BMWED points to a handful of cases in which courts have implied the FRSA may indeed protect labor strikes. Filing 18 at 34. These cases are either non-binding or make such allusions in dicta, and the Court finds them unpersuasive in light of the plain statutory language.

However, even if the FRSA were to apply to threatened labor stoppages like the one at hand, the Court does not find the statutory requirements would be satisfied. First, the COVID-19 pandemic does not present a "hazardous safety or security condition related to the performance of the employee's duties." 49 U.S.C. § 20109(b)(2). The pandemic is not a *work-specific* safety concern for the BMWED employees under the FRSA. Instead, the pandemic is, unfortunately, a worldwide and widespread problem confronting not just the BMWED employees, but individuals

15

of all walks of life. Thus, it does not constitute a condition "related to the performance of the employee's duties" for purposes of the FRSA. *See, e.g.*, *Stokes v. Se. Pennsylvania Transportation Auth.*, 657 F. App'x 79, 82 (3d Cir. 2016) (finding the FRSA did not apply where "the safety risk that Stokes identified was unconnected to railroad safety, and thus her refusal to appear due to a non-work-related risk to her was not covered by the FRSA."); *Ziparo v. CSX Transportation, Inc.*, 443 F. Supp. 3d 276, 297 (N.D.N.Y. 2020) ("'Hazardous safety or security conditions' have generally been found to be physical conditions that are within the control of the rail carrier employer; circumstances outside of the carrier's control and non-work related conditions are not included.").

Secondly, a reasonable individual under the circumstances would not conclude that there is "an *imminent* danger of death or serious injury" presented by the current situation. 49 U.S.C. § 20109(b)(2) (emphasis added). First, Union Pacific has implemented certain safety measures for the protection of its workers starting in the early days of the pandemic in March 2020. These measures included complying with CDC guidance, Filing 1-8, providing fourteen days' paid leave for those employees directed to quarantine for a work-related exposure, instituting policies requiring social distancing and face coverings, regular cleaning of equipment, and providing hand sanitizer and wipes to employees, Filing 1 at 6; Filing 22-6 at 2-4; Filing 22-7; Filing 22-8; Filing 22-9; Filing 22-10; Filing 22-11. The evidence also shows the parties have been in regular communication regarding evolving COVID-19 protocols since March 2020. *See* Filing 1-1; Filing 1-2; Filing 1-3; Filing 1-4; Filing 1-5; Filing 1-7; Filing 1-8; Filing 1-9; Filing 1-10; Filing 1-11; Filing 1-12. BMWED claims it is Union Pacific's lack of a response and accommodations that has prompted it to resort to a threatened strike under emergent situations, *see* Filing 1-12 at 1-2, but it has not provided a persuasive reason why a pandemic now in its tenth month is suddenly imminent

despite already-implemented safety measures, on-going dialogue between the parties, and continually-evolving safety procedures.

Lastly, Union Pacific's COVID-19 response itself does not constitute a "hazardous safety or security condition" as BMWED argues. While BMWED takes issue with certain aspects of Union Pacific's COVID-19 protocol, it does not dispute that Union Pacific has, in fact, implemented numerous safety measures, including some requested by BMWED. *See* Filing 18 at 10-16. Rather, BMWED seeks *additional* safety precautions and pay provisions. While a complete absence of a response to the pandemic may have constituted a "hazardous safety or security condition" under the FRSA, differences over the level of protections needed and the semantics of implementing protections and paying workers during an unprecedented health situation do not rise to the level of "hazardous" contemplated by the FRSA.

Accordingly, the Court finds the FRSA does not apply to the dispute at hand. Rather, the RLA governs and, as set forth above, supports the issuance of the requested injunctive relief.

### D.  *Dataphase* Factors

In deciding a motion for injunctive relief, the court generally considers "(1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981). The same factors apply in determining whether to issue a temporary restraining order. *Baker Elec. Co-op., Inc. v. Chaske*, 28 F.3d 1466, 1472 (8th Cir. 1994). The burden of establishing the propriety of issuing a temporary restraining order is on the movant. *Id.* "No single factor is determinative." *WWP, Inc. v. Wounded Warriors, Inc.*, 566 F. Supp. 2d 970, 974 (D. Neb. 2008).

That said, it is not entirely clear to what extent those factors apply when a railroad seeks to enjoin a union from exercising self-help over a minor dispute under the RLA. *See Air Line Pilots Ass'n, Int'l v. Guilford Transp. Indus.*, 399 F.3d 89, 95-96 and n.3 (1st Cir. 2005) (applying the same factors enumerated in *Dataphase* when analyzing a motion for preliminary injunction alleging violations of the RLA); *Nat'l Ry. Labor Conference v. Int'l Ass'n of Machinists & Aerospace Workers*, 830 F.2d 741, 750 n.7 (7th Cir. 1987) (noting the district court was obligated "to apply the traditional standards necessary for determining whether or not to issue a preliminary injunction, as well as to heed the particular concerns presented by the requirements of the Railway Labor Act"); *Pilots Representation Org. v. Airline Pilots Ass'n., Int'l*, No. CIV. NO. 07-3580DSD, 2007 WL 2480349, at *4 (D. Minn. Aug. 24, 2007) (stating the *Dataphase* factor of irreparable harm would apply in cases for injunctive relief governed by the NLGA); *Boys Markets, Inc. v. Retail Clerks Union, Local 770*, 398 U.S. 235, 254–55, 90 S. Ct. 1583, 1594, 26 L. Ed. 2d 199 (1970) (holding where parties' contractual obligation to arbitrate labor disputes is at issue in considering an injunction, a district court must first find the parties are contractually bound to arbitrate and then apply tradition standards for injunctive relief); *Bhd. of Locomotive Engineers v. Missouri-Kansas-Texas R. Co.*, 363 U.S. 528, 531, 80 S. Ct. 1326, 1328–29, 4 L. Ed. 2d 1379 (1960) (noting in the RLA/NLGA context that the court may attach conditions to injunctive relief under traditional equitable principles). The Court need not resolve that question, however, because it finds that the *Dataphase* factors also weigh in favor of injunctive relief and thus would not change the above calculus.

First, Union Pacific has shown it is likely to prevail on the merits of its Complaint. "In deciding whether to grant a preliminary injunction, likelihood of success on the merits is most significant." *S.J.W. ex rel. Wilson v. Lee's Summit R-7 Sch. Dist.*, 696 F.3d 771, 776 (8th Cir.

2012) (internal quotation marks omitted) (quoting *Minn. Ass'n of Nurse Anesthetists v. Unity Hosp.*, 59 F.3d 80, 83 (8th Cir. 1995)). A movant need not prove it is more likely than not to prevail, but "need only show a reasonable probability of success, that is, a 'fair chance of prevailing'" on the merits. *Kroupa v. Nielsen*, 731 F.3d 813, 818 (8th Cir. 2013) (quoting *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 732 (8th Cir. 2008) (en banc)).

In its Complaint, Union Pacific seeks injunctive and declaratory relief. *See* Filing 1 at 16-17. It sets forth three counts: Unlawful exercise of self-help under the RLA; breach of BMWED's duty to exercise reasonable efforts to make and maintain agreements under Section 2 First, 45 U.S.C. § 152; and declaratory relief that the FRSA does not protect BMWED's threatened strike. Filing 1 at 12-15. As set forth in greater detail above, the evidence at this stage supports that the RLA governs this dispute, that BMWED's proposed strike constitutes unlawful self-help and violates its duty under 45 U.S.C. § 152, and that the FRSA does not protect BMWED's proposed conduct. Accordingly, the Court finds Union Pacific has shown a likelihood of success on the merits of its claims for injunctive relief and declaratory judgment.

Second, the movant must "demonstrate that irreparable [harm] is *likely* in the absence of an injunction." *Sierra Club v. U.S. Army Corps of Eng'rs*, 645 F.3d 978, 992 (8th Cir. 2011) (emphasis in original) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22, 192 S. Ct. 365, 172 L. Ed. 2d 249 (2008). "[I]rreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Grasso Enters., LLC v. Express Scripts, Inc.*, 809 F.3d 1033, 1040 (8th Cir. 2016) (quoting *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009)). "Loss of intangible assets such as reputation and goodwill can constitute irreparable injury." *United Healthcare Ins.*

*Co. v. AdvancePCS*, 316 F.3d 737, 741 (8th Cir. 2002) (citing *Gen. Mills, Inc. v. Kellogg Co.*, 824 F.2d 622, 625 (8th Cir. 1987)).

Here, Union Pacific has presented concrete evidence that it is likely to suffer harm in the absence of an injunction. As set forth above, Powers's declaration substantiates that a work stoppage of Union Pacific's services would impact critical U.S. industries and cause severe and irreparable financial loss in the range of millions of dollars in lost revenue and business opportunities. Filing 8-1 at 1-6.

Third, the court must assess whether the "balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Dataphase*, 640 F.2d at 113. To determine the harms that must be weighed, the Eighth Circuit has looked at the threat to each of the parties' rights that would result from granting or denying the injunction. *Baker Elec.*, 28 F.3d at 1473. A Court also must consider the potential economic harm to each of the parties and to interested third parties. *Id.*

As discussed above, the purpose of the RLA and of the requested injunctive relief is to protect the status quo while CBA negotiations are ongoing. The risk of harm to Union Pacific in allowing an unlawful strike outweighs the harm to BMWED in not allowing it to pursue self-help in order to gain the additional COVID-19 accommodations it seeks.

Lastly, the Court concludes that the public interest favors issuance of a temporary restraining order as well. As previously stated, the threatened strike could have severe repercussions for numerous individuals and industries which rely on railroad transportation. Thus, the public interest favors maintaining the status quo and avoiding major disruption to the nation's rail lines.

**E.  Bond**

20

The NLGA requires the party granted a temporary restraining order to post a bond:

No temporary restraining order or temporary injunction shall be issued except on condition that complainant shall first file an undertaking with adequate security in an amount to be fixed by the court sufficient to recompense those enjoined for any loss, expense, or damage caused by the improvident or erroneous issuance of such order or injunction, including all reasonable costs (together with a reasonable attorney's fee) and expense of defense against the order or against the granting of any injunctive relief sought in the same proceeding and subsequently denied by the court.

29 U.S.C. § 107(e).

At the hearing on this motion, the Court heard argument on the amount of the bond to be posted in the event the Court were to issue a temporary restraining order. Union Pacific argued a bond of $500 or $1,000 would be sufficient. BMWED did not advocate for any specific higher amount. Having determined the issuance of a temporary restraining order in Union Pacific's favor is warranted, and given BMWED did not present evidence or make argument seeking a higher bond amount under the present circumstances, the Court concludes a bond in the amount of $1,000 is adequate to satisfy the purposes of Section 107(e). Union Pacific is ordered to post said bond with the Clerk of the Court.

## III. CONCLUSION

The Court concludes Union Pacific's request for a Temporary Restraining Order should be granted. Accordingly,

IT IS ORDERED:

1.  Plaintiff's Motion for Temporary Restraining Order (Filing 6) is granted as follows:

2.  Defendant and its officers, members, agents, successors, deputies, servants, and employees, and all persons acting by, with, through or under Defendant or by and through Defendant's orders, directions or requests, and all others acting in concert

or participation with Defendant are enjoined and restrained from, in any manner or by any means

    a.  directing, calling, causing, approving, authorizing, instigating, conducting, threatening, continuing, encouraging, inducing or engaging in any strike, self-help, sickout, concerted refusal to bid on advertised assignments, absenting themselves from work, slowdown, work stoppage, refusal to work, job action, picketing, or refusal to cross a picket line at or outside of the premises of or against Union Pacific, and any and all acts of any kind whatsoever, in furtherance or support thereof;

    b.  interfering in any manner with any person employed by Union Pacific while that person is performing his or her work and duties for the carrier;

    c.  seeking to resolve their major dispute with Union Pacific by any means (including picketing, patrolling or economic pressure of any kind against Union Pacific or any of its corporate affiliates or any person doing business with them, or any of them) other than by pursuing the collective bargaining and mediation procedures contained in the Railway Labor Act;

    d.  otherwise interfering with the normal business operations of Union Pacific.

3. Defendants are directed to notify all officers and employees under their jurisdiction of this Temporary Restraining Order; take all steps within their power to halt any strike, self-help, sickout, concerted refusal to bid on advertised assignments, slowdown, work stoppage, refusal to work, job action, picketing, and refusal to cross a picket line and to prevent such actions from occurring or continuing if

22

commenced against Union Pacific; and take all steps necessary to encourage and ensure compliance with the terms of this Order;

4.  Pursuant to 29 U.S.C. § 107(e), NECivR 65.1.1, and the provisions of this Order, the Court requires Plaintiff, Union Pacific Railroad Company, to post a bond with the Clerk of the Court in the amount of $1,000 on or before December 26, 2020;

5.  The hearing on Plaintiff's Motion for Preliminary Injunction will take place on January 5, 2021, at 9:00 AM before the undersigned judge in Courtroom No. 5, Roman L. Hruska United States Courthouse, 111 South 18th Plaza, Omaha, Nebraska 68102; and

6.  At the hearing on the Motion for Temporary Restraining Order, the parties stipulated on the record that any temporary restraining order entered will be effective from the date entered until January 8, 2020, notwithstanding the timing limitations of 29 U.S.C. § 107(e). In accordance with the parties' stipulation, this Temporary Restraining Order will expire on January 8, 2020 at 11:59 PM, unless otherwise ordered by the Court.

DATED this 23rd day of December, 2020.

BY THE COURT:

_____
Brian C. Buescher
United States District Judge