IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNION PACIFIC RAILROAD COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil Action No. 8:20-cv-00516 |
| | ) | |
| BROTHERHOOD OF MAINTENANCE OF WAY EMPLOYES DIVISION/IBT | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**SUPPLEMENTAL MEMORANDUM IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION**


Richard S. Edelman
Aaron S. Edelman
Mooney, Green, Saindon, Murphy & Welch, P.C.
1920 L Street NW, Suite 400
Washington, DC 20036
(202) 783-0010
(202) 841-8796 (cell)
Redelman@MooneyGreen.com

Robert E. O'Connor, Jr.
P.O. Box 451116
Omaha, NE 68145
(402) 330-5906

Attorneys for Brotherhood of Maintenance of Way Employes Division/IBT

## TABLE OF CONTENTS

**Page**


TABLE OF AUTHORITIES ........................................................................................................ ii

I. A COLLECTIVE WITHDRAWAL FROM SERVICE BY UP MAINTENANCE OF WAY EMPLOYEESWOULD NOT VIOLATE THE RLA ........................................ 1

II. A WITHDRAWAL FROM SERVICE WOULD BE PROTECTED BY THE FRSA... ........................................................................................................ 5

III. IF A PRELIMINARY INJUNCTION IS GRANTED IT SHOULD BE SUBJECT TO CONDITIONS TO PROTECT BMWED'S MEMBERS ........................................ 10

## TABLE OF AUTHORITIES

### CASES


**Page**

*Battenfield v. BNSF Ry.*, Case No. 12-cv-213-JED-PJC, 2013 BL 79845 (N.D. Okla. Mar. 26, 2013) .......... 9

*Boston & Maine Corp. v. Lenfest*, 799 F.2d 795 (1st Cir. 1986) .......... 4, 9, 10

*Cieslicki v. Soo Line R.R.*, ARB Case No. 2019-0065 2020 BL 243372 (June 4, 2020) .......... 7

*Consol. Rail Corp. v. RLEA*, 491 U.S. 299 (1989) .......... 1

*Consol. Rail Corp. v. Transp. Union*, 947 F. Supp. 168 (E.D. Pa. 1996) .......... 9

*Detroit and Toledo Shore Line R.R. v United Transp. Union*, 396 U.S. 142 (1969) .......... 2

*Green v. Grand Trunk Western R.R.*, No. 14-11125, 2015 BL 103464 (E.D. Mich. Apr. 13, 2015) .......... 9

*Grigsby v. Kan. City S. Ry.*, No. G-13-418, 2014 BL 56875 (S.D. Tex. Mar. 03, 2014) .......... 9

*Hernandez v. Metro-N. Commuter R.R.*, 74 F. Supp. 3d 576 (S.D.N.Y. 2015) .......... 6

*Kurec v. CSX Transp., Inc.*, No. 5:18-CV-0670, 2020 BL 428087 (N.D.N.Y. Nov. 04, 2020) .......... 6, 7

*Monongahela Ry. v. Transportation Communications Union*, No. 89-4439, 1989 BL 175 (W.D. Pa. July 12, 1989) .......... 9

*Norfolk S. Ry. v. Solis*, 915 F. Supp.2d 32 (D.D.C. 2013) .......... 8, 9

*Stoke v. Se. Pa. Transp. Auth.*, 657 Fed. Appx. 79 (3d Cir. 2016) .......... 8

*Tompkins v. Metro-North Commuter R.R.*, No. 18-3174, 2020 BL 490502 (2d Cir. Dec. 17, 2020) .......... 6

*United Transp. Union v. Springfield Terminal Co.*,
675 F. Supp. 683 (D. Me. 1987) .......... 10

*Williams v. Ill. Cent. R.R.*,
2017 BL 203768 (S.D. Miss. June 15, 2017) .......... 7

*Ziparo v. CSX Transp., Inc.*,
443 F. Supp. 3d 276 (N.D.N.Y. 2020) .......... 8

**STATUTES AND REGULATIONS**

45 U.S.C. § 151, *et seq.* .......... *passim*

49 U.S.C. §20109 .......... *passim*

## I. A COLLECTIVE WITHDRAWAL FROM SERVICE BY UP MAINTENANCE OF WAY EMPLOYEESWOULD NOT VIOLATE THE RLA

The Brotherhood of Maintenance of Way Employes Division/IBT ("BMWED" or "Union") recognizes that the Court initially concluded that a withdrawal from service by Union Pacific Railroad ("UP" or "Carrier") maintenance of way employees would be unlawful under the RLA. BMWED respectfully submits that this holding was in error.

The Court's initial conclusion was based on its finding that the dispute over UP's Covid-19 policies is a "major dispute", such that the RLA status quo applies. But a major dispute is one where there is "an intended change in agreements affecting rates of pay, rules or working conditions". 45 U.S.C. §156. The Supreme Court has described major disputes as those "relat[ing] to disputes over the formation of collective agreements or efforts to secure them. They arise where there is no such agreement or where it is sought to change the terms of one...". *Consol. Rail v. RLEA*, 491 U.S. 299, 302 (1989). The RLA contains several express status quo provisions applicable in major disputes: one that comes into play after a bargaining notice is served which bars changes "by the carrier' (Section 6), one that applies during mediation (Section 5 First), and one that applies if a Presidential Emergency Board is appointed (Section 10). There is also an "implicit status quo requirement" in the duty of both parties "to exert every reasonable effort to make and maintain agreements" (Section 2 First). *Detroit and Toledo Shore Line R.R. v United Transp. Union*, 396 U.S. 142, 150-153 (1969).

This discussion of the nature of major disputes and the RLA status quo requirements reveals why the instant dispute is not a major dispute; and why a collective withdrawal from service would not violate the only RLA status quo requirement applicable in this situation- Section 2 First (the Section 6 status quo applies only to carriers; and the parties are not in mediation or before a PEB). BMWED's demand that UP improve its unilaterally developed Covid-19 policies is not a

proposal to change or add to the terms of any agreement; and it is not a part of BMWED's proposal regarding paid leave. BMWED's demand is strictly related to the current Covid-19 crisis and is not intended to apply other than when UP requires maintenance of way employees to self-report exposure to the virus or virus-like symptoms, and to quarantine. The demand is not related to any other circumstance and would not apply once the pandemic has run its course. If that was not clear from the Temporary Restraining Order hearing, BMWED will expressly so state at the preliminary injunction hearing. BMWED has merely responded to the policy unilaterally developed by UP to prevent the spread of this novel and highly transmissible virus among its workforce, by seeking a more effective mandatory quarantine and compensation for quarantining policy, as well as other improved protections for its members. Indeed, UP has taken the position that its program does not arise under the CBA, but was created by UP outside the collective bargaining process. Under the plain terms of the statute, BMWED does not "intend[] [a] change in agreements" (Section 6), nor does it seek to "change the terms of one" (*Conrail, supra.*).

Additionally, the Union's demand is not part of, or connected to, its Section 6 Notice. The parties' Section 6 Notices were served in the first week of November of 2019, before anyone was aware of the novel coronavirus. BMWED's Section 6 proposal to UP is not to establish sick leave, or any increase in paid leave; the proposal is that when an employee is entitled to paid leave under the existing agreement, the employee will be compensated at the same rate as when they work their assigned position (*e.g.* 10 hours leave for what would be 10 hours of work), and to make qualifications for use of existing vacation and personal days reflect "mainstream practices". *See* Hanquist Declaration Ex. A. Furthermore, to the extent the Section 6 proposal might result in change with respect to existing leave, it would be for an actual and permanent change to the parties' collective bargaining agreement that is not limited to the circumstances of Covid-19; and it would continue to apply after the pandemic ends. The mere fact that BMWED's Section 6 Notice, and

BMWED's response to UP's quarantine compensation policy, related to compensation for time not worked, does not mean the two are connected. The December 17 letter is a response to the pandemic and UP prohibiting exposed employees from working, when they otherwise would be working. The December 17 letter does not seek paid leave; compensation would be paid only when UP bars employees from working under its Covid-19 policy. And the differences between the Union and the Carrier are not over whether there should be compensation in such circumstances, but over when they are entitled to compensation, and how much they should receive, in order to achieve the goal of compliance with UP's quarantine requirement.

Furthermore, only one of BMWED's demands concerned pay for time not worked. The others (testing, temperature screening, contact tracing, adequate PPE and sanitation supplies and strong physical distancing requirements) have nothing whatsoever to do with BMWED's Section 6 Notice and plainly concern worker safety. Consequently, those aspects of BMWED's demand cannot be described as related to the Section 6 bargaining, and there is no RLA basis for enjoining a withdrawal from service related to those demands.

That the employees' action would not violate the RLA is also demonstrated by UP's own conduct. UP unilaterally implemented a policy that bars employees from working, even though the parties' collective bargaining agreement provides them with rights to exercise seniority and to bid for and hold positions with UP. UP's new policy could be considered a change in rules and working conditions. And UP established a program to provide compensation to some employees who it requires to quarantine; it is paying employees for time not worked. That could be considered a change in compensation. Under the logic of the argument advanced by UP, the Carrier would have violated RLA Section 2 Seventh and 6 by establishing a policy barring some employees from working when they otherwise would have an agreement right to work, and by changing terms related to paid time off. Indeed, UP took the position that its program was created outside the

collective bargaining process. But BMWED recognized that UP was responding to an extraordinary situation, some have called it a once a century event; and that UP was not attempting to change any agreement, but to implement policies to enable to it to continue to operate and provide an essential service during a pandemic. This is a unique situation, not one for an ongoing agreement, so BMWED did not challenge UP's actions under the RLA. BMWED's actions similarly are not violative of the RLA. All BMWED seeks is improvement to the policies implemented by the Carrier because the Union believes the current policies do not adequately protect its members. But if BMWED's actions violate the RLA status quo requirement, so do UP's.

Upon completion of the preliminary injunction hearing, the Court may conclude that the Union's concerns about its members' safety do not permit a collective withdrawal from service. BMWED would disagree. But in that event, the Court should handle the issue as an FRSA matter; and if it thinks an injunction is necessary while the FRSA issues are resolved, the Court could do so in aid of that process, but it should not do so based on an RLA violation, when there is none.

## II. A WITHDRAWAL FROM SERVICE WOULD BE PROTECTED BY THE FRSA

BMWED recognizes that the Court has initially concluded that other courts erred in holding that the FRSA protects a collective refusal to work in unsafe conditions organized by a union because the statute protects employees from retaliation and discrimination when they refuse to work in unsafe conditions. BMWED respectfully disagrees, and submits that the decisions of other courts were correct, and that the passages relied on by BMWED about concerted refusals to work were not dicta. *E.g. Boston & Maine Corp. v. Lenfest*, 799 F.2d 795, 799 (1st Cir. 1986)(twice referring to its conclusion as a holding). BMWED further contends that its position is supported by the language of the FRSA which is designed to protect the rights of employees to refuse to work in hazardous conditions. *Id.* Also, the statute does not differentiate between one employee or many employees invoking that protection. Additionally, BMWED is not asserting a cause of action under

Section 20109. BMWED has, based on its knowledge of carrier-wide policies and system-wide conditions, informed its members that the Union believes that working conditions on the railroad pose an imminent threat of death or serious injury. Where individual employees might be hesitant to act, the Union has advised its members that they all may act together. By refusing to work in such conditions, the employees who withdraw from service until the situation is remedied are protected by the FRSA. Under the language of the Act, the employees are protected if the Union declares working conditions to be unsafe under the Act and its members all refused to work under such conditions. Furthermore, a declaration of an emergency by a union is consistent with the "reasonable individual in the circumstances" element of Section 20109(b)(2), since the Union reflects the consensus of its members confronted with the circumstances. *Cf. Tompkins v. Metro-North Commuter R.R.*, No. 18-3174, 2020 BL 490502, *4 (2d Cir. Dec. 17, 2020)– an employee invoking Section 20109(b) must "show not only that he believed that the conduct constituted a violation, but also that a reasonable person in his position would have believed that the conduct constituted a violation" and "reasonableness for FRSA purposes is based on the knowledge available to a reasonable person in the same factual circumstances with the same training and experience as the aggrieved employee.". *Id.* *4, citing, *Hernandez v. Metro-N. Commuter R.R.*, 74 F. Supp. 3d 576, 580 (S.D.N.Y. 2015); *see also Kurec v. CSX Transp., Inc.*, No. 5:18-CV-0670, 2020 BL 428087, *15 (N.D.N.Y. Nov. 04, 2020).

BMWED further submits that the Court's finding that the pandemic "is not a *work-specific* safety concern for the BMWED employees under the FRSA", but "a worldwide and widespread problem", does not render Section 20109 inapplicable. Section 20109 does not limit its coverage to "work specific" issues; it applies to "hazardous conditions related to the employee's duties". Section 20109(b))1)(B). And BMWED is not attempting to address the pandemic generally, but the working conditions of its members during the pandemic. If the pandemic causes normal

working conditions to become hazardous, and UP refuses to take sufficient steps to alleviate the danger the virus poses to its employees, then the dispute over the carrier's response is one concerning hazardous conditions affecting the employees' performance of their duties at work. Furthermore, the analysis that the FRSA does not apply to carrier reactions to the general environment in which work is to be performed has been rejected in other decisions. In a recent decision, the Northern District of New York held that there is "no basis in FRSA's plain language to suggest that the "hazardous safety or security condition" must be under the railroad's control"; and the court found that such an interpretation is an attempt to read an additional requirement into the statute. *Kurec v. CSX Transp.* 2020 BL 428087, at *12. And the Department of Labor's Administrative Review Board ("ARB"), which decides claims under Section 20109, recently rejected an Administrative Law Judge's more limited reading of FRSA Section 20109 (a) and (b), in which the ALJ held that they do not cover a worker's self-reported infirmities, stating that "Our first and primary reason is that the statute does not limit complained of violations, hazardous safety conditions, or security conditions as the ALJ held....the Department of Labor's primary purpose, as regards the... FRSA, is safety... This purpose applies equally whether there is a regulatory violation or hazardous safety condition that relates to the equipment, or the condition of a person who is working on the equipment". *Cieslicki v. Soo Line R.R.*, ARB Case No. 2019-0065 2020 BL 243372 (June 4, 2020). Furthermore, while UP can make only limited contribution to the worldwide effort to defeat the virus, it can control its own response to the impact of the virus on the working conditions of its employees. *Cf. Williams v. Ill. Cent. R.R.*, 2017 BL 203768, 3 (S.D. Miss. June 15, 2017) –while a carrier cannot control an employee's illness or injury, a co-worker's lack of fitness and lack of skill to perform a job safely is a hazardous condition within the railroad's control because a "railroad carrier can, for instance, provide and mandate employee training,

evaluate job performance, and assure that the co-worker complained of is equipped to perform the tasks to which he or she is assigned."[1]

With respect to UP's assertion that BMWED could have sought action by the Federal Railroad Administration, when two other unions sought FRA action, the agency declined, saying that the challenges of the pandemic were not unique to the rail industry and not the type of issue for which FRA would exercise its emergency authority. UP Complaint Exhibit F at 2. Later, the Department of Transportation declined to mandate certain protective measures for transportation industries and the Administrator of the Federal Aviation Administration cited the Secretary of Transportation's statement that such issues should be handled by public health agencies.[2]

As to whether UP's response to the pandemic constituted a hazardous condition that poses an imminent threat, the Union submits that while UP has taken some steps to protect its employees and has communicated with BMWED over the months since the pandemic began, that does not mean that the workplace is safe and that the threat is not imminent. An inadequate response can be a hazardous condition as shown by the fact that despite knowledge of the virus and of protective measures, hundreds of thousands of Americans have died of the virus, including 3 UP maintenance of way employees. And the recent rapid escalation of the rate of infections, and UP's refusal to

---

[1] *Stoke v. Se. Pa. Transp. Auth.*, 657 Fed. Appx. 79, 80 (3d Cir. 2016) and *Ziparo v. CSX Transp., Inc.*, 443 F. Supp. 3d 276, 290-91 (N.D.N.Y. 2020), which the Court cited as supporting a narrow reading of hazardous conditions related to the employee's duties are distinguishable from this case, and do not support the notion that because the origin of a threat is outside the railroad's control, the railroad has no obligations and employees have no rights under the FRSA. In *Stoke*, the plaintiff was on medical leave for an injury, became pregnant, had a difficult pregnancy, was instructed to limit her activity, and then did not show up for a medical examination the carrier sought as part of confirming her leave. The cause of her medical difficulty and the reason she did not comply with the carrier's directive had nothing to do with her performance of work. In *Ziparo*, the employee was fired for refusing to follow a supervisor's instructions to input inaccurate information "because he felt that it would have constituted lying, that it was not right, and that it would affect customers, and because it made him uncomfortable." 443 F. Supp. 3d at 282. The court rejected his reliance on the FRSA, concluding that his feelings about inputting the information was not about workplace safety– it was an ethical objection.

[2] https://www.washingtonpost.com/local/trafficandcommuting/coronavirus-mask-airplanes/2020/12/31/09c12d52-4565-11eb-975c-d17b8815a66d_story.html

change its protocols, (along with the recent mutation of the virus to a more transmissible variant- https://www.nytimes.com/2020/12/30/health/coronavirus-mutant-colorado.html), have rendered the threat imminent.

BMWED submits that if the Court has doubts about whether the elements of Section 20109 are satisfied, that is a matter to be decided by the Department of Labor's Occupational Safety and Health Administration. In *Norfolk S. Ry. v. Solis*, 915 F. Supp.2d 32, 39 (D.D.C. 2013), the court noted that the plain text of the FRSA establishes that "District courts have jurisdiction in § 20109 actions in two limited circumstances": (1) "if the Secretary has not issued a final decision within 210 days of the filing of an administrative complaint, and the delay is not due to the bad faith of the employee", and (2) "the Secretary may bring an action in district court to require compliance with an order". *See also Battenfield v. BNSF Ry.*, Case No. 12-CV-213-JED-PJC, 2013 BL 79845, 4 (N.D. Okla. Mar. 26, 2013) ("District courts have jurisdiction in § 20109 cases in limited circumstances."); *Green v. Grand Trunk Western R.R.,* No. 14-11125, 2015 BL 103464, *3 (E.D. Mich. Apr. 13, 2015); *Grigsby v. Kan. City S. Ry.*, No. G-13-418, 2014 BL 56875, *2 (S.D. Tex. Mar. 03, 2014). *And see* decisions under the pre-RSIA FRSA-- *Boston & Maine Corp. v. Lenfest*, 799 F.2d at 800 -- "This entire dispute, including the nature of the hazard faced" and "whether the [union] complied with the statutory requirements" must be submitted to the neutral body specified in the FRSA to hear these claims under the statute; *Consol. Rail Corp. v. Transp. Union*, 947 F. Supp. 168, 174 (E.D. Pa. 1996) --"It is not for this court to weigh the conflicting evidence on whether the… strike was called for legitimate safety reasons or whether those reasons were merely pretextual.", "Nor is it our role at this point to determine whether all conditions of the FRSA have been met." Accordingly, if the Court doubts whether the facts of this case satisfy the requirements of Section 20109, it should not simply reject BMWED's position, but let OSHA decide.

BMWED recognizes the Court may not be inclined to permit a withdrawal from service if it is not certain that the requirements of Section 20109 are satisfied. BMWED submits that in that event, the Court could issue a preliminary injunction to preserve the ability of OSHA to effectively resolve the dispute. That would be similar to the outcome in. *Lenfest, supra.* 799 F.2d at 801-803; when such disputes were to be resolved in arbitration rather than by an administrative agency. *Cf. Monongahela Ry. v. Transportation Communications Union,* No. 89-4439, 1989 BL 175, *8 (W.D. Pa. July 12, 1989). Those courts reasoned that as courts can issue injunctions to support arbitral resolution of contract interpretation disputes, the same could be done for resolution of disputes under Section 20109. Furthermore, those courts made the injunctions subject to the carrier's compliance with certain conditions, pending the arbitration, or at least held that they could (*Lenfest, supra.,* 799 F.2d at 803-804; *United Transp. Union v. Springfield Terminal Co.*, 675 F. Supp. 683, 685 (D. Me. 1987); *Monongahela Ry., supra.,* at *8); as is discussed in the next section BMWED submits the same should be done here if a preliminary injunction is granted.

## III. IF A PRELIMINARY INJUNCTION IS GRANTED IT SHOULD BE SUBJECT TO CONDITIONS TO PROTECT BMWED'S MEMBERS

As is described in BMWED's brief in opposition to UP's application for a temporary restraining order (at 32-35), the Court has authority under the Norris LaGuardia Act, and as part of its general equity jurisdiction, to set conditions on a preliminary injunction; and courts have found they can do so in FRSA cases. If the Court issues a preliminary injunction, it should condition the order on UP's compliance with its own Covid-19 policies and protocols; and on UP treating all mandatory quarantines the same with respect to compensation.

It is equitable to condition the injunction sought by UP on its compliance with its own Covid-19 policies and protocols since it has relied on them in defending against BMWED's assertions that working conditions on the railroad are unsafe. BMWED has also asserted that field

managers have not consistently complied with UP's policies and protocols. If BMWED is to be enjoined based on the Carrier's assertion that its policies and protocols are adequate, UP should be required to adhere to and to ensure compliance with its own policies and protocols as a condition of obtaining such an injunction. It is also equitable to condition an injunction that UP at least treat all mandatorily quarantined employees the same with regard to compensation. The distinctions between employees exposed at work and those exposed elsewhere, and between those exposed once and those exposed more than once are irrational with respect to ensuring worker safety. Co-workers of an employee who has been exposed to the virus are in just as much danger when the employee was exposed at work as when the employee was exposed elsewhere; and they are in just as much danger when the employee has been exposed for a second or third time as they are when it is the employee's first exposure. Because the distinctions in UP's policy are arbitrary and irrational and do not further any safety goal and actually undermine safety, UP should be required to treat all employees required to quarantine the same with respect to compensation for being required to quarantine as a condition of any injunction.

## IV. CONCLUSION

BMWED respectfully submits that the preliminary injunction requested by UP should be denied.

Respectfully submitted,


| /s/ *Richard S. Edelman*<br>Richard S. Edelman<br>Aaron S. Edelman<br>Mooney, Green, Saindon, Murphy & Welch, P.C.<br>1920 L Street NW, Suite 400<br>Washington, DC 20036<br>(202) 783-0010<br>(202) 841-8796 (cell)<br>Redelman@MooneyGreen.com | /s/*Robert E. O'Connor, Jr.*<br>Robert E. O'Connor, Jr.<br>P.O. Box 451116<br>Omaha, NE 68145<br>(402) 330-5906<br>Reolaw@aol.com |
|---|---|

## CERTIFICATE OF SERVICE

I hereby certify that I have this day caused a copy of the foregoing Supplemental Memorandum in Opposition to Motion For A Preliminary Injunction to be served through the Court's electronic case filing system to the following:

Jacquelyn V. Clark
Union Pacific Railroad
1400 Douglas Street STOP 1580
Omaha, NE 68179
jvclark@up.com

Robert Hawkins
Andrew Rolfes
Cozen O'Connor
1650 Market Street, Suite 2800
Philadelphia, PA 19103
rhawkins@cozen.com
arolfes@cozen.com

January 4, 2020

*/s/Robert E. O'Connor, Jr.*
Robert E. O'Connor, Jr.