IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

UNION PACIFIC RAILROAD COMPANY,

Plaintiff,

vs.

BROTHERHOOD OF MAINTENANCE OF
WAY EMPLOYES DIVISION OF THE
INTERNATIONAL BROTHERHOOD OF
TEAMSTERS,

Defendant.

8:20-CV-516

PRELIMINARY INJUNCTION

This matter came on for hearing on Plaintiff's Motion for Preliminary Injunction, Filing 6, on the 5th day of January, 2021. Plaintiff and Defendant appeared by counsel of record. The Court previously granted Plaintiff's Motion for Temporary Restraining Order. Filing 24. The Court heard the testimony of witnesses in open court by both sides and permitted cross-examination of the same. Having reviewed the pleadings, arguments, evidence, and testimony in the record, the Court concludes Plaintiff's Motion for Preliminary Injunction should be granted.

## I.      BACKGROUND

Plaintiff, Union Pacific Railroad Company ("Union Pacific"), is a Class I railroad operating and providing freight transportation services covering 32,000 miles in twenty-three states. Filing 1 at 2; Filing 8-1 at 1. It is the second largest freight rail system in the United States, employs approximately 30,000 people, and provides transportation services to approximately 10,000 customers. Filing 8-1 at 2-3. Union Pacific provides transportation services to many manufacturers throughout the country, transporting a variety of goods, often on a time-sensitive basis. Filing 8-1 at 2-3. The railroad is the largest shipper of finished automobiles west of the Mississippi River and

1

a major shipper of grain and coal. Filing 8-1 at 2-3. Union Pacific also transports products and raw materials used for public health and safety, some of which cannot be shipped by truck. Filing 8-1 at 3. Union Pacific generated around $54 million per day in operating revenue in the last fiscal year, equating to around $22 million per day net operating income. Filing 8-1 at 4.

Defendant, the Brotherhood of Maintenance of Way Employes Division of the International Brotherhood of Teamsters ("BMWED"), is a labor organization that represents Union Pacific employees in the craft or class of maintenance of way. Filing 1 at 2-3. BMWED and Union Pacific are parties to multiple collective-bargaining agreements ("CBAs") that govern rates of pay, rules, and working conditions of Union Pacific employees represented by BMWED. Filing 1 at 3.

Union Pacific is a member of a collective-bargaining organization of large railroads represented by the National Carriers' Conference Committee ("NCCC") of the National Railway Labor Conference ("NRLC"). Filing 1 at 4. NCCC negotiates with multiple unions nationwide to form CBAs on behalf of its member railroads in what is known as national handling. On November 1, 2019, NCCC, acting on behalf of Union Pacific and other member carriers, served BMWED with formal notice, known as Section 6 notice, as required under the Railway Labor Act ("RLA"), 45 U.S.C. § 151 et seq., beginning the bargaining process designed to lead to a new CBA between BMWED and the railroads. Filing 1 at 4; *see* 45 U.S.C. § 156 ("Carriers and representatives of the employees shall give at least thirty days' written notice of an intended change in agreements affecting rates of pay, rules, or working conditions . . . ."). BMWED served its own Section 6 notice of demands for increased pay and additional paid time off for the employees it represents on November 4, 2019, in accordance with the RLA. Filing 1 at 4; Filing 22-2; *see* 45 U.S.C. § 156. In its notice, BMWED sought a seven percent per annum wage increase for its members and cost

of living allowances adjusted annually only for rising costs, both retroactive to January 1, 2020; increased travel allowances; reduced out-of-pocket healthcare expenses; per diem payments at the transportation industry national rate, as adjusted annually by the federal government; paid leave compensation determined by the number of hours each employee is assigned to work and amended "[v]acation and personal day qualifications to reflect mainstream practices"; and that all training and testing occur during regular hours and employees be paid for testing and training time at their assigned rate. Filing 22-2 at 3-4. NCCC and BMWED have remained in bargaining since the notices were served, and neither party has sought mediation services from the National Mediation Board. Filing 1 at 4.

On March 11, 2020, officers of multiple rail-workers' unions wrote the Chairman of the NRLC, Brendan Branon, requesting a coordinated response by NRLC-member railroads, including Union Pacific, to the COVID-19 pandemic. Filing 1-1. The unions requested the railroads adhere to Center for Disease Control ("CDC") guidelines for mitigating COVID-19, that all attendance policies be suspended, that employees required to quarantine not be subject to discipline, and that quarantined employees receive paid leave for missed work. Filing 1-1 at 2-3. By letter dated March 13, 2020, Branon advised the unions that NRLC-member railroads were working with "their medical experts to implement and maintain prevention and response measures" consistent with CDC guidelines and the unions should address their concerns with the individual rail carriers. Filing 1-2.

On March 19, 2020, BMWED's president wrote to Union Pacific's chairman and CEO requesting copies of COVID-19-related preventative and response plans and attendance policies concerning BMWED-represented employees. Filing 1-3. On March 30, 2020, the Union Pacific Vice President of Mechanical and Engineering responded to the request, noting that Union Pacific

was endeavoring to follow CDC guidelines and providing a link for Union Pacific's intranet site where the railroad's documents and instructions concerning its COVID-19 practices and policies were posted. Filing 1-4. The Vice President of Mechanical and Engineering also noted the fluidity of the situation, the need to check the intranet site often due to constant updates, and that Union Pacific had established a daily call with senior staff and union personnel to share information and hear the concerns of the unions. Filing 1-4. In late March, Union Pacific adopted a policy providing fourteen days paid leave for those employees who were directed to quarantine due to workplace exposure to COVID-19 and instituted policies requiring social distancing and face coverings. Filing 1 at 6. The current guidance provides that Union Pacific employees can only receive payment for one fourteen-day quarantine period and only if they are exposed to COVID-19 at work. Filing 1 at 6; Filing 35-5 at 1. Rod Doerr, Union Pacific Vice President of Labor relations, testified that Union Pacific's supplemental pay policy does not apply when an employee is exposed to COVID-19 outside of work in order "to incent[ivize] the correct behavior [and n]ot to take on risky activities while one is off company property." This was the result of a few early cases where an employee had "gone to concerts and then would return from those kind of events knowing that they were risky and bring that information to [Union Pacific] and then expect to be quarantined." Doerr testified that employees can nevertheless use vacation, sick, or other paid leave if required to quarantine for non-work-related exposures.

On March 20, 2020, two other rail labor unions, the Brotherhood of Locomotive Engineers and Trainmen and the International Association of Sheet Metal, Air, Rail, and Transportation Workers – Transportation Division, filed a petition with the Federal Railroad Administration ("FRA") seeking an emergency order pursuant to the Federal Railroad Safety Act of 1970 ("FRSA"), 49 U.S.C. § 20101 et seq., "to address safety conditions arising from the novel

coronavirus (COVID-19) emergency" and to standardize and identify best practices in the industry for mitigating the spread of the virus and protecting employees. Filing 1-5 at 1. The FRA issued a Safety Advisory encouraging railroads to adhere to CDC guidelines and incorporate industry best practices regarding the pandemic. Filing 1 at 7. The FRA declined to issue an emergency order, however. Filing 1-6.

On July 2, 2020, BMWED's President again wrote to Union Pacific's Chairman and CEO, submitting for the railroad's consideration a thirteen-page "white paper" document detailing COVID-19 mitigation guidelines and procedures BMWED sought to have Union Pacific implement. Filing 1-7. Doerr responded on July 14, 2020, writing to BMWED that Union Pacific has a qualified pandemic team that assesses the latest pandemic-related information made available by the government, and the railroad's programs comply with CDC guidance. Filing 1-8. BMWED responded by letter dated July 21, 2020, maintaining its opinion that "the only way to achieve the necessary, safe working conditions" was to implement the testing, temperature-taking, and contact-tracing procedures provided in the white paper BMWED sent with its July 2, 2020, letter which would provide paid leave for employees who tested positive, who were found to have a temperature exceeding 100.4 degrees, or who had been exposed to other employees who tested positive for COVID-19. Filing 1-9.

On September 24, 2020, BMWED wrote Union Pacific again, contending Union Pacific's "Covid-19 protocols don't go far enough to protect their valuable employees and the public" and again urging Union Pacific to adopt a safety program in line with the suggestions provided in the July 2, 2020, white paper. Filing 1-10 at 4. Union Pacific responded on October 6, 2020, informing BMWED that while it appreciated the suggestions and would implement some of them, Union

Pacific would "not advance several BMWED outlined recommendations as they would have the detrimental effect of creating an atmosphere of false security." Filing 1-11.

On December 18, 2020, Union Pacific received a letter, dated December 17, 2020, from BMWED General Chairman, Tony Cardwell. Filing 1 at 9; Filing 1-12. In the letter, Cardwell stated that if BMWED's demands were not met within ten days, "BMWED will declare a health and safety emergency because of the imminent threat to its members of serious injury or death, and will call for a cessation of work if UP does not take the necessary corrective actions." Filing 1-12 at 4. BMWED made six demands including: (1) Union Pacific was to continue paying employees absent from work for "any . . . Covid-19 related reason"; (2) Union Pacific was to provide access to COVID-19 testing on the job site and on company time; (3) Union Pacific was to provide for employees to have their temperatures checked at the start of each shift, and any employee having a temperature exceeding 100.4 degrees was to be prohibited from work until obtaining a negative COVID-19 test and paid any time missed as a result; (4) any employee exposed to a person with COVID-19 in the workplace was to be quarantined for at least fourteen days, required to obtain a negative COVID-19 test before returning to work, and would receive pay for any time missed at work; (5) Union Pacific was to provide new face masks and hand cleaner each day, ensure no employee be required to use a locker room, vehicle, or machine that has not been sanitized within eight hours, and pay employees unable to work due to a lack of personal protective equipment ("PPE") or sanitization; and (6) Union Pacific was to require six-foot social distancing be made a priority over daily tasks and require job briefing in the rare instances when a task cannot be completed without employees coming within six feet of one another. Filing 1-12 at 3-4. On December 19, 2020, Union Pacific's Vice President of Labor Relations spoke by phone with BMWED representatives including Cardwell and attempted to

discuss the issues BMWED raised in its most recent letter. Filing 1 at 10; Filing 19-1 at 11. BMWED representatives responded that their letter made their concerns clear. Filing 1 at 10; Filing 19-1 at 11.

Union Pacific filed suit against BMWED on December 20, 2020, seeking declaratory and injunctive relief and alleging that BMWED's threatened work stoppage violates sections 2 and 6 of the RLA, 45 U.S.C. §§ 152, 156, and attempts to circumvent the statutory authority of the National Mediation Board ("NMB"). Filing 1 at 16. BMWED contends that its threatened work stoppage is unrelated to its collective-bargaining agreements with Union Pacific and is a protected refusal to work under hazardous conditions pursuant to the FRSA. Filing 18 at 9 (citing 49 U.S.C. § 20109(b)(1)(B)). On December 21, 2020, Union Pacific moved for a temporary restraining order and preliminary injunction preventing BMWED from commencing its threatened work stoppage. Filing 6; Filing 7 at 1. The Court held a hearing and issued a temporary restraining order on December 23, 2020, and, pursuant to the parties' stipulation that any temporary restraining order issued would not expire until January 8, 2021, set a hearing on the motion for preliminary injunction for January 5, 2021. Filing 24; Filing 26.

At the hearing on the preliminary injunction, Union Pacific presented the declaration and testimony of Carrie Powers, Union Pacific's Assistant Vice President of Financial Reporting and Analysis. Filing 8-1. Powers averred that a work stoppage of Union Pacific's services would impact critical U.S. industries including the automotive market, grain transportation, and the shipment of coal for providing electricity to millions of homes and businesses. Filing 8-1 at 1-4. Powers also averred that a strike against Union Pacific would cause severe and irreparable financial loss in the range of millions of dollars in lost revenue and business opportunities. Filing 8-1 at 5-

6. Powers testified that because Union Pacific provides a service rather than goods, any stoppage of work would result in a lost revenue which could not be recouped.

Union Pacific also presented the declarations and testimony of Brant Hanquist, Nate McLaughlin, Dr. Laura Gillis, and Russell Rohlfs, as well as the testimony of Rod Doerr and Jason Rea. Filing 22. Hanquist is the General Director of Labor Relations for Union Pacific and described the CBA bargaining process with BMWED, the COVID-19 Quarantine Leave Pay Policy, and the ongoing dialogue between Union Pacific and BMWED to address COVID-19 concerns. Filing 22-1 at 2.

Nate McLaughlin, the General Director of Payroll Operations, described how employees are paid when forced to quarantine due to COVID-19. Filing 22-5 at 2-3. According to Rohlfs, Assistant Vice President of Engineering for Union Pacific's Northern Region, Union Pacific provides hand sanitizer and disinfecting wipes to all employees, cleans equipment regularly, has taken steps to allow employees to maintain social distance whenever possible including during transportation, and mandated that all employees wear facial coverings. Filing 22-6 at 2-4.

Dr. Gillis, Chief Medical Officer for Union Pacific, leads the COVID-19 Pandemic Response Team at Union Pacific. Filing 22-7 at 2. She elaborated on the team's response and the various actions it has undertaken to protect employees, including implementing safety protocols and setting up a COVID-19 website. Filing 22-7 at 2-3. Dr. Gillis testified that Union Pacific has formulated its COVID-19 response based on guidance from the CDC, with additional guidance from infectious disease experts at the University of Nebraska Medical Center. She also confers regularly with medical officers from other railroads, leveraging their additional experience. Union Pacific has continued to update its policies as the CDC guidance has evolved. Dr. Gillis testified that Union Pacific policy is to educate employees about social distancing and encourage employees

8

to maintain six feet of distance in the workplace whenever possible, citing Union Pacific's written policy made available to all employees on the company's COVID-19 intranet page. *See* Filing 22-10. She also testified that Union Pacific's policy has evolved to encourage the use of face coverings and that Union Pacific has worked to continue to supply higher-quality face masks and hand sanitizer to employees when needed as the pandemic has progressed. Dr. Gillis also detailed Union Pacific's implementation of a contact-tracing program. She noted the program was developed based on CDC guidance, and as the pandemic has evolved, the company's contact tracers have benefitted from online training provided by Johns Hopkins, supplemented by in-house training at Union Pacific that addresses industry-specific contact-tracing concerns. Union Pacific also mandates all employees receive training on the company's COVID-19 protocols. Dr. Gillis testified that Union Pacific decided against implementing on-site COVID-19 testing due in part to the logistical challenges of the railroad's geographically dispersed workforce, the lack of established private-testing infrastructure and training, and the invasiveness of the tests. She also cited the widespread availability of testing through local public-health authorities which would be paid for by employee health insurance if costs were incurred. Dr. Gillis also explained that Union Pacific does not require employee temperatures scans to screen for COVID-19 infection because fever is not necessarily a good indicator given the potential for asymptomatic cases of the disease, the ability of over-the-counter medications to lower temperatures, and higher likelihood of false positives due to elevated body temperatures associated with the physical labor often performed by Union Pacific employees. She also noted logistical challenges to temperature checking at remote job sites and indicated employees with a fever would likely know they were ill and should comply with company instructions to avoid reporting for duty when sick to prevent the spread of the disease.

Union Pacific's COVID-19 website contains information about Union Pacific's mask policy and availability of free cloth face coverings, Filing 22-8; Filing 22-9; outlines Union Pacific's social-distancing policy and cleaning protocols, Filing 22-10; Filing 22-11; describes Union Pacific's COVID-19 notification process, Filing 22-14; and provides additional resources and updated information, Filing 22-12; Filing 22-13.

Rod Doerr, the Vice President of Labor Relations at Union Pacific, testified regarding the ongoing CBA-bargaining process between BMWED and Union Pacific. Doerr testified that BMWED's demands included a proposed seven percent wage increase, health and welfare benefits, and more paid leave for employees. Doerr testified that BMWED's demands contained in its December 17 letter overlapped with its Section 6 demands because they relate to how much time an employee is given off for COVID-19 reasons and how much an employee is paid for such time off. Doerr also described the ongoing dialogue between Union Pacific BMWED to reach proper safety protocols regarding COVID-19.

BMWED and Union Pacific both submitted correspondence between Union Pacific and BMWED concerning and leading up to the present dispute. *See, e.g.*, Filing 19-2. BMWED also submitted a letter, dated April 2, 2020, from three BMWED General Chairmen, including Cardwell, to Union Pacific's Vice President of Labor Relations detailing what BMWED perceived as conflicts between some of Union Pacific's COVID-19 policies and its collective-bargaining agreement with BMWED. Filing 19-2 at 11-12.

BMWED presented the testimony of Tony Cardwell and Joseph Nantista. Cardwell elaborated on the inadequacies BMWED sees in Union Pacific's approach to COVID-19 and the risks it believes such shortcomings pose to workers. Filing 19-1. He also testified that social distancing was not always possible for all types of work BMWED employees perform. He testified

10

that at times, he received complaints from employees that Union Pacific did not have enough masks available for employees and that employees were not being compensated for missed work time, even when exposed to the virus at work. He has also received complaints from Union Pacific employees who were not compensated for a second quarantine following work exposure.

On cross-examination, Cardwell admitted that BMWED's demands in its December 17 strike letter "could have been seen as excessive" because BMWED's ultimate "goal is to get the employee's straight time [earning] exception." Cardwell also stated that if the strike is not enjoined, BMWED intends to establish picket lines, fine members who elect to work, and would expect other unions to respect its picket lines. He admitted such actions would cause a complete shutdown of the Union Pacific railroad system.

Nantista is the Joint Vice Chairman at Large of the United System Division of BMWED. He assists BMWED members with submitting requests for medical leaves of absence. He testified that employees have been denied compensation for non-work-related COVID-19 exposures requiring them to quarantine.

The Court has reviewed the parties' submissions and arguments and makes the following findings.

## II. DISCUSSION

Union Pacific seeks a preliminary injunction preventing BMWED from "directing, calling, causing, approving, authorizing, instigating, conducting, threatening, continuing, encouraging, inducing or engaging in any strike, self-help, sickout, concerted refusal to bid on advertised assignments, absenting themselves from work, slowdown, work stoppage, refusal to work, job action, picketing, or refusal to cross a picket line at or outside of the premises of or against Union Pacific, and any and all acts of any kind whatsoever, in furtherance or support thereof"; "interfering

in any manner with any person employed by Union Pacific while that person is performing his or her work and duties for the carrier"; "seeking to resolve their major dispute with Union Pacific by any means (including picketing, patrolling or economic pressure of any kind against Union Pacific or any of its corporate affiliates or any person doing business with them, or any of them) other than by pursuing the collective bargaining and mediation procedures contained in the Railway Labor Act"; and "otherwise interfering with the normal business operations of Union Pacific." Union Pacific further requests the Court order BMWED to notify all officers and employees of the preliminary injunction, order them to take all steps within their power to halt any strike, require them to take all steps necessary to ensure compliance with the order, and notify the Court of the steps it has taken to comply. The Court addresses whether it has the statutory authority to issue the requested injunctive relief and whether such relief is proper.

## A.  The Norris-LaGuardia Act

Labor disputes are subject to the Norris-LaGuardia Act ("NLGA"), 29 U.S.C. § 101 et seq. In the NLGA, Congress stripped federal courts of "jurisdiction to issue any . . . temporary or permanent injunction in a case involving or growing out of a labor dispute, except in . . . strict conformity" with various procedural requirements. 29 U.S.C. § 101. The NLGA also categorically eliminates jurisdiction to enjoin certain types of conduct in "any labor dispute," including work stoppages and slowdowns. 29 U.S.C. § 104. However, where another statute specifically applies to a labor dispute, its narrower provisions can create exceptions to the NLGA which allow a court to issue injunctive relief. *See, e.g.*, *United Air Lines, Inc. v. Int'l Ass'n of Machinist & Aerospace Workers, AFL-CIO*, 243 F.3d 349, 362 (7th Cir. 2001) ("[W]here a challenged action violates specific provisions of [a labor statute], 'the specific provisions . . . take precedence over the more general provisions of the [NLGA]'" (third alteration in original) (quoting *Pittsburgh & Lake Erie*

12

*R.R. Co. v. Ry. Labor Executives' Ass'n*, 491 U.S. 490, 513, 109 S. Ct. 2584, 105 L. Ed. 2d 415 (1989))).

When a statutory exception permits a court to issue injunctive relief in a labor dispute, the procedural requirements of the NLGA still apply. *See United Air Lines, Inc.*, 243 F.3d at 363 ("[W]hen a carrier seeks to enjoin a strike against a union under the status quo provisions of the RLA, the procedural provisions of the NLGA remain in effect."); *accord Delta Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l*, 238 F.3d 1300, 1310 (11th Cir. 2001) ("[T]he general procedural provisions of the NLGA still apply to this action [involving a labor dispute], even though the anti-injunction portion of the NLGA does not . . . ."). These procedural requirements include the following findings:

> (a) That unlawful acts have been threatened and will be committed unless restrained or have been committed and will be continued unless restrained, but no injunction or temporary restraining order shall be issued on account of any threat or unlawful act excepting against the person or persons, association, or organization making the threat or committing the unlawful act or actually authorizing or ratifying the same after actual knowledge thereof;
>
> (b) That substantial and irreparable injury to complainant's property will follow;
>
> (c) That as to each item of relief granted greater injury will be inflicted upon complainant by the denial of relief than will be inflicted upon defendants by the granting of relief;
>
> (d) That complainant has no adequate remedy at law; and
>
> (e) That the public officers charged with the duty to protect complainant's property are unable or unwilling to furnish adequate protection.

29 U.S.C. § 107. The NLGA further states that the court may not issue injunctive relief to a party "who has failed to comply with any obligation imposed by law which is involved in the labor dispute in question, or who has failed to make every reasonable effort to settle such dispute either

13

by negotiation or with the aid of any available governmental machinery of mediation or voluntary arbitration." 29 U.S.C. § 108.

The parties here disagree over whether a specific statutory exception exists which would permit the Court to issue injunctive relief in light of the NLGA. Union Pacific argues the RLA allows the Court to issue an injunction while BMWED urges that the FRSA prohibits the requested relief.

### B.   The Railway Labor Act

Union Pacific argues that the Railway Labor Act ("RLA"), 45 U.S.C. § 151 et seq., applies to the present dispute and provides an exception to the NLGA's prohibition on injunctive relief in labor disputes. *See* Filing 7 at 15-16. BMWED, on the other hand, argues the RLA is inapplicable to the present dispute because the proposed work stoppage is unrelated to the ongoing CBA negotiating between the parties. Filing 33 at 5-6. The Court agrees with Union Pacific that the RLA governs the present dispute.

The RLA was enacted, among other reasons, "[t]o avoid any interruption to commerce or to the operation of any carrier engaged therein," and "to provide for the prompt and orderly settlement of all disputes concerning rates of pay, rules, or working conditions." 45 U.S.C. § 151a. "The purposes of the Act include avoiding interruption to commerce, ensuring worker freedom of association and the right to unionize, providing for the 'prompt and orderly' settlement of employment related disputes, and securing the 'complete independence' of railroads and their employees in matters of self-organization and in carrying out the Act's other purposes." *Burlington N. R. Co. v. United Transp. Union*, 848 F.2d 856, 860 (8th Cir. 1988) (citing 45 U.S.C. § 151a). In the RLA, Congress established separate procedures to resolve two different types of labor disputes in the transportation industry, commonly referred to as major and minor disputes. *Consol.*

*Rail Corp. v. Ry. Labor Execs.' Ass'n*, 491 U.S. 299, 302, 109 S. Ct. 2477, 105 L. Ed. 2d 250 (1989). A major dispute concerns the formation or amendment of a collective-bargaining agreement. *Id.*; *see also Sheet Metal Workers' Int'l Ass'n v. Burlington N. R. Co.*, 893 F.2d 199, 202 (8th Cir. 1990) ("Major disputes are . . . 'disputes over the formation of collective agreements or efforts to secure them' and 'arise where there is no such agreement or where it is sought to change the terms of one, and therefore the issue is not whether an existing agreement controls the controversy.'" (quoting *Elgin, J. & E. Ry. v. Burley*, 325 U.S. 711, 723, 65 S. Ct. 1282, 1290, 89 L. Ed. 1886 (1945))). The RLA's process for resolving a major dispute is detailed and extensive, including the giving of notice, 45 U.S.C. § 156, mediation by the NMB, 45 U.S.C. § 155, and investigations and reports regarding disputes, 45 U.S.C. § 160. "Until they have exhausted those procedures, the parties are obligated to maintain the status quo . . . ." *Consol. Rail Corp.*, 491 U.S. at 302, 109 S. Ct. at 2480, 105 L. Ed. 2d 250. Only once that process is complete may the company or the union alter the status quo by engaging in a work slowdown or stoppage. *Bhd. of R.R. Trainmen v. Jacksonville Terminal Co.*, 394 U.S. 369, 378, 89 S. Ct. 1109, 22 L. Ed. 2d 344 (1969) ("While the dispute is working its way through these stages [of the RLA], neither party may unilaterally alter the status quo."). Delaying the time at which labor or management may use economic self-help encourages compromise and prevents interruptions to commerce or carriers' operations. *Id.* If either side unilaterally alters the status quo during the bargaining and mediation process, a court may issue an injunction to put a stop to that party's illegal self-help and to restore the status quo, and it may do so even without the traditional showing of irreparable injury to the other party. *See Consol. Rail Corp.*, 491 U.S. at 303, 109 S. Ct. at 2480, 105 L. Ed. 2d 250 ("The district courts have subject-matter jurisdiction to enjoin a violation of the status quo pending completion of the required procedures, without the customary showing of irreparable injury.").

By contrast, a minor dispute involves a question about how to interpret an existing CBA, like the meaning of a term or whether the agreement permits a certain action. *Id.*; *accord Elgin, J. & E. Ry. Co.*, 325 U.S. at 723, 65 S. Ct. at 1290, 89 L. Ed. 1886. As long as the contested "action is arguably justified by the terms of the parties' collective-bargaining agreement," a court treats the dispute as minor. *Consol. Rail Corp.*, 491 U.S. at 307, 109 S. Ct. at 2483, 105 L. Ed. 2d 250; *Air Line Pilots Ass'n, Int'l v. E. Air Lines, Inc. (Eastern)*, 869 F.2d 1518, 1521 (D.C. Cir. 1989). The resolution process for a minor dispute is less involved, and there is no "general statutory obligation . . . to maintain the status quo" while that process is ongoing. *Consol. Rail Corp.*, 491 U.S. at 307, 109 S. Ct. at 2483, 105 L. Ed. 2d 250. So although "[c]ourts may enjoin strikes arising out of minor disputes" in limited circumstances, they generally may not enjoin other violations of the status quo. *Id.*

BMWED is demanding certain changes to Union Pacific's COVID-19 response. BMWED argues these changes are focused on health and safety concerns and because its "demand is strictly related to the current Covid-19 crisis" it falls outside the scope of the ongoing CBA negotiations. Filing 33 at 6. Union Pacific argues BMWED's demands are primarily economic in nature and therefore directly overlap with those made in its Section 6 notice. Filing 36 at 2. The Court concludes this dispute arises out of the negotiation of a new CBA and is therefore a major dispute under the RLA.

Since November 1, 2019, the parties have been engaged in bargaining to negotiate a new CBA. Filing 1 at 4. In its Section 6 notice, BMWED sought, among other items, a wage increase and cost of living adjustment, reduced out-of-pocket healthcare expenses, and enhanced paid leave compensation. Filing 22-2 at 3-4. BMWED's strike letter demands pay for employees absent from work for "any . . . Covid-19 related reason," access to COVID-19 testing and temperature checks,

16

mandatory paid quarantine for exposed employees, provision of PPE or pay for employees who lacked PPE, and mandatory social distancing. Filing 1-12 at 3-4. Additionally, BMWED's strike letter does not assert that any existing agreement with Union Pacific entitles it to the monetary relief, additional paid time off, or changes to COVID-19 protocols that it now seeks. *See* Filing 1-12. Rather, BMWED is aiming to establish entirely new rights that overlap with the rights it is currently seeking to negotiate in the new CBA relating to pay and leave time. *See* Filing 1-12 at 3-4. BMWED argues that because some of the measures relate to mask-wearing, social distancing, and the provision of PPE, its entire request falls outside the economic demands of the CBA bargaining process. Filing 33 at 7.

Evidence and argument at the preliminary injunction hearing illustrates that BMWED's requests center around pay and leave time, the same rights involved in the ongoing CBA negotiating process. For example, at the hearing on the preliminary injunction, BMWED's attorney conceded that BMWED is demanding payment from Union Pacific to stop the proposed strike, stating, "[W]e ought to have this payment to protect our people." This shows the economic component is of primary importance in this dispute. Merely adding claims regarding health measures does not remove BMWED's economic demands from the ambit of the CBA. Indeed, were that the case, BMWED could avoid the entire RLA process at any time simply by including one non-pay-related demand. Furthermore, BMWED's General Chairman, Tony Cardwell admitted that BMWED's December 17 letter represents excessive demands above and beyond what BMWED actually expects, thus conceding BMWED is engaging in classic bargaining behavior and further supporting that the threatened strike is part of the ongoing CBA negotiation. Accordingly, the Court concludes this "dispute[] [is] over the formation of [a] collective

agreement[]," *Sheet Metal Workers*, 893 F.2d at 202, rather than whether an existing agreement controls the controversy and is therefore a major dispute.

Section 2 First of the RLA, 45 U.S.C. § 152 First, imposes a duty on carriers and employees "to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes, whether arising out of the application of such agreements or otherwise, in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof." 45 U.S.C. § 152. The Supreme Court has ruled that § 2 First "was designed to be a legal obligation, enforceable by whatever appropriate means might be developed on a case-by-case basis." *Chicago & N. W. Ry. Co. v. United Transp. Union*, 402 U.S. 570, 577, 91 S. Ct. 1731, 1735, 29 L. Ed. 2d 187 (1971). Strike injunctions may issue to enforce the duty under § 2 First when that remedy is "the only practical, effective means of enforcing the duty." *Id.* at 583, 91 S. Ct. at 1738, 29 L. Ed. 2d 187.

Accordingly, because this is a major dispute, neither side can alter the status quo absent following the extended procedures provided for in the RLA. *Consol. Rail Corp*, 491 U.S. at 302, 109 S. Ct. at 2480, 105 L. Ed. 2d 250. There is no dispute that the parties are in the early stages of negotiating a new CBA per the RLA. Filing 1 at 4. BMWED has violated its legal obligation to follow the RLA process and honor its duty under 45 U.S.C.§ 152. Thus, BMWED's resort to self-help unlawfully alters the status quo and is prohibited by the RLA.

BMWED argues that if it has violated the RLA by threatening to strike in order to achieve enhanced pay and leave, then Union Pacific is equally guilty of acting outside the CBA by implementing a COVID-19 response to begin with. Filing 33 at 7. However, that is not the issue before the Court. BMWED did not file suit or otherwise challenge Union Pacific's actions as being outside the RLA process. If BMWED had challenged Union Pacific's actions, this could have

placed in jeopardy the additional benefits that Union Pacific offered due to the pandemic, including a $1,000 COVID-19 payment and paid quarantine time, which BMWED members have benefited from.[1] Even if the issue were properly raised, there is no evidence Union Pacific has acted to violate the status quo. While BMWED has threatened a strike if its demands are not met, Union Pacific has not undertaken or threatened any actions which would similarly disrupt the current relationship between the parties. Rather, Union Pacific has exercised its preexisting right under the CBA to hold employees out of service, in this case due to illness or exposure to COVID-19. This is not a new right or change to the status quo which would violate the RLA. Furthermore, the evidence shows that the current COVID-19 policies Union Pacific has in place have been the result of ongoing dialogue between BMWED and Union Pacific, not a unilateral action by Union Pacific to disrupt the status quo.

The Court also finds Union Pacific's requested injunctive relief is appropriate under the NLGA. BMWED has threatened a strike unless restrained, which is unlawful under the RLA. *See* 29 U.S.C. § 107(a). Union Pacific has shown it will suffer substantial and irreparable injury if a work stoppage occurs in the form of severe harm to its business and reputation. The harm to Union Pacific if its preliminary injunction motion is not granted would be greater than the harm to BMWED if it is granted. *See* 29 U.S.C. § 107(b) & (c). In particular, Union Pacific's Assistant Vice President of Financial Reporting and Analysis, Carrie J. Powers, averred that a work stoppage of Union Pacific's services would impact critical U.S. industries including the automotive market, grain transportation, and the shipment of coal for providing electricity to millions of homes and business. Filing 8-1 at 1-4. Powers also averred that a strike against Union Pacific would cause

---

[1] At oral argument, the attorneys for Union Pacific and BMWED agreed the COVID-19 compensation offered by Union Pacific and accepted by BMWED employees was not required to be paid by any collective-bargaining agreement.

severe and irreparable financial loss in the range of millions of dollars in lost revenue and business opportunities. Filing 8-1 at 5-6. In contrast, BMWED has no lawful interest in resorting to self-help under these circumstances. Lastly, the Court finds there is no adequate remedy at law given BMWED's threatened violation of the RLA and that there are no public officers charged with protecting Union Pacific's interest who can provide adequate protection. *See* 29 U.S.C. § 107(d) & (e). Accordingly, the issuance of a preliminary injunction is in accordance with both the RLA and the NLGA.

### C.  The Federal Railroad Safety Act

BMWED argues that the RLA does not apply and that the present dispute is governed exclusively by the FRSA, 49 U.S.C. § 20109. Filing 33 at 8-13. The FRSA provides a railroad carrier "may not discharge, demote, suspend, reprimand, or in any other way discriminate against an employee for . . . refusing to work when confronted by a hazardous safety or security condition related to the performance of the employee's duties" if certain prerequisite conditions exist. 49 U.S.C. § 20109(b)(1)(B). Those conditions include that the refusal is made in good faith; that a reasonable individual under the circumstances would conclude "the hazardous condition presents an imminent danger of death or serious injury" and "the urgency of the situation does not allow sufficient time to eliminate the danger without such refusal"; and the employee has notified the railroad carrier of the hazard. 49 U.S.C. § 20109(b)(2). BMWED argues this statute protects its proposed strike because COVID-19 presents a hazardous condition which Union Pacific has failed to adequately address. Filing 18 at 27-33. It further argues the FRSA protects the situation of a threatened mass labor strike like that in the present case. Filing 33 at 8-9.

First, the Court does not agree that this statute protects labor strikes as BMWED proposes. The statutory language is clear that the FRSA is an anti-retaliation statute applicable when

employees are unable to work due to hazards on the job. *See* 49 U.S.C. § 20109(b)(1)(B) (stating the statute prohibits "discriminat[ing] against an employee"). Its protections do not mention labor unions or mass labor strikes. BMWED points to a handful of cases in which courts have implied the FRSA may indeed protect labor strikes. Filing 18 at 34. These cases are either non-binding in this circuit or make such allusions in dicta, and the Court finds them unpersuasive in light of the plain statutory language.

However, even if the FRSA were to apply to threatened labor stoppages like the one at hand, the Court does not find the statutory requirements would be satisfied. First, the COVID-19 pandemic does not present a "hazardous safety or security condition related to the performance of the employee's duties." 49 U.S.C. § 20109(b)(2). The pandemic is not a *work-specific* safety concern for the BMWED employees under the FRSA; that is, it is not a hazardous condition "*related* to the performance" of BMWED employees' duties. 49 U.S.C. § 20109(b)(2) (emphasis added). Instead, the pandemic is, unfortunately, a worldwide and widespread problem confronting not just the BMWED employees, but individuals of all walks of life. Thus, it does not constitute a condition "related to the performance of the employee's duties" for purposes of the FRSA. *See, e.g.*, *Stokes v. Se. Pennsylvania Transportation Auth.*, 657 F. App'x 79, 82 (3d Cir. 2016) (finding the FRSA did not apply where "the safety risk that Stokes identified was unconnected to railroad safety, and thus her refusal to appear due to a non-work-related risk to her was not covered by the FRSA."); *Ziparo v. CSX Transportation, Inc.*, 443 F. Supp. 3d 276, 297 (N.D.N.Y. 2020) ("'Hazardous safety or security conditions' have generally been found to be physical conditions that are within the control of the rail carrier employer; circumstances outside of the carrier's control and non-work related conditions are not included.").

BMWED cites *Kurec v. CSX Transportation, Inc.*, No. 518CV0670LEKTWD, 2020 WL 6484056 (N.D.N.Y. Nov. 4, 2020) for the proposition that the FRSA's plain language does not require the hazardous safety or security condition to be under the railroad's control. *See* Filing 33 at 10-11. In *Kurec*, the railroad employee, an engineer, refused to report to work when he was intoxicated. 2020 WL 6484056, at *6. Thus, his altered state was one "related to the performance" of his job. In contrast, COVID-19 has no unique impact on BMWED employees' job performance and thus is neither under Union Pacific's control nor "related to the performance of the employee's duties." 49 U.S.C. § 20109(b)(2). Furthermore, the *Kurec* court cited the *Stokes* decision favorably for the proposition that a claim under subsection (b)(1)(B) "requires the hazardous condition to be 'related to the performance of the employee's duties.'" *Kurec*, 2020 WL at 12, n.15 (quoting 49 U.S.C. §§ 20109(b)(1)(B)).[2]

Secondly, a reasonable individual under the circumstances would not conclude that there is "an imminent danger of death or serious injury" presented by the current situation. 49 U.S.C. § 20109(b)(2). First, Union Pacific has implemented certain safety measures for the protection of its workers starting in the early days of the pandemic in March 2020. These measures included complying with CDC guidance, Filing 1-8, voluntarily providing fourteen days' paid leave for those employees directed to quarantine for a work-related exposure, instituting policies requiring

---

[2] The *Kurec* court also noted the distinction between subsection (b)(1)(B) "tying the condition to the workplace" and subsection (b)(1)(A) containing no such language. *Kurec*, 2020 WL at 12, n.15. Subsection (b)(1)(A) protects an employee who reports a hazardous work condition whereas subsection (b)(1)(B) applies when an employee refuses to work in light of a hazardous safety condition "related to the performance of the employees duties." 49 U.S.C. § 20109(b)(2). The present threatened strike would therefore invoke 49 U.S.C. § 20109(b)(1)(B) rather than subsection (b)(1)(A), thus requiring the nexus to job performance. However, many courts have held that even the lesser standard in (b)(1)(A) requires work-specific, work-related conditions. *See Lockhart v. Long Island R.R. Co.*, 266 F. Supp. 3d 659, 663 (S.D.N.Y. 2017), *aff'd sub nom. Lockhart v. MTA Long Island R.R.*, 949 F.3d 75 (2d Cir. 2020) ("Indeed, courts have uniformly held that subsections (b)(1)(A) and (c)(2) of the statute are limited to 'work-related' conditions and injuries.") (citing *Stokes*, 657 Fed. Appx. at 82; *Port Auth. Trans–Hudson Corp. v. Sec'y, U.S. Dep't of Labor*, 776 F.3d 157, 163–68 (3d Cir. 2015); *Murdock v. CSX Transp., Inc.*, No. 3:15-CV-1242, 2017 WL 1165995, at *4 (N.D. Ohio Mar. 29, 2017); *Miller v. BNSF Ry. Co.*, No. 14-CV-2596, 2016 WL 2866152, at *14–15 (D. Kan. May, 17, 2016); *Goad v. BNSF Ry. Co.*, No. 15-CV-0650, 2016 WL 7131597, at *2–4 (W.D. Mo. March 2, 2016)). There is thus little dispute that a connection between the alleged hazard and job performance is required under the FRSA.

social distancing and face coverings, regular cleaning of equipment, and providing hand sanitizer and wipes to employees, Filing 1 at 6; Filing 22-6 at 2-4; Filing 22-7; Filing 22-8; Filing 22-9; Filing 22-10; Filing 22-11. The evidence also shows the parties have been in regular communication regarding evolving COVID-19 protocols since March 2020. *See* Filing 1-1; Filing 1-2; Filing 1-3; Filing 1-4; Filing 1-5; Filing 1-7; Filing 1-8; Filing 1-9; Filing 1-10; Filing 1-11; Filing 1-12. BMWED claims Union Pacific's response has been inadequate and that the recent increase in COVID-19 cases combined with the mutation of the virus into a more transmissible strain make the safety concern urgent. *See* Filing 1-12 at 1-2; Filing 33 at 11-12. In light of Union Pacific's already-implemented safety measures, on-going dialogue between the parties, and continually-evolving safety procedures, the Court finds there is no "imminent danger of death or serious injury" as defined by 49 U.S.C. § 20109(b)(2).

Lastly, Union Pacific's COVID-19 response itself does not constitute a "hazardous safety or security condition" as BMWED argues. While BMWED takes issue with certain aspects of Union Pacific's COVID-19 protocol, it does not dispute that Union Pacific has, in fact, implemented numerous safety measures, including some requested by BMWED. *See* Filing 18 at 10-16. Furthermore, witnesses testified that Union Pacific has continued to improve its response to the pandemic, including securing higher-quality masks, locating hand sanitizer when it was in short supply, and updating social-distancing requirements as CDC guidance has evolved. BMWED seeks additional safety precautions that are either of marginal benefit because of the measures already in place or, as in the case of on-site COVID-19 testing, unworkable. Furthermore, as set forth above, BMWED's primary demands are related to pay and leave time, not measures relating to safety and health. The differences illustrated by the evidence presented over the level of

23

protections needed and the semantics of implementing protections and paying workers during an unprecedented health situation do not rise to the level of "hazardous" contemplated by the FRSA.[3]

Accordingly, the Court finds the FRSA does not apply to the dispute at hand. Rather, the RLA governs and, as set forth above, supports the issuance of the requested injunctive relief.[4]

### D. *Dataphase* Factors

In deciding a motion for injunctive relief, the court generally considers "(1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981). The same factors apply in determining whether to issue a preliminary injunction. *Baker Elec. Co-op., Inc. v. Chaske*, 28 F.3d 1466, 1472 (8th Cir. 1994). The burden of establishing the propriety of issuing a preliminary injunction is on the movant. *Id.* "No single factor is determinative." *WWP, Inc. v. Wounded Warriors, Inc.*, 566 F. Supp. 2d 970, 974 (D. Neb. 2008).

That said, it is not entirely clear to what extent those factors apply when a railroad seeks to enjoin a union from exercising self-help over a minor dispute under the RLA. *See Air Line Pilots Ass'n, Int'l v. Guilford Transp. Indus.*, 399 F.3d 89, 95-96 and n.3 (1st Cir. 2005) (applying the same factors enumerated in *Dataphase* when analyzing a motion for preliminary injunction alleging violations of the RLA); *Nat'l Ry. Labor Conference v. Int'l Ass'n of Machinists &*

---

[3] BMWED argues that the Court should defer the matter to the Occupational Safety and Health Administration to determine whether the FRSA is satisfied. Filing 33 at 12. As set forth above, the Court finds the FRSA does not apply to the present dispute and the RLA governs. Thus, no referral to OSHA for findings under the FRSA is warranted.

[4] BMWED asks the Court to impose reciprocal restrictions on Union Pacific should it find a preliminary injunction should be issued. Filing 33 at 13. In particular, BMWED asks the Court to order Union Pacific to comply "with its own Covid-19 policies and protocols." Filing 33 at 13. At the preliminary injunction hearing, BMWED presented evidence of a limited number of workers experiencing erroneous denials of payment, being unable to access masks and hand sanitizer for a two-day period, and one incident of a transportation bus being overly crowded. These discrete instances represent the difficulties of navigating new policies in an unprecedented global pandemic, not a willful, coordinated effort by Union Pacific to circumvent its own safety policies. The Court does not find it necessary to include a provision requiring Union Pacific to undertake specific actions it is already attempting to execute.

*Aerospace Workers*, 830 F.2d 741, 750 n.7 (7th Cir. 1987) (noting the district court was obligated "to apply the traditional standards necessary for determining whether or not to issue a preliminary injunction, as well as to heed the particular concerns presented by the requirements of the Railway Labor Act"); *Pilots Representation Org. v. Airline Pilots Ass'n., Int'l*, No. CIV. NO. 07-3580DSD, 2007 WL 2480349, at *4 (D. Minn. Aug. 24, 2007) (stating the *Dataphase* factor of irreparable harm would apply in cases for injunctive relief governed by the NLGA); *Boys Markets, Inc. v. Retail Clerks Union, Local 770*, 398 U.S. 235, 254–55, 90 S. Ct. 1583, 1594, 26 L. Ed. 2d 199 (1970) (holding where parties' contractual obligation to arbitrate labor disputes is at issue in considering an injunction, a district court must first find the parties are contractually bound to arbitrate and then apply tradition standards for injunctive relief); *Bhd. of Locomotive Engineers v. Missouri-Kansas-Texas R. Co.*, 363 U.S. 528, 531, 80 S. Ct. 1326, 1328–29, 4 L. Ed. 2d 1379 (1960) (noting in the RLA/NLGA context that the court may attach conditions to injunctive relief under traditional equitable principles). The Court need not resolve that question, however, because it finds that the *Dataphase* factors also weigh in favor of injunctive relief and thus would not change the above calculus.

First, Union Pacific has shown it is likely to prevail on the merits of its Complaint. "In deciding whether to grant a preliminary injunction, likelihood of success on the merits is most significant." *S.J.W. ex rel. Wilson v. Lee's Summit R-7 Sch. Dist.*, 696 F.3d 771, 776 (8th Cir. 2012) (internal quotation marks omitted) (quoting *Minn. Ass'n of Nurse Anesthetists v. Unity Hosp.*, 59 F.3d 80, 83 (8th Cir. 1995)). A movant need not prove it is more likely than not to prevail, but "need only show a reasonable probability of success, that is, a 'fair chance of prevailing'" on the merits. *Kroupa v. Nielsen*, 731 F.3d 813, 818 (8th Cir. 2013) (quoting *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 732 (8th Cir. 2008) (en banc)).

In its Complaint, Union Pacific seeks injunctive and declaratory relief. *See* Filing 1 at 16-17. It sets forth three counts: Unlawful exercise of self-help under the RLA; breach of BMWED's duty to exercise reasonable efforts to make and maintain agreements under Section 2 First, 45 U.S.C. § 152; and declaratory relief that the FRSA does not protect BMWED's threatened strike. Filing 1 at 12-15. As set forth in greater detail above, the evidence at this stage supports that the RLA governs this dispute, that BMWED's proposed strike constitutes unlawful self-help and violates its duty under 45 U.S.C. § 152, and that the FRSA does not protect BMWED's proposed conduct. Accordingly, the Court finds Union Pacific has shown a likelihood of success on the merits of its claims for injunctive relief and declaratory judgment.

Second, the movant must "demonstrate that irreparable [harm] is *likely* in the absence of an injunction." *Sierra Club v. U.S. Army Corps of Eng'rs*, 645 F.3d 978, 992 (8th Cir. 2011) (emphasis in original) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22, 192 S. Ct. 365, 172 L. Ed. 2d 249 (2008). "[I]rreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Grasso Enters., LLC v. Express Scripts, Inc.*, 809 F.3d 1033, 1040 (8th Cir. 2016) (quoting *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009)). "Loss of intangible assets such as reputation and goodwill can constitute irreparable injury." *United Healthcare Ins. Co. v. AdvancePCS*, 316 F.3d 737, 741 (8th Cir. 2002) (citing *Gen. Mills, Inc. v. Kellogg Co.*, 824 F.2d 622, 625 (8th Cir. 1987)).

Here, Union Pacific has presented concrete evidence that it is likely to suffer harm in the absence of an injunction. As set forth above, Powers's declaration and testimony substantiates that a work stoppage of Union Pacific's services would impact critical U.S. industries and cause severe

and irreparable financial loss in the range of millions of dollars in lost revenue and business opportunities. Filing 8-1 at 1-6.

Third, the court must assess whether the "balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Dataphase*, 640 F.2d at 113. To determine the harms that must be weighed, the Eighth Circuit has looked at the threat to each of the parties' rights that would result from granting or denying the injunction. *Baker Elec.*, 28 F.3d at 1473. A Court also must consider the potential economic harm to each of the parties and to interested third parties. *Id.*

As discussed above, the purpose of the RLA and of the requested injunctive relief is to protect the status quo while CBA negotiations are ongoing. The risk of harm to Union Pacific in allowing an unlawful strike outweighs the harm to BMWED in not allowing it to pursue self-help in order to gain the additional COVID-19 accommodations it seeks.

Lastly, the Court concludes that the public interest favors issuance of a preliminary injunction as well. As previously stated, the threatened strike could have severe repercussions for numerous individuals and industries which rely on railroad transportation. Thus, the public interest favors maintaining the status quo and avoiding major disruption to the nation's rail lines.

### E. Bond

The NLGA requires the party granted a preliminary injunction order to post a bond:

No temporary restraining order or temporary injunction shall be issued except on condition that complainant shall first file an undertaking with adequate security in an amount to be fixed by the court sufficient to recompense those enjoined for any loss, expense, or damage caused by the improvident or erroneous issuance of such order or injunction, including all reasonable costs (together with a reasonable attorney's fee) and expense of defense against the order or against the granting of any injunctive relief sought in the same proceeding and subsequently denied by the court.

29 U.S.C. § 107(e).

At the hearing on the motion for temporary restraining order, the Court heard argument on the amount of the bond to be posted. Union Pacific argued a bond of $500 or $1,000 would be sufficient. BMWED did not advocate for any specific higher amount. Having determined the issuance of a preliminary injunction in Union Pacific's favor is warranted, and given BMWED did not present evidence or make argument seeking a higher bond amount under the present circumstances, the Court concludes a bond in the amount of $1,000 remains adequate to satisfy the purposes of Section 107(e), and thus the $1,000 bond Union Pacific previously posted is continued.

### III. CONCLUSION

The Court concludes Union Pacific's request for a Preliminary Injunction should be granted. Accordingly,

IT IS ORDERED:

1. Plaintiff's Motion for Preliminary Injunction (Filing 6) is granted as follows:

2. Defendant and its officers, members, agents, successors, deputies, servants, and employees, and all persons acting by, with, through or under Defendant or by and through Defendant's orders, directions or requests, and all others acting in concert or participation with Defendant are enjoined and restrained from, in any manner or by any means

   a. directing, calling, causing, approving, authorizing, instigating, conducting, threatening, continuing, encouraging, inducing or engaging in any strike, self-help, sickout, concerted refusal to bid on advertised assignments, absenting themselves from work, slowdown, work stoppage, refusal to work, job action, picketing, or refusal to cross a picket line at or outside of

28

the premises of or against Union Pacific, and any and all acts of any kind whatsoever, in furtherance or support thereof;

b.  interfering in any manner with any person employed by Union Pacific while that person is performing his or her work and duties for the carrier;

c.  seeking to resolve their major dispute with Union Pacific by any means (including picketing, patrolling or economic pressure of any kind against Union Pacific or any of its corporate affiliates or any person doing business with them, or any of them) other than by pursuing the collective bargaining and mediation procedures contained in the Railway Labor Act;

d.  otherwise interfering with the normal business operations of Union Pacific.

3.  Defendants are directed to notify all officers and employees under their jurisdiction of this Preliminary Injunction; take all steps within their power to halt any strike, self-help, sickout, concerted refusal to bid on advertised assignments, slowdown, work stoppage, refusal to work, job action, picketing, and refusal to cross a picket line and to prevent such actions from occurring or continuing if commenced against Union Pacific; and take all steps necessary to encourage and ensure compliance with the terms of this Order;

4.  Pursuant to 29 U.S.C. § 107(e), NECivR 65.1.1, and the provisions of this Order, the Court continues the $1,000 bond previously posted by Plaintiff, Union Pacific Railroad Company; and

5.  This preliminary injunction will remain in effect for the pendency of the present case unless rescinded or otherwise modified by the Court.

29

DATED this 7th day of January, 2021.

BY THE COURT:

_____

Brian C. Buescher
United States District Judge